# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT L. GARBER and SAGINAW POLICE & FIRE PENSION BOARD, Derivatively on Behalf of LEHMAN BROTHERS HOLDINGS, INC., | Civil Action No. 07-CV-2990 (DAB) |
| Plaintiffs, | |
| v. | **VERIFIED DERIVATIVE COMPLAINT IN INTERVENTION FOR BREACH OF FIDUCIARY DUTY, UNJUST ENRICHMENT, RESCISSION, GROSS MISMANAGEMENT, AND THE MISAPPROPRIATION AND WASTE OF CORPORATE ASSETS** |
| RICHARD S. FULD, JR.; MICHAEL L. AINSLIE; JOHN F. AKERS; ROGER S. BERLIND; THOMAS H. CRUIKSHANK; MARSHA JOHNSON EVANS; SIR CHRISTOPHER GENT; JOHN L. CECIL; ROLAND A. HERNANDEZ; JOHN D. MACOMBER; DINA MERRILL; JONATHAN BEYMAN; DAVID GOLDFARB; JOSEPH M. GREGORY; CHRISTOPHER O'MEARA; THOMAS A. RUSSO; BRADLEY H. JACK; HENRY KAUFMAN; STEPHEN M. LESSING; MICHAEL F. MCKEEVER; JEFFREY VANDERBEEK, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| LEHMAN BROTHERS HOLDINGS, INC., | |
| Nominal Defendant. | |

Plaintiffs, by and through their attorneys, derivatively on behalf of Lehman Brothers Holdings, Inc. ("Lehman" or the "Company"), allege as follows, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through their attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Lehman, and the performance of statistical studies of the dates and amounts of stock option payments made to Lehman executives:

## NATURE OF THE ACTION

1.     This is a shareholders' derivative suit brought by Plaintiffs Robert L. Garber and Saginaw Police & Fire Pension Board on behalf of Nominal Defendant Lehman and all Lehman shareholders (collectively, "Plaintiffs") against: Richard S. Fuld, Jr. ("Fuld"), Michael L. Ainslie ("Ainslie"), John F. Akers ("Akers"), Roger S. Berlind ("Berlind"), Thomas H. Cruikshank ("Cruikshank"), Marsha Johnson Evans ("Evans"), Sir Christopher Gent ("Gent"), Roland A. Hernandez ("Hernandez"), John D. Macomber ("Macomber"), Jeremy Isaacs ("Isaacs"), Bradley H. Jack ("Jack"), Henry Kaufman ("Kaufman"), Stephen M. Lessing ("Lessing"), Michael F. McKeever ("McKeever"), Dina Merrill ("Merrill"), Jeffrey Vanderbeek ("Vanderbeek"), Jonathan Beyman ("Beyman"), John L. Cecil ("Cecil"), David Goldfarb ("Goldfarb"), Joseph M. Gregory ("Gregory"), Christopher O'Meara ("O'Meara"), Thomas A. Russo ("Russo") (collectively, "Defendants"), by Plaintiff, a stockholder of Lehman.

2.     Plaintiffs bring claims to declare that stock options issued in violation of Lehman's stock plan are void, and to set them aside, to recover wrongfully issued stock and stock proceeds, and to obtain damages for breach of fiduciary duty, misappropriation of corporate assets, unjust enrichment, gross mismanagement, and corporate waste. These claims arise from the actions of Individual Defendants (described below) in engaging in, or permitting others to engage in the wrongful and deceptive practice of intentionally manipulating Lehman's stock option grant dates between 1998 and 2001

(the "Grant Period"), in order to secure a huge financial windfall for themselves and others at the expense of Lehman.  For the Grant Period, and through the present (the "Relevant Period"), as options vested, Defendants also misstated Lehman's financial results by failing to properly report its true compensation expense and tax liabilities attributable to the backdated stock option grants.

3.    Specifically, Company executives including Defendant Fuld, the Company's Chairman and Chief Executive Officer ("CEO"), Defendant Beyman, Chief of Operations and Technology and Executive Vice-President, Defendant Goldfarb, the Company's Chief Administrative Officer ("CAO") and Executive Vice President, Defendant Gregory, the Company's President and Chief Operating Officer ("COO") and former CAO, Defendant O'Meara, the Company's Chief Financial Officer ("CFO"), Executive Vice-President and Global Controller and Defendant Russo, Executive Vice-President and Chief Legal Officer ("CLO"), have engineered, authorized or permitted the award of Lehman stock options with exercise prices below the fair market value of Lehman's stock in violation of Lehman's stock option plans and have engaged in certain transactions, including the exercise of backdated options, to reap hundreds of millions of dollars in unlawful windfall profits at the expense of the Company.  These key executives caused the stock option grants to be backdated in order to have the stock options issued at an exercise or "strike" price below the closing price of the shares at the true time of the grant, thus pocketing more compensation than they otherwise were entitled to receive. As described by Professor James Cox of Duke University School of Law, backdating grants is "a very sorry practice" – "[i]t's like letting the CEOs bet on a race when they know who the winner will be."  This practice also exposed Lehman to additional liability for federal income taxes, government investigations and prosecutions, as well as shareholder actions and liability based upon Lehman's issuance and publication of false financial statements and false tax returns.

4.    A stock option granted to an employee or director of Lehman allows the employee or director to purchase Company common stock at a specified price – referred

to as the "exercise price" – for a specified period of time.  Under Lehman's Management Ownership Plan and Employee Incentive Plan, (collectively, "Stock Plans") stock options were granted as part of an executive's or other employee's compensation package to create incentives for him or her to boost profitability and, hence, stock value. When an executive or other employee exercised an option, he or she purchased the stock from the Company at the exercise price, regardless of the stock's price at the time the option was ultimately exercised.   Under Lehman's Stock Plans, the Compensation and Benefits Committee of Lehman's Board of Directors (the "Compensation Committee") was required to establish option (or "exercise") prices which were at least 100% of the Fair Market Value (*i.e.* the stock's closing price on the NYSE and other exchanges) of the stock on the true date of the stock option grant.

5.      When an option is backdated to a day on which a market price is lower than the price on the day the option is granted, the executive or other employee pays less and the Company gets less money for the stock when the option is ultimately exercised. There are also serious federal tax consequences and different financial reporting requirements when a company issues stock options to employees at prices below fair market value.   Because of these consequences, Lehman's Stock Plans expressly prohibited the issuance of stock options below their fair market value, so that Defendants' authorization of the grant of the stock options was *ultra vires,* illegal and should be declared void and of no effect.   The wrongful pricing of the stock options resulted in excessive compensation to Lehman's executives and directors, including the Individual Defendants, increased Lehman's federal tax liabilities by causing the options to be treated as non-deductible compensation under §162(m) of the Internal Revenue Code ("IRC"), resulted in Lehman's issuance of misstated financial statements, and exposed Lehman to federal prosecution, government investigations, penalties and suits for violation of the securities laws for filing misstated financial statements.

6.      Here, the unlawful stock option grants occurred between 1998 and 2001 while certain Director Defendants were directing the Company.   These Director

Defendants received their own backdated stock options which improperly increased their compensation. Because many of the stock options vested over a 4 ½ year period, under Generally Accepted Accounting Principles ("GAAP"), and particularly No. 25 APB, the wrongful grants affected Lehman's financial reporting and public reports (which the Directors signed) through at least 2005. Thus, all the current Director Defendants shared in the responsibility for Lehman's false financial reporting. By this misconduct the Director Defendants breached their fiduciary duties to the Company, thus causing or allowing the Company to suffer hundreds of millions of dollars in harm. Many of the Director Defendants also engaged in self-dealing, misappropriated corporate assets and were unjustly enriched by their misconduct.

7.    This action seeks redress for Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith, candor, due care, and their knowing, reckless and/or gross negligence in, *inter alia*: (i) failing to discover and/or prevent the improper manipulation of employee stock options and the grant of the stock options at prices below that authorized by Lehman's Stock Plans; (ii) failing to discover and/or prevent the public misreporting of earnings caused by the manipulation of employee stock options, including its effect on stock option expenses and tax liabilities; (iii) failing to properly implement, oversee and maintain appropriate and adequate accounting and internal controls, practices and procedures, namely concerning the administration of the Company's stock-based compensation plan; (iv) failing to ensure that Lehman's financial statements were prepared in accordance with GAAP; (v) failing to ensure that Lehman operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; and (vi) failing to ensure that Lehman did not engage in any unsafe, unsound, or illegal business practices. This suit also seeks to remedy the *ultra vires* acts by which the stock options were issued in violation of the Stock Plans and to recover misappropriated assets on behalf of the Company.

8.     The practice of backdating stock options, though widespread, remained virtually undetected until academic research revealed patterns of stock option grants that could not be explained by chance.  Professor Eric Lie of the Tippie College of Business at the University of Iowa hypothesized that at least some grant dates must have been determined retroactively, prompting the SEC to begin investigating the anomaly.   In March 2006, The Wall Street Journal published a study it performed with the help of Professor Lie and Professor John Emerson, a statistician at Yale University that tested Professor Lie's theory.  Charles Forelle and James Bandler, *The Perfect Payday*, The Wall Street Journal, March 18, 2006.  That article identified a number of companies at which executives had achieved stock paydays the likelihood of which far exceeded that of winning the lottery.  Since that date, more than 100 corporations have been the target of investigations by the SEC, the Department of Justice, or one or more United States Attorneys, or have conducted internal investigations that resulted in a restatement of earnings.

9.     Statistical analyses of Lehman's stock option grants indicate that the same type of statistical anomaly has occurred at Lehman.  Using 15 days before to 15 days after the grant date as the benchmark period, the odds that Lehman's stock option grant dates pattern would have occurred by chance are more than 800 million to one.  See Exhibit A incorporated herein by reference.

10.     Defendants' malfeasance has caused, and will continue to cause Lehman great harm, by (i) indelibly damaging its reputation and loss of goodwill in general, (ii) expending considerable financial cost in having to review and restate previously issued financial statements; (iii) exposing the Company to potential criminal and civil liability, including potential suits for violations of the securities laws; (iv) denying the Company payment for common stock to which it was entitled; and (v) exposing the Company to potential additional federal tax liability, interest and penalties imposed by the Internal Revenue Service for the mis-reporting of employee compensation deductions, and for the failure to pay withholding taxes as a consequence of the backdating of options provided

to Lehman employees, including executive officers and directors.

### III.    THE PARTIES

#### A.    Plaintiff

11.    Plaintiffs are holders of Lehman common stock, have standing to assert these claims on behalf of Lehman and will fairly and adequately protect the interests of Lehman and its other stockholders.

#### B.    Nominal Defendant

12.    Nominal Defendant Lehman is incorporated in New York and during the Relevant Period has maintained its executive offices at 745 Seventh Avenue, New York, NY 10019.   Lehman provides financial services to corporations, governments and municipalities, and institutional customers worldwide. It offers an array of equities and fixed income sales, trading, and research; investment banking services; and investment management and advisory services. The Company operates through three segments: Investment Banking, Capital Markets, and Investment Management. The Investment Banking segment provides advice on mergers, acquisitions, and other financial matters. It also raises capital for clients by underwriting public and private offerings of debt and equity securities. The Capital Markets segment represents institutional customer flow activities, including prime brokerage, research, and secondary-trading, and financing activities in fixed income and equity products. Its equity and fixed income products include U.S., European, and Asian equities; government and agency securities; money market products; corporate high grade securities; high yield and emerging market securities; mortgage- and asset-backed securities; preferred stock; municipal securities; bank loans; foreign exchange; and financing and derivative products. This segment also invests in real estate and private equity. The Investment Management segment consists of private investment management, which provides investment, wealth advisory, and capital markets execution services; and asset management that offers asset management products across traditional and alternative asset classes through various distribution channels. The Company operates in North America, Europe, the Middle East, Latin America, and the

Asia Pacific region. Lehman was founded in 1850 and is headquartered in New York City. Lehman common stock trades on the New York Stock Exchange ("NYSE") and Pacific Stock Exchange under the symbol "LEH."

**C.    Officer Defendants**

13.    The following parties, sometimes referred to herein as the "Officer Defendants," during the Relevant Period, served as Officers of the Company as follows:

14.    Defendant Fuld is Chairman of the Board and has served as the CEO since 1993 and as a Director since 1990. He has been a member of the Executive Committee of the Board since 1993. Fuld previously served as Chairman of the Nominating Committee, and in 1998, he was a member of the Corporate Management Committee.

15.    Upon information and belief, Defendant Fuld is a resident of Greenwich, Connecticut.

16.    Since 1998, Fuld has received the following stock grants allegedly granted on the following dates: on December 3, 2001, an option to purchase 400,000 at $63.40 per share; on September 20, 2001, an option to purchase 145,482.4 at $46.64 per share; on December 1, 2000, an option to purchase 450,000 at $51.125 per share; on February 18, 2000, an option to purchase 80,000 at $63.25 per share; and on December 14, 1998, an option to purchase 350,000 shares at $40.875 per share. Statistically, at least some of these awards were part of a pattern that was so advantageous to Fuld and Lehman's other executives that they cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

17.    Defendant Joseph M. Gregory served as the Company's CAO from 1998 to 2000, has been President and COO of Lehman since 2004 and is a member of the Company's Executive Committee. From 2002 until 2004, Gregory was the Company's Co-COO. From 2000 until 2002, he was the Company's CAO, and from 1996 to 2000, he was head of the Company's Global Equities Division, in charge of the overall equities business. He joined Lehman in 1974.

18.    Upon information and belief, Defendant Gregory is a resident of

Huntington, New York.

19.     Since 1998, Gregory has received the following stock grants allegedly granted on the following dates: on December 3, 2001, an option to purchase 468,032.68 at $63.40 per share; on September 20, 2001, an option to purchase 84,226.7 at $46.64 per share; on December 1, 2000, an option to purchase 350,001 at $51.12 per share; on November 30, 2000, an option to purchase 158,547 at $49.56 per share; on February 18, 2000, an option to purchase 600,000 at $63.25 per share; and on December 14, 1998 an option to purchase 300,000 at $40.87 per share.  Statistically, at least some of these awards were part of a pattern that was so advantageous to Gregory and Lehman's other executives that they cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

20.     Defendant Jeremy M. Isaacs is CEO for Lehman Brothers Europe & Asia and a member of the Company's Executive Committee.  Isaacs joined the Company in 1996, as Co-COO of European Equities and later that year became head of Global Equity Derivatives.   In 1997, he was appointed head of European Equities and retained responsibility for the global equity derivatives business.  In March 1999, he became COO, Europe, and, in December 1999, was appointed CEO, Europe.  In April 2000, he was additionally named head of the Lehman's Asian operations, and has held the role of CEO, Europe & Asia since then.

21.     Since 1998, Isaacs has received the following stock grants allegedly granted on the following dates: on December 3, 2001, an option to purchase 884,016.3 at $63.400 per share; on September 20, 2001, an option to purchase 54,747.6 at $46.64 per share; on December 1, 2000, an option to purchase 350,661 at $51.12 per share; and on November 30, 2000, an option to purchase 158,547 at $49.56 per share.   Statistically, at least some of these awards were part of a pattern that was so advantageous to Isaacs and Lehman's other executives that they cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

22.     Defendant Thomas A. Russo is an Executive Vice President and the Chief

Legal Officer of Lehman. Russo is a Vice Chairman of Lehman and is a member of and serves as Counsel to Lehman's Executive Committee. He is responsible for the Company's Corporate Advisory Division, which includes Legal, Compliance, Corporate Audit, Government Relations and Transaction Management.

23. Upon information and belief, Defendant Russo is a resident of New York, New York.

24. Since joining the Company in 1984, Defendant Jeffrey Vanderbeek, a former member of the Executive Committee, served in a number of senior management positions, including Managing Director and COO of Fixed Income Central Funding Department, Head of the Company's Global Fixed Income Division and Head of the Company's Capital Market's Division and Head of Global Risk Management.

25. Upon information and belief, Defendant Vanderbeek is a resident of Warren, New Jersey.

26. Since 1998, Vanderbeek has received the following stock grants allegedly granted on the following dates: on December 3, 2001, an option to purchase 384,016.3 at $63.400 per share; on December 1, 2000, an option to purchase 35,001 at $51.12 per share; on November 30, 2000, an option to purchase 158,547 at $49.56 per share; on February 18, 2000, an option to purchase 600,000 at $63.25 per share; and on December 14, 1998, an option to purchase 300,00 at $40.87 per share. Statistically, at least some of these awards were part of a pattern that was so advantageous to Vanderbeek and Lehman's other executives that they cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

27. Defendant Stephen M. Lessing is head of Client Relationship Management at Lehman, a position he has held since 2002 and is a member of Lehman's Executive Committee. Lessing joined the Company in 1980 as an associate in the Fixed Income Division. In his 26 years with Lehman, he has held a number of senior management positions, including head of Global Fixed Income Sales and Research, head of Global Equity Sales and Research, co-head of Global Capital Markets and head of Private Client

Services. In his current role, Defendant Lessing is responsible for senior client relationship management across all of the Firm's businesses.

28. Upon information and belief, Defendant Lessing is a resident of Cold Spring Harbor, New York.

29. In 1998, Lessing received the following stock grant allegedly granted on the following date: on December 14, 1998, an option to purchase 300,000 at $40.87 per share. Statistically, this award was part of a pattern that was so advantageous to Lessing and Lehman's other executives that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

30. Defendant Bradley H. Jack joined the Company in 1984 and has held a number of senior management positions, including as the Company's Co-COO, and as a member of the Company's Executive Committee.

31. Upon information and belief, Defendant Jack is a resident of Fairfield, Connecticut.

32. Since 1998, Jack has received the following stock grants allegedly granted on the following dates: on December 3, 2001, an option to purchase 384,016.34 at $63.400 per share; on September 20, 2001, an option to purchase 84,226.6 at $46.64 per share; on December 1, 2000, an option to purchase 350,001 at $51.12 per share; on September 20, 2000, an option to purchase 158,547 at $49.56 per share; on February 18, 2000, an option to purchase 600,000 at $63.25 per share; on December 1, 1999, an option to purchase 100,000 at $76.87 per share; and on December 14, 1998 an option to purchase 300,000 at $40.87 per share. Statistically, at least some of these awards were part of a pattern that was so advantageous to Jack and Lehman's other executives that they cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

33. Defendant David Goldfarb is global head of Strategic Partnerships, Principal Investing and Risk for Lehman and a member of the Company's Executive Committee. Goldfarb is also chairman of the Company's Pension Trustee Committee. He

was named global head of Strategic Partnerships, Principal Investing and Risk in October 2006. Previously, Goldfarb was CAO of Lehman for two years and, prior to that, served as CFO from 2000 to December 2004. Additionally, he served as global controller from 1995 to 2000. Goldfarb joined Lehman Brothers in 1993.

34.    Upon information and belief, Defendant Goldfarb is a resident of Woodbury, New York.

35.    Since 1998, Goldfarb has received the following stock grants allegedly granted on the following dates: on December 3, 2001, an option to purchase 129,766.34 at $63.400 per share; on September 20, 2001, an option to purchase 90,313.94 at $46.64 per share; on December 1, 2000, an option to purchase 150,000 at $51.12 per share; and on November 30, 2000, an option to purchase 28,827 at $49.56 per share. Statistically, at least some of these awards were part of a pattern that was so advantageous to Goldfarb and other executives that they cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

36.    Defendant Christopher O'Meara is the CFO and an Executive Vice President of Lehman.  As CFO, O'Meara oversees treasury and tax, financial control, expense management and the Firm's international finance organization. O'Meara joined Lehman in 1994. During his tenure at the Company, O'Meara has served in various prominent roles across the Finance Division including financial controller, head of Expense Management, CFO of Investment Banking, and head of Financial Management Information. O'Meara has served as the Company's Global Controller since April 2002.

37.    Upon information and belief, Defendant O'Meara is a resident of Purchase, New York.

38.    Defendant Jonathan Beyman has served as the Company's Chief of Operations and Technology since July 2002 and is an Executive Vice-President of the Company.

39.    Upon information and belief, Defendant Beyman is a resident of Norwalk, Connecticut.

40.    Defendant Michael F. McKeever was with the Company for over 21 years. In addition to establishing the Private Equities business, he served as Co-Head of Investment Banking, Sector Head of Banking and on Co-Head of the Company's Investment Committee.

41.    Upon information and belief, Defendant McKeever is a resident of Greenwich, Connecticut.

42.    In 1998, McKeever received the following stock grant allegedly granted on the following date: on December 14, 1998, an option to purchase 300,000 at $40.87 per share.  Statistically, this award was part of a pattern that was so advantageous to McKeever and Lehman's other executives that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

43.    Each of these Executives received stock options that, in light of the statistical unlikelihood that their terms could have occurred by chance, may fairly be inferred as having been backdated to include exercise prices that were below the trading price of the true date of the stock option grant.  As such, each of the Defendants were unjustly enriched by the receipt of stock options that were illegally issued in violation of Lehman's Stock Plans. As the Company's Executives, the Officer Defendants assumed important managerial responsibilities at Lehman, which required them to implement appropriate internal controls to assure that stock option compensation was paid and truthfully reported in accordance with law and with Lehman's Stock Plans. Rather than fulfill these important fiduciary duties the Officer Defendants owed to Lehman, they actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached their fiduciary duties to Lehman by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of their positions, they knew Lehman's executive compensation and accounting and public reporting practices, via access to internal corporate documents, conversations and contacts with other corporate officers, directors, employees and outside auditors, tax professionals and attorneys, attendance at

management and Board meetings, and via reports and other information provided to them in connection therewith. During the Relevant Period, they participated in (or had responsibility for) the   process by which stock options were improperly granted and backdated as well as the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases, proxy statements, periodic financial statements, tax returns and SEC filings.

**D.    The Director Defendants**

44.    The following parties, sometimes referred to herein as the "Director Defendants," during the Relevant Period, serve as members of the Board as follows:

45.    Defendant Michael L. Ainslie has served as a Director of the Company since 1996, and is a member of the Audit Committee.  Ainslie is also a Director of the Lehman Brothers Bank, FSB.

46.    Upon information and belief, Defendant Ainslie is a resident of Palm Beach, Florida.

47.    In 2001, Ainslie received the following stock grant allegedly granted on the following date: on April 3, 2001, an option to purchase 7,500 at $58.51 per share. Statistically, this award was part of a pattern that was so advantageous to Ainslie and Lehman's other directors that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

48.    Defendant John F. Akers has served as a Director of the Company since 1996.  Defendant Akers serves as Chairman of the Compensation Committee that administers Lehman's Stock Plans and is a member of the Finance Committee.

49.    Upon information and belief, Defendant Akers is a resident of Westport, Connecticut.

50.    In 2001, Akers received the following stock grant allegedly granted on the following date: on April 3, 2001, an option to purchase 7,500 at $58.51 per share. Statistically, this award was part of a pattern that was so advantageous to Akers and Lehman's other directors that it cannot be explained by chance, and may be inferred to be

the result of the back-dating of the stock options.

51.    Defendant Roger S. Berlind has served as Director of the Company since 1985.  He serves as a member of the Finance Committee and as Chairman of the Audit Committee.

52.    Upon information and belief, Defendant Berlind is a resident of New York, New York.

53.    In 2001, Berlind received the following stock grant allegedly granted on the following date: on April 3, 2001, an option to purchase 7,500 at $58.51 per share. Statistically, this award was part of a pattern that was so advantageous to Berlind and Lehman's other directors that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

54.    Defendant Thomas H. Cruikshank has served as Director of the Company since 1996.  He has served as Chairman of the Audit Committee since 2004 and has been a member of the Nominating and Corporate Governance Committee since 2003. Cruikshank previously served as a member of the Audit Committee.

55.    Upon information and belief, Defendant Cruikshank is a resident of Dallas, Texas.

56.    In 2001, Cruikshank received the following stock grant allegedly granted on the following date: on April 3, 2001, an option to purchase 2,566 at $58.51 per share. Statistically, this award was part of a pattern that was so advantageous to Cruikshank and Lehman's other directors that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

57.    Defendant Henry Kaufman has served as Director of the Company since 1995.  He serves as Chairman of the Finance Committee and served as a member of the Nominating and Corporate Governance Committee from 1996 to 2002.

58.    Upon information and belief, Defendant Kaufman is a resident of New York, New York.

59.    In 2001, Kaufman received the following stock grant allegedly granted on

the following date: on April 3, 2001, an option to purchase 7,500 at $58.51 per share. Statistically, this award was part of a pattern that was so advantageous to Kaufman and Lehman's other directors that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

60.     Defendant John D. Macomber has served as Director of the Company since 1994. He served as Chairman of the Compensation Committee from 1995 to 2004 and has served as a member of the Compensation Committee since that time. Macomber is been a member of the Executive Committee and Nominating and Governance Committee.

61.     Upon information and belief, Defendant Macomber is a resident of Washington, DC and North Haven, Maine.

62.     In 2001, Macomber received the following stock grant allegedly granted on the following date: on April 3, 2001, an option to purchase 7,500 at $58.51 per share. Statistically, this award was part of a pattern that was so advantageous to Macomber and Lehman's other directors that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

63.     Defendant John Cecil is a former CAO of the Company.

64.     Upon information and belief, Defendant Cecil is a resident of Larchmont, New York.

65.     In 1998, Cecil received the following stock grant allegedly granted on the following date: on December 14, 1998, an option to purchase 3,000,000 at $40.87 per share. Statistically, this award was part of a pattern that was so advantageous to Cecil and Lehman's executives at the time that it cannot be explained by chance, and may be inferred to be the result of the back-dating of the stock options.

66.     Defendant Marsha Johnson Evans has been a Director of Lehman since 2004. She serves as the Chairman of the Nominating and Corporate Governance Committee and as a member of the Compensation and Benefits Committee and the Finance and Risk Committee.

67.    Upon information and belief, Defendant Evans is a resident of Alexandria, Virginia.

68.    Defendant Sir Christopher Gent has been a Director of Lehman since 2003.  He serves as a member of the Audit Committee and the Compensation and Benefits Committee.

69.    Upon information and belief, Defendant Gent is a resident of the United Kingdom.

70.    Defendant Roland A. Hernandez has been a Director of Lehman since 2005.  He serves as a member of the Finance and Risk Committee.

71.    Defendant Dina Merrill served as a Director and a member of the Compensation Committee from 1998 to April 2006.

72.    Upon information and belief, Defendant Merrill is a resident of New York, New York and Los Angeles, California.

73.    Each of these Directors, who received backdated stock options have been unjustly enriched, and should be ordered to return the options, stock and proceeds of these grants.  As members of the Board, the Director Defendants owed a duty to Lehman to be reasonably informed about the business, operations and finances of the Company and to act in the best interest of the Company.  Those directors who were members of the Compensation Committee had an obligation to administer the Stock Plans in accordance with their terms.  In violation of those obligations, and without legal authority, these members knowingly, recklessly or negligently approved stock options for less than fair market value.  Those directors who were members of the Audit Committee had obligations to assure that appropriate internal controls were implemented and observed with respect to the grant of stock option compensation, and their reporting in Lehman's financial statements and tax returns.  Rather than fulfill these important fiduciary duties that the Director Defendants owed to Lehman, each actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached their fiduciary duties to Lehman by purposefully, recklessly

and/or negligently disregarding these wrongful acts or omissions. Because of their positions, they knew or should have known, Lehman's Executive compensation, accounting and reporting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at management and Board meetings, and via reports and other information provided to them in connection therewith. During the Relevant Period, the Director Defendants participated in the process by which stock options were improperly granted, backdated and approved a well as for the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases, proxy statements, periodic financial statements and SEC filings.

74.    The Officer Defendants and Director Defendants identified in Parts III.C and III.D, above, are referred to collectively as the "Individual Defendants."

### III.    JURISDICTION AND VENUE

75.    This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, because Plaintiffs' claims, brought derivatively, exceed $75,000 and the suit is between citizens of different states.

76.    Venue is proper in this Court pursuant to Section 28 U.S.C. § 1391, because Nominal Defendant Lehman is a resident of this District and substantially all of the other Defendants either reside or conduct business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

### IV. SUBSTANTIVE ALLEGATIONS

A.    **Lehman's Stock Option Plans**

77.    For all periods relevant to this lawsuit, Lehman had Stock Option Plans, including a "1996 Management Ownership Plan" (the "Management Plan"), which was amended through March 31, 2001, pursuant to which purported authority, stock options were awarded to Lehman's executive management.

78.    Pursuant to the Management Plan, the Compensation Committee had the responsibility and authority to administer the plan, select participants to receive stock

option awards and determine the terms of the awards subject to the provisions of the Management Plan.

79.     Among other things, the Compensation Committee was required to "administer the Plan in such a manner as to comply with the requirements for deductibility under §162(m) of the [Internal Revenue] Code."  Under the Management Plan, the Compensation Committee was also directed to "establish the option price at the time each stock option is granted, which shall not be less than 100% of the Fair Market Value of the Common Stock on the date of grant."  The Management Plan defined "Fair Market Value" on any date to mean, "the closing price of the shares on such date on the principal national securities exchange on which such shares are listed or admitted to trading," *i.e.* the New York Stock Exchange.

80.     By back-dating the stock options and issuing them at prices below the closing price on the NYSE on the true date of the grant, Defendants engaged in *ultra vires* acts and the stock options should be declared legally invalid, set aside and the proceeds recovered from each of the Defendants receiving and exercising the stock options.

81.     In addition, non-Management Directors, as part of their compensation, could elect to receive stock options, with an exercise price per share equal to the closing price of Lehman's Common Stock on the NYSE on the date the award was made.  These options were also backdated during the grant period to improperly and deceptively increase the Directors' compensation.

**B.     Duties of the Company's Directors and Officers**

82.     By reason of their positions as directors, officers and/or fiduciaries of Lehman and because of their ability to control the business, corporate and financial affairs of Lehman, each of the Defendants owed Lehman the duty to exercise due care and diligence in the management and administration of the affairs of the Company and in the use and preservation of its property and assets, and owed the duty of loyalty, including full and candid disclosure of all material facts related thereto.  Further,

Defendants owed a duty to Lehman to ensure that the Company operated in compliance with all applicable federal and state laws, rules, and regulations and within the bounds of their authority under the Lehman's Stock Plans; and ensure that Lehman not engage in any unsafe, unsound, or illegal business practices. The conduct of Defendants complained of herein involves knowing violations of their duties as directors of Lehman, a lack of due diligence and the absence of good faith on their part of which Director Defendants were aware or should have been aware posed a risk of serious injury to Lehman.

83. Director Defendants, by their fiduciary duties of care, good faith and loyalty, owed to Lehman a duty to ensure that the Company's financial reporting fairly presented, in all material aspects, the operations and financial condition of Lehman. In order to adequately carry out these duties, it was necessary for Director Defendants to know and understand the material, non-public information to be disclosed or omitted from the Company's public statements. This material, non-public information included the fact that Lehman's internal controls were woefully defective and that the Company's executives were improperly causing their stock options to be backdated, and that the Compensation Committee was administering the Stock Plans in violation of the Stock Plan terms and their authority.

84. To discharge these duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of Lehman. By virtue of this obligation of due care and diligence, Defendants were required, among other things, to:

    (a)    manage, conduct, supervise, and direct the employees, businesses and affairs of Lehman, in accordance with laws, rules and regulations, and the charter, by-laws, and Stock Plans of Lehman;

    (b)    neither violate nor knowingly or recklessly permit any officer, director or employee of Lehman to violate applicable laws, rules regulations and Lehman's Stock Plans, and to exercise reasonable control and supervision over such officers and employees; ensure the prudence and soundness of policies and practices undertaken or

proposed to be undertaken by Lehman;

(c)    remain informed as to how Lehman was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of internal controls to gather and report information internally, to allow Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

(d)    supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Lehman and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Lehman and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

(e)    preserve and enhance Lehman's reputation as befits a public corporation and to maintain public trust and confidence in Lehman as a prudently managed institution fully capable of meeting its duties and obligations.

85.    Each Defendant breached his duty of loyalty, due care and good faith by failing to implement appropriate internal controls, by allowing other Defendants to cause, or by themselves causing the Company to violate the terms of its Stock Plans, to file false tax returns and to misrepresent Lehman's financial results, as detailed herein, and by failing to prevent the Defendants from taking such illegal actions.  As a result, Lehman has and will unnecessarily expend significant sums of money.  Such expenditures include, but are not limited to:

(a)    Costs of excessive compensation;

(b)    Costs incurred to carry out internal investigations, including legal fees paid to outside auditors and counsel;

(c)    Additional tax liabilities, penalties and interest; and

(d)    Costs incurred in investigating and defending Lehman and certain directors and officers in potential class action lawsuits, plus potentially millions of dollars in settlements or to satisfy an

adverse judgment.

86.     Moreover, these actions will irreparably damage Lehman's corporate image and goodwill.  For at least the foreseeable future, Lehman will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Lehman's ability to raise equity capital or debt on favorable terms in the future may be impaired.

**C.     Duties and Responsibilities of Committees of the Board**

87.     The standing committees of the Board include: (i) the Compensation and Benefits Committee; (ii) the Audit Committee; (iii) the Finance Committee; (iv) the Executive Committee; and (v) the Nominating and Corporate Governance Committee.

***Compensation and Benefits Committee***

88.     The following Director Defendants served on the Compensation Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| COMPENSATION AND BENEFITS COMMITTEE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** |
| Akers | C | C | C | C | C | C | C | C | C |
| Evans | | | | | | | | | M |
| Gent | | | | | | | | M | M |
| Macomber | C | C | C | C | C | C | C | M | M |
| Merrill | M | M | M | M | M | M | M | M | M |
| | | | | | | | | | |
| **M = Member     C = Chairman** | | | | | | | | | |
| | | | | | | | | | |

89.     Under the Stock Plans, the Compensation Committee has the responsibility to administer the plans, including selecting the plan participants who will receive awards and determining the terms of the awards, including the option or exercise prices, subject to the limitations in the Stock Plans.

***Audit Committee***

90.     The following Director Defendants served on the Audit Committee of the

Lehman Board of Directors at certain times during the Relevant Period:

| AUDIT COMMITTEE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** |
| Ainslie | M | M | M | M | M | M | M | M | M |
| Berlind | C | C | C | C | C | C | M | M | M |
| Cruikshank | M | M | M | M | M | M | C | C | C |
| Gent | | | | | | | | M | M |
| | | | | | | | | | |
| **M = Member    C = Chairman** | | | | | | | | | |

91.    The Audit Committee's responsibility is to monitor and oversee the management of the Company's internal controls, the financial reporting process and preparation of the consolidated financial statements of the Company.   The Audit Committee represents the Board in discharging its responsibilities relating to the accounting, reporting and internal control practices of the Company. The Audit Committee has general responsibility for surveillance of financial controls, as well as for the Company's accounting and audit activities. The Audit Committee annually reviews the qualifications of the independent auditors, makes recommendations to the Board of Directors as to their selection, reviews the audit plan, fees and results of their audit, and approves their non-audit services and related fees.

***Finance Committee***

92.    The following Director Defendants served on the Finance Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| FINANCE COMMITTEE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** |
| Akers | M | M | M | M | M | M | M | M | M |
| Berlind | M | M | M | M | M | M | M | M | M |
| Evans | | | | | | | | M | M |
| Hernandez | | | | | | | | | M |
| Kaufman | C | C | C | C | C | C | C | C | C |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **M = Member    C = Chairman** | | | | | | | | |

93.     The Finance Committee reviews and advises the Board of Directors on financial policies and practices of the Company, and periodically reviews, among other things, major capital expenditure programs and significant capital transactions and recommends a dividend policy to the Board of Directors.

### *Executive Committee*

94.     The following Director Defendants served on the Executive Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| EXECUTIVE COMMITTEE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** |
| Fuld | C | C | C | C | C | C | C | C | C |
| Macomber | M | M | M | M | M | M | M | M | M |
| Goldfarb | | | | | | M | M | M | M |
| Gregory | | M | M | M | M | M | M | M | M |
| Russo | | | | | | * | * | * | M* |
| | | | | | | | | | |
| **M = Member    C = Chairman    * = Counsel to** | | | | | | | | | |

95.     The Executive Committee has the authority, in the intervals between meetings of the Board of Directors, to exercise all of the authority of the Board of Directors, except for those matters that the Delaware General Corporation Law or the Restated Certificate of Incorporation reserves to the full Board of Directors.

### *Nominating and Corporate Governance Committee*

96.     The following Director Defendants served on the Nominating and Corporate Governance Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| NOMINATING AND CORPORATE GOVERNANCE COMMITTEE | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** |
| Cruikshank | | | | | | M | M | C | C |

| Macomber | M | M | M | M | M | M | M | M | M |
| Evans | | | | | | | | M | M |
| Merrill | M | M | M | M | M | C | C | M | M |
| Kaufman | M | M | M | M | M | | | | |
| Fuld* | C | C | C | C | | | | | |
| **M = Member    C = Chairman    *Chairman and Non-Voting Member** | | | | | | | | | |
| | | | | | | | | | |

97.      The Nominating Committee considers and makes recommendations to the Company's Board of Directors with respect to the size and composition of the Board of Directors and Board Committees and with respect to potential candidates for membership on the Board of Directors.

**D.      The Failures of the Committees of the Lehman Board of Directors**

98.      Lehman's Board should have taken reasonable steps to ensure that stock option compensation was established and approved in compliance with Lehman's Stock Plans, including by establishing internal controls to ensure that the grants were not made for less than fair market value and that the grants were not backdated.

99.      Director Defendants Fuld, Ainslie, Akers, Berlind, Cruikshank, Evans, Gent, Hernandez, Merrill and Macomber, as Directors of Lehman, had ample opportunity to discuss the material information at issue with management and their fellow directors at any of the Board meetings that occurred during the Grant Period and thereafter, as well as at the numerous meetings of these Board committees.

100.      Despite these duties, Director Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, stock option compensation to be paid to Lehman executives in amounts that violated Lehman's Stock Plans and permitted improper statements to be disseminated by Lehman to the investing public and the Company's shareholders during the Relevant Period. These Directors also improperly permitted the filing of tax returns that falsely reported Lehman's compensation expense attributable to the stock options.

101.      During the Relevant Period, Director Defendants caused or allowed the Compensation Committee and/or Lehman executives to manipulate the stock option grant dates so as to illegally increase the executives' compensation and their stock profits. The

price of Lehman shares on the reported option grant date, therefore, was lower than the share price on the actual day options were granted – thus, providing these Lehman executives with more favorably priced options and higher and excessive compensation.

102.    Backdating these stock option grants brought an instant paper gain to these executives because the options were priced below the stock's fair market value on the actual grant date. Under GAAP, and particularly APB No. 25, this instant paper gain was equivalent to paying extra compensation and was thus a cost to Lehman that Lehman was required to report on its financial statements over the vesting period. These compensation costs were not properly reported on Lehman's publicly filed financial statements, and in turn, Lehman's profits were overstated from at least 1999 to date.

103.    Instead of properly disclosing these improper stock option backdating practices and the corresponding understatement of compensation costs, Director Defendants caused or allowed these practices to continue unabated throughout the Relevant Period. As a result, the press releases and SEC filings from the Relevant Period materially misstated Lehman's earnings in violation of GAAP.

**E.    Defendants' Stock Option Manipulations**

104.    The following options were granted to Director and Officer Defendants named herein during the Grant Period.

| Defendant | Purported Date of Grant | Number Of Options | Exercise Price | Cost |
|---|---|---|---|---|
| *Cruikshank* | 4/3/2001 | 2566 | $58.51 | $150,136 |
| *Kaufman* | 4/3/2001 | 7500 | $58.5100 | $438,825 |
| *Berlind* | 4/3/2001 | 7500 | $58.51 | $438,825 |
| *Macomber* | 4/3/2001 | 7500 | $58.510 | $438,825 |
| *Merrill* | 4/3/2001 | 7500 | $58.510 | $438,825 |
| *Ainslie* | 4/3/2001 | 7500 | $58.510 | $438,825 |
| *Isaacs* | 11/30/2000 | 158547 | $49.563 | $7,858,064 |
|  | 12/1/2000 | 350661 | $51.125 | $17,927,543 |
|  | 9/20/2001 | 54747.6 | $46.640 | $2,553,428 |
|  | 12/3/2001 | 884016.3 | $63.400 | $56,046,633 |
| *Cecil* | 12/14/1998 | 3000000 | $40.875 | $122,625,000 |
| *McKeever* | 12/14/1998 | 300000 | $40.875 | $12,262,500 |
| *Vanderbeek* | 12/14/1998 | 300000 | $40.875 | $12,262,500 |

|  | 2/18/2000 | 600000 | $63.250 | $37,950,000 |
|  | 11/30/2000 | 158547 | $49.563 | $7,858,064 |
|  | 12/1/2000 | 35001 | $51.125 | $1,789,426 |
|  | 12/3/2001 | 384016.3 | $63.400 | $24,346,633 |
| *Lessing* | 12/14/1998 | 300000 | $40.875 | $12,262,500 |
| *Jack* | 2/18/2000 | 600000 | $63.250 | $37,950,000 |
|  | 9/20/2001 | 158547 | $49.563 | $7,858,064 |
|  | 12/1/2000 | 350001 | $51.125 | $17,893,801 |
|  | 9/20/2001 | 84226.6 | $46.640 | $3,928,328 |
|  | 12/3/2001 | 384016.34 | $63.400 | $24,346,635 |
| *Goldfarb* | 11/30/2000 | 28827 | $49.563 | $1,428,752 |
|  | 12/1/2000 | 150000 | $51.125 | $7,668,750 |
|  | 9/20/2001 | 90313.94 | $46.64 | $4,212,242 |
|  | 12/3/2001 | 129766.34 | $63.400 | $8,227,185 |
| *Fuld* | 12/14/1998 | 350000 | $40.875 | $14,306,250 |
|  | 2/18/2000 | 80000 | $63.250 | $5,060,000 |
|  | 12/1/2000 | 450000 | $51.125 | $23,000,625 |
|  | 9/20/2001 | 145482.4 | $46.640 | $6,785,299 |
|  | 12/3/2001 | 400000 | $63.400 | $25,360,000 |
| *Gregory* | 12/14/1998 | 300000 | $40.875 | $12,262,500 |
|  | 2/18/2000 | 600000 | $63.250 | $37,950,000 |
|  | 11/30/2000 | 158547 | $49.563 | $7,858,064 |
|  | 12/1/2000 | 350001 | $51.125 | $17,893,801 |
|  | 9/20/2001 | 84226.7 | $46.640 | $3,928,333 |
|  | 12/3/2001 | 468032.68 | $63.400 | $29,673,271 |

105.    Under the Lehman Stock Plans, the exercise price for any stock issued under the Plan could not be more than 100% of the Fair Market Value on the option grant date – i.e. the closing price on the NYSE on the true date of the grant.

106.    The Lehman stock option grant dates follow a striking pattern that is so advantageous to the grantees that it could not have been the result of chance.  Each of the Officer and/or Director Defendants identified on the table above, received a substantial number of option shares that increased in value immediately after they were granted, by significant amounts.

107.    Indeed, a great number of the foregoing stock option grants were dated just after a sharp drop and just before a substantial rise in Lehman's stock price (low point) and many others were granted on dates when the option values increased immediately after they were granted (low point and upward trend), as the Company's

historical stock price charts demonstrate. (*See* Ex. A, attached hereto and incorporated herein).

108.    Thus backdating of the options may fairly be inferred.  This practice resulted in option grants with lower exercise prices, which improperly increased the value of the options to the Officer and Director Defendants and improperly reduced the amount they had to pay the Company upon exercise of the options.

## V.    NO STATUTE OF LIMITATIONS BAR

109.    Although certain of Defendants' misconduct as alleged herein occurred more than three years prior to the filing of this derivative action, the statute of limitations as set forth under Delaware statute 10 *Del. C.* §8106, either failed to accrue because of the continuing nature of the wrongs or because of the discrete acts of misconduct that occurred during the last three years.  In addition the "discovery" rule, equitable tolling and/or defendants' fraudulent acts to conceal their misconduct tolled the statute of limitations or delayed its accrual.  Defendants engaged in wrongful acts (including by backdating the options and falsely reporting the dates of the grants) that denied Plaintiffs the opportunity to timely discover that stock options were issued in violation of the Stock Plans and improperly accounted for.  Thus, Defendants failed to apprise shareholders of sufficient facts to provide them with actual knowledge that the Defendants had repudiated their fiduciary duties and engaged in the other affirmative misconduct alleged herein.

110.    These stock option grants were and continue to be illegal, *ultra vires* and void because the Defendants engineered, permitted and/or approved the granting of options in a manner that violated the Company's Stock Plans

111.    When they participated in, or allowed the granting of the backdated stock options, Defendants, including the members of the Company's Audit Committee who are charged with overseeing the Company's financial reporting, failed to ensure an accurate accounting of the Company's compensation expenses and committed affirmative acts of concealment or misrepresentation when they issued false disclosures about the circumstances of the stock option awards, including statements made in the Company's

proxy statements that falsely assert that options had been granted at fair market value on the date of the grant. The wrongful award of the stock options was further concealed by the false financial accounting for the awards. Pursuant to APB No. 25, the below market stock options that vested over a 3 to 4 ½ year period should have been reported and disclosed as additional compensation over the vesting period. Instead, the grants were backdated to conceal the excessive compensation and the accounting and tax implications of the awards, and false financial statements were publicly reported over this period.

112.    Defendants' actions impeded discovery of the truth, despite Plaintiffs' due diligence until after March 2006, when academic statistical studies were published showing the widespread industry practices described in this Complaint. Armed with these disclosures, Plaintiffs diligently reviewed Lehman's stock option grant patterns, and once the misconduct became apparent, Plaintiffs promptly filed suit.

113.    Thus, even for those claims for which the 3 year statute would otherwise have run, the applicable limitations period is tolled or its accrual delayed under (1) equitable tolling because Defendants participated in unfair self-dealing resulting in an abuse of the fiduciary relationship; (2) fraudulent concealment because Defendants fraudulently concealed facts essential to Plaintiffs' case; and (3) the "discovery rule" because the injuries alleged herein were inherently unknowable, there were no observable or objective factors to put Plaintiffs on notice of injury and Plaintiffs were blamelessly ignorant of the acts and injuries alleged in the Complaint.

114.    As the party seeking to toll the limitations period or delay its accrual, Plaintiffs were not on inquiry notice until after March 2006 because they were not in possession of facts sufficient to have made them suspicious. Accordingly, to the extent required, Plaintiffs have alleged the specific facts to demonstrate that the facts regarding the illegal stock option grants were so hidden as a result of their having been backdated and falsely reported, that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint within the applicable statute of limitations.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

115.    Plaintiffs bring this action derivatively in the right and for the benefit of Lehman to redress injuries suffered, and to be suffered, by Lehman as a direct result of Defendants' *ultra vires* acts, breaches of fiduciary duties and/or self-dealing acts, misappropriation of and/or waste of corporate assets, gross mismanagement, unjust enrichment involving, *inter alia*, violations of the federal securities laws through the misstatements of Lehman's financial statements. Lehman is named as a Nominal Defendant solely in a derivative capacity.   This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

116.    Plaintiffs will adequately and fairly represent the interests of Lehman in enforcing and prosecuting its rights.

117.    Plaintiffs are and were owners of Lehman stock during times relevant to Defendants' wrongful course of conduct alleged herein, and remain stockholders of the Company.

118.    The Lehman Board, at the time of filing of this Complaint, consisted of the following nine (9) Director Defendants: Ainslie, Akers, Evans, Macomber, Berlind, Cruikshank, Gent, Kaufman and Hernandez.

119.    Plaintiffs have not made any demand upon the current Board to bring an action asserting the claims herein, for the damages suffered by Lehman, since such demand would be a futile, wasteful and useless act, particularly for the following reasons.

120.    Demand is excused because the issuance of the stock options at prices below their fair market value by deceptively back dating the grants as alleged herein violated Lehman's Stock Plans and was unlawful; it is not within Director Defendants' business judgment to acquire, authorize, ratify or facilitate the unlawful acts and practices alleged herein which violated Lehman's Stock plans and these acts and practices cannot be defended by the Director Defendants and are not subject to the protection of any independent business judgment since it would undoubtedly be to the benefit of Lehman to invalidate the stock options and recover the proceeds and/or damages caused by

Defendants' wrongdoing and to assert these derivative claims. There was no basis or justification for issuing stock options in violation of Lehman's Stock Plans and backdating the stock option grants.    Hence, the transactions constituted a misappropriation and/or waste of corporate assets, and could not have been the product of the proper exercise of business judgment by the Director Defendants.

121.    Demand is excused because the wrongs alleged herein constitute violations of the Stock Plans and are incapable of ratification by the current Board.  Two of the nine Directors were on the Compensation Committee at the time the stock options were issued and backdated, so were directly involved in the illegal conduct.  A majority of the current Board of Directors (i.e., seven of the ten current directors) served on the Board when the illegal and backdated options that are the subject of this lawsuit were issued.   All current members of the Board signed and approved the public reports containing financial statements that continued to be misstated for the stock options compensation expense (that should have been reported as the options vested under APB No. 25).   The Director Defendants are thus subject to liability for breaching their fiduciary duties to Lehman by, *inter alia*, failing to assure proper internal controls were in place to adequately monitor Lehman's financial reporting, and to detect, prevent and/or halt the accounting misstatements complained of herein.

122.    Between 1998 and 2001, certain Director Defendants were the recipient of stock option grants, which Plaintiffs herein allege were backdated. Because the Director Defendants received a personal financial benefit from these improper transactions, they are interested and demand upon them is futile, making them conflicted and thus unable to exercise independent judgment.

123.    All of the Director Defendants authorized the filing of one or more of the Proxy Statements from 1999 to 2006, in support of their nomination as Directors, which failed to disclose that that certain stock option grants had been backdated.  Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to suit for securities fraud and proxy violations; thus, they are hopelessly conflicted

and are unable to make an independent determination on a demand that they cause the Company to bring this action.

124.    All of the Director Defendants signed one or more of the Company's Annual Reports on Form 10-K between 1998 and the present containing the Company's financial statements, which failed to account for the backdated stock option grants as compensation and an expense of the Company incurred as the options vested as provided in APB No. 25. As a result, the income on those financial statements of the Company was inflated and may need to be restated.  The financial statements may also need to be restated to properly account for disallowed compensation expense under §162(m) of the IRC. The Company may also have failed to properly withhold taxes from its executives and paid them over to the Internal Revenue Service.  Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to securities and tax liabilities. Thus, they are hopelessly conflicted and are unable to make an independent determination on a demand that they cause the Company to bring this action.

125.    As a result of their access to and review of internal corporate documents, conversations and contacts with other corporate officers, employees and directors, and attendance at management and Board meetings, each of the Director Defendants knew the adverse, non-public information regarding Lehman's performance.  Those Director Defendants who received backdated options thus engaged in illegal self-dealing.

126.    Because these Director Defendants received a personal financial benefit from the challenged insider trading transactions, these Director Defendants are interested. Also, these Director Defendants face a substantial threat of liability should the options be set aside, or for damages for the misappropriation or waste of assets, unjust enrichment and breach of fiduciary duty.  Since these Director Defendants are undeniably interested, any demand upon them is futile.

127.    Demand is also excused because Director Defendants participated in, approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly and/or negligently disregarded them, and are therefore not

disinterested parties and lack sufficient independence to exercise business judgment as described in paragraphs herein.

128.    The Audit Committee is comprised of Director Defendants Cruikshank, Ainslie, Berlind and Gent.  The Audit Committee failed to assist the Board in fulfilling its oversight responsibility by overseeing (i) the conduct of the Company's accounting and financial reporting process and the integrity of the financial statements that will be provided to shareholders and others; (ii) the functioning of Lehman's systems of internal accounting and financial controls; and (iii) the portions of the Code of Ethics that relate to the integrity of accounting and financial reporting. Lehman's internal controls were materially inadequate as evidenced by the issuance of options in violation of the Stock Plans and the improper backdating of the stock option grants to cover up the illegal grants. As a result of this improper conduct, the Company's financials were misstated because those financials did not account for the true amount of compensation being paid to Lehman's executives or Lehman's true tax liabilities.  Accordingly, there is reasonable doubt that Audit Committee Defendants are disinterested because they face a substantial risk of liability for their breaches of fiduciary duty to Lehman. Thus, demand is futile as to Director Defendants Cruikshank, Ainslie, Berlind and Gent.

129.    Two current Director Defendants, Akers and Macomber, sat on the Compensation Committee at the time that the Compensation Committee illegally approved the issuance of stock options below their Fair Market Value and then these wrongs were concealed through the backdating of the grants.  As these directors are immediately implicated in the alleged illegal misconduct, they are not disinterested because they face a substantial likelihood of liability.  Thus, demand is undeniably futile as to Director Defendants Akers and Macomber.

130.    The Nominating and Corporate Governance Committee also reviews the overall corporate governance of Lehman as well as Board policies and procedures and recommends improvements as needed and periodically reviews the compensation payable to members of the Board.  As such, members of this Committee during the Grant Period

are likely involved in or otherwise responsible for the backdating of the Director stock options. Therefore Director Defendants Cruickshank, Macomber, Evans and Merrill face a substantial likelihood of liability and are not disinterested. Thus, demand is futile as to these Directors.

131.    Additionally, from April 1998 through 2003, the Company was party to a consulting agreement with HK Company, pursuant to which HK Company provided, upon request, advice to the Company on global initiatives, economic forecasts and other matters. HK Company received a consulting fee of $12,500 per month. Director Kaufman is a principal of HK Company. In December 2004, a private investment fund managed by the Company that invests in third-party investment funds purchased a limited partnership interest in a third-party venture capital fund from Director Defendant Kaufman, for $404,000. As a result, Kaufman may find it difficult to bring suit against Directors that approve contracts and investments that benefit him and his company. Thus, demand is futile as to Director Kaufman.

132.    Several of the Directors have developed debilitating conflicts of interest that prevent the Board members from taking the necessary and proper action on behalf of the Company, as requested herein. In addition to the conflicts that exist as a result of their participation in the improper approval of the illegal stock options, insider trading and false accounting as detailed herein, the majority of the Board are subject to prejudicial entanglements.

133.    Each of the Director Defendants knew of, disregarded or directly benefited from the wrongdoing complained of herein.

134.    The Lehman Director Defendants, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Lehman's stockholders or recklessly and/or negligently disregarded those wrongs, and are therefore not disinterested parties.

135.    In order to bring this suit, all the Lehman Director Defendants would be

forced to sue themselves and persons with whom they have extensive business, professional and personal entanglements, which they will not do, thereby excusing demand.

136.    The Sarbanes-Oxley Act of 2002 ("SOX") placed significant additional responsibilities on the boards of directors of public companies subject to SOX, like Lehman, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure.  This new law was a disaster for the Lehman Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a massive scheme to falsify and thus, artificially inflate its Company's reported financial results.  Though the illegal stock options were granted before SOX was enacted, because the options vested thereafter, pursuant to APB No. 25 Lehman's financial statements continued to understate Lehman's compensation expenses long after SOX was passed.  Any real compliance with SOX would have exposed the long-existing scheme, brought it to an end and resulted in embarrassing discharges.  Thus, the Board did not enforce or comply with SOX, despite its legal obligation under federal law to do so.  Clearly, the Lehman Board will not sue themselves for this failure.

137.    Demand is also excused because insurance policies covering the liability of a company's directors and officers purport to exclude legal claims asserted directly by the Company against such persons.  Thus, there was, and is, a substantial disincentive for Lehman to bring any action directly against Defendants. Generally, under the terms of such directors' and officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Lehman, including Defendants in this action, for misconduct and mismanagement.  Thus, if the policy or policies which Lehman maintains contain the foregoing provision, the insurance carriers would argue that Lehman and its Board are thereby contractually disabled from complying with any demand that would cause Lehman to institute, and/or prosecute any action against

Defendants for such misconduct and mismanagement; because to do so could result in the loss to Lehman of its insurance coverage. Similarly, Lehman would be disabled from pursuing Defendants, as it would not benefit from any insurance they may have.

138.    Moreover, Lehman has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite Director Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has failed and refused to seek to recover for Lehman for any of the wrongdoing alleged by Plaintiffs herein.

139.    Demand is futile because the Lehman Board cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint. In addition, the failures of the Board to design and implement an effective corporate information and reporting system to assure the existence of reasonable internal financial controls and the accuracy of the Company's publicly reported financial information demonstrates a lack of a good faith exercise of business judgment. The Board would thus be required potentially to investigate and bring claims against themselves for their own misconduct.

140.    Demand is futile because the Lehman Board has failed to act to investigate potential misconduct even after the *Wall Street Journal* published wide-spread industry abuses in the back-dating of stock options issued to corporate executives. As alleged herein, a statistical analysis of the dates and terms of the stock option awards would have revealed that Lehman's awards were unlikely to have occurred by chance. Nevertheless, Lehman's public reports do not reveal that Lehman Directors have taken any action to review the legitimacy of its stock option award practices. Thus a formal demand by Plaintiff's would also be unlikely to prompt this Board to act.

## VIII. CAUSES OF ACTION

**A.    COUNT I:    Invalidating Stock Options for *Ultra Vires* Acts**

141.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

142.    Stock options were issued to the Management Defendants in violation of the Stock Plans.  Lehman's Compensation Committee's approval of the stock options issued below Fair Market Value constituted *ultra vires* acts.

143.    The unexercised stock options should be declared to be void, and set aside and other equitable relief awarded to permit Lehman to recover the stock or other proceeds of those illegal stock options that have already been exercised.

**B.    COUNT II: Derivative Claim for Breach of Fiduciary Duty (Against All Defendants)**

144.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

145.    Defendants all owed and owe a fiduciary duty to Lehman and its stockholders. By reason of their fiduciary relationships, Defendants all owed and owe Lehman the highest obligation of good faith, fair dealing, loyalty and due care and diligence in the management and administration of the affairs of the Company, as well as in the financial accounting, auditing and reporting of the Company. Moreover, Defendants owed and owe the duty of full and candid disclosure of all material facts.

146.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by, *inter alia*, (i) approving or permitting the issuance of stock options in violation of the Stock Plans, and the backdating of the awards to conceal the violations, (ii) the reckless disregard with which they published the financial statements of Lehman that did not conform to GAAP; (iii) the reckless disregard with which they supervised the audits and reviews of Lehman's financial statements and internal controls and procedures; and (iv) the violation of their duties of loyalty in failing to detect, prevent and/or disclose Lehman accounting

misstatements, and the weaknesses in the internal controls and procedures of the Company, as previously described herein.

147.    Defendants also each owed a duty to Lehman to test, oversee and monitor their systems of internal disclosure, financial and accounting controls, governance procedures and disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia,* SOX.

148.    Each of the Defendants had actual or constructive knowledge that they had caused the Company to misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

149.    Each of the Defendants authorized, or by abdication of duty, permitted the stock options granted to Lehman's executives to be issued in violation of Lehman's Stock Plans and then backdated. The Director Defendants also caused their own stock options to be issued at prices below fair market value and backdated the options to conceal their excessive compensation.  Company records were falsified to conceal the true amounts of excessive compensation thus awarded to Defendants.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.  By this misconduct, Defendants exposed Lehman to potential government investigations, civil and criminal prosecutions, additional liabilities for federal taxes, penalties and interest, and lawsuits for violation of the federal securities laws.

150.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Lehman has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Lehman's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

**C.    COUNT III:  Derivative Claim for Gross Mismanagement (Against All Defendants)**

151.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

152.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and businesses of Lehman in a manner consistent with the operations of a publicly held corporation.

153.    Defendants also engaged in further gross mismanagement by recklessly subjecting the Company to claims under the Federal and State securities laws and federal tax laws by including false and misleading statements of Lehman's compensation expenses in Lehman's financial statements and by failing to properly report Lehman's executive compensation on its federal tax returns.

154.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Lehman has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Lehman's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

**D.    COUNT IV:  Derivative Claim for Misappropriation and/or Waste Of Corporate Assets (Against All Defendants)**

155.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

156.    As a result of the improper grant of stock options to Lehman executives in violation of the Stock Plans, the excessive compensation paid to the Director Defendants through the back-dating described herein, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, Defendants have either misappropriated Lehman corporate assets or caused Lehman to waste its assets.  Besides the millions of dollars of excessive compensation paid to Defendants and Lehman's other executives and potential additional tax liabilities for

violation of the deductibility requirements of §162(m) of the IRC, Lehman is exposed to enormous professional costs to restate Lehman's past financial statements to correct for the improperly backdated stock option grants, and to respond to likely government investigations and to defend  Defendants' unlawful actions.

157.    Defendants also wasted corporate assets by recklessly subjecting the Company to claims under the Federal and State securities laws by issuing false and misleading statements in Lehman's financial statements.

158.    As a direct and proximate result of Defendants' misappropriation and/or waste of corporate assets, the Defendants are liable to the Company.

**E.      COUNT V:  Derivative Claim for Unjust Enrichment**

159.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

160.    By their wrongful acts and omissions, the Defendants that received stock options at exercise prices below the stock's fair market value, received illegal and excessive compensation and were unjustly enriched at the expense of and to the detriment of Lehman.

161.    As a result of the wrongful pricing and backdating of the options granted to them, the Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

162.    Plaintiffs, as shareholders and representatives of Lehman, seek to declare the illegal stock options to be void, to set them aside, to recover their proceeds, if any, restitution, damages, and an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches, and other relief for the Company, in an amount to be proven at trial.

## IX.  PRAYER FOR RELIEF

WHEREFORE**,** Plaintiffs, on their own behalf, and derivatively on behalf of Lehman, pray for judgment as follows:

A.      Declaring the illegal unexercised stock options void and ordering the recovery of the proceeds of the exercised stock options;

B.      Awarding Plaintiffs, on behalf of Lehman, all equitable and injunctive relief permitted by law and equity, including the imposition of a constructive trust and attachment of assets, as may be necessary to grant to Lehman all relief to redress all of the harm suffered by Lehman as a result of Defendants' wrongdoing;

C.      Ordering Defendants to account to Lehman for all damages sustained or to be sustained by the Company, and all profits obtained by Director, by reason of the wrongs alleged herein;

D.      Ordering the Individual Defendants to return to Lehman all incentive-based or equity-based compensation paid to them by the Company during the time they were in breach of their fiduciary duties that they owed to Lehman;

E.      Ordering the Individual Defendants to return to Lehman all unexercised stock option grants granted to them by the Company during the period of wrongdoing;

F.      Against all of the Individual Defendants, for the damages suffered by Lehman as a result of their breaches of fiduciary duty, mismanagement and misappropriation and waste of corporate assets together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

G.      Against all of the Individual Defendants in an amount equal to the amount by which they have been unjustly enriched.

H.     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts; and

I.     Granting Plaintiffs such further relief as the Court may deem just and proper.

**<u>JURY TRIAL DEMANDED</u>**

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED:  August 14, 2007               Respectfully submitted,

                                      SCOTT + SCOTT, LLP


                                      /s/ Beth A. Kaswan
                                      Beth Kaswan (CT 0264)
                                      75 Rockefeller Plaza
                                      19th Floor, Suite 1915
                                      New York, NY  10019
                                      Telephone:  212/710-1040
                                      Facsimile:  212/710-1041
                                      bkaswan@scott-scott.com



                                      SCOTT + SCOTT, LLP
                                      David R. Scott
                                      108 Norwich Ave.
                                      P.O. Box 192
                                      Colchester, CT 06415
                                      Telephone:  860/537-5537
                                      Facsimile:  860/537-4432
                                      drscott@scott-scott.com

                                      SCOTT + SCOTT, LLP
                                      Geoffrey Johnson
                                      33 River Street
                                      Chagrin Falls, OH  44022
                                      Telephone:  440/247-8200
                                      Facsimile:  440/247-8275
                                      gjohnson@scott-scott.com


                                      **Counsel for Plaintiffs**

## VERIFICATION

I, BETH A. KASWAN, hereby declare as follows:

1.    I am an attorney with the law firm of Scott + Scott, LLP, counsel for

plaintiff in the above-entitled action. I have read the foregoing complaint

and know the contents thereof. I am informed and believe the matters

therein are true and on that ground allege that the matters stated therein are

true.

2.    I make this Verification because plaintiff is absent from the County of

Manhattan where I maintain my office.

Executed this 14th day of August, 2007 at New York, NY

Beth A. Kaswan