UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------x   :
ROBERT L. GARBER, Derivatively on Behalf                       :
of LEHMAN BROTHERS HOLDINGS, INC.,                             :
                                                               :
                                        Plaintiff,             :
                                                               :
                          v.                                   :    Case No.:  07-CV-02990 (DAB)
                                                               :
RICHARD S. FULD, JR., MICHAEL L.                               :
AINSLIE, JOHN F. AKERS, ROGER S.                               :
BERLIND, THOMAS H. CRUIKSHANK,                                 :
MARSHA JOHNSON EVANS, SIR                                      :
CHRISTOPHER GENT, JOHN L. CECIL,                               :
ROLAND A. HERNANDEZ, JOHN D.                                   :
MACOMBER, DINA MERRILL, JONATHAN                               :
BEYMAN, DAVID GOLDFARB, JOSEPH M.                              :
GREGORY, JEREMY M. ISAACS,                                     :
CHRISTOPHER O'MEARA, THOMAS A.                                 :
RUSSO, BRADLEY H. JACK, HENRY                                  :
KAUFMAN, STEPHEN M. LESSING,                                   :
MICHAEL F. MCKEEVER, JEFFREY                                   :
VANDERBEEK,                                                    :
                                                               :
                                     Defendants,               :
                                                               :
                       - and -                                 :
                                                               :
LEHMAN BROTHERS HOLDINGS, INC.,                                :
                                                               :
                             Nominal Defendant.                :
-----------------------------------------------------------x   :
```

**MEMORANDUM IN SUPPORT OF  MOTION FOR SELECTION AS LEAD
PLAINTIFFS AND APPROVAL OF LEAD COUNSEL, AND IN OPPOSITION
TO MOTION OF LOCALS 302 AND 612 OF THE INTERNATIONAL UNION OF
OPERATING ENGINEERS- EMPLOYERS CONSTRUCTION INDUSTRY
RETIREMENT TRUST**

Saginaw Police & Fire Pension Board ("Saginaw") and Robert L. Garber

("Garber") have moved this Court for an Order appointing them as lead plaintiffs and

approving their selection of Scott + Scott LLP ("Scott + Scott") and Robins, Umeda and

Fink LLP ("RUF") as co-lead derivative counsel.

As discussed further below, there can be no question that Saginaw and Garber are

the most adequate lead plaintiffs as they were the ones, by and through counsel, that

unearthed the fraudulent behavior at the heart of this lawsuit.  Their selection and retainer

of Scott + Scott and RUF, law firms with substantial experience in prosecuting securities

and derivatives fraud actions, should likewise be approved.


<u>INTRODUCTION</u>

On April 13, 2007, following extensive investigation and research, this case was

filed, thereby exposing Lehman Brothers Holdings, Inc. ("Lehman" or the "Company")

for its manipulative and illegal "backdating" practices.  On May 4, 2007, the case of

*Staehr ex rel. Lehman Brothers Holdings, Inc. v. Fuld, et. Al.,* Civil Action No. 07-cv-

03562 (DAB) was filed by Plaintiff Staehr, by and through counsel, RUF.

Recognizing the validity and severity of the allegations of the original complaint filed

by Garber, the case of *Locals 203 & 612 of the International Union of Operation*

*Engineers-Employers Construction Industry Retirement Trust ex. Rel Lehman Brothers*

*Holdings, Inc. v. Fuld et al.,* Civil Action No. 07-cv-03950 (the "Locals" or the "Locals

Case"), was filed on May 21, 2007, alleging the same facts and prayers for relief as the

complaint in this action.  All three actions thus concern the backdating of Lehman stock

options by certain key executives and directors at Lehman that Scott + Scott discovered.

The complaints are also all against substantially the same key executives and directors

based upon the identical backdating practices.  Therefore, by Order dated July 10, 2007,

this Court ordered the three cases consolidated.  On August 1, 2007, Plaintiffs in the

Locals Case, by and through counsel, filed a motion for consolidation, motion to be

appointed lead plaintiff and for approval of lead counsel (the "August 1, 2007 Motion").

This motion, therefore:

1) Is in opposition to the August 1, 2007 Motion in so far as it seeks appointment of
   lead plaintiff and lead counsel;

2) Asks that Saginaw and Garber be appointed lead plaintiffs; and

3) Requests that this Court approve Saginaw and Garber's selection of Scott + Scott
   and RUF as co-lead derivative counsel.

## FACTUAL BACKGROUND

This case concerns "backdating" of stock option grants by Lehman executives and

directors between 1998 and 2001.  "Backdating" occurs when individuals issue stock

option grants at an exercise or "strike" price below the closing price of the share at the

true time of the grant.

A March, 2006 Wall Street Journal article first publicized the work of notable

business professors who had long researched stock option grant dates at various large

companies.  These professors found that many of the companies had widely improbable

stock option granting patterns in that, year after year, top executives at certain companies

received options on one of the lowest possible trading dates.  The article revealed that the

pattern of stocks dropping sharply right before the date of grants, then rising immediately

afterward, strongly suggested backdating practices at these companies.

Recognizing the harm to a company and its shareholders caused by backdating,

Scott + Scott sought to further investigate the practice immediately following the

publication of this Wall Street Journal article.  Scott + Scott quickly engaged a renown statistician to examine thousands of companies and their stock grant patterns to determine if backdating had or was occurring at them.   See Declaration of David R. Scott, Esq. (the "Scott Declaration"), ¶ 8.  Scott + Scott and their expert thereby performed statistical evaluations of the stock grant dates at scores of companies.  From this overview, they were able to narrow it to a smaller pool of companies (including Lehman) that exhibited extremely skeptical and curious results where the likelihood of the grant date and the date of the stock's lowest performance being the same were, in many cases, greater than winning the lottery.  See Complaint dated April 13, 2007 (Docket ID # 1)(the "Complaint"), ¶ 8.

Even from this select group of companies, Lehman stood out.  Scott + Scott and its expert, in fact, discovered that the odds that Lehman's stock option grant dates pattern would have occurred by chance were **greater than 800 million to one**.  They were able to come to this conclusion by comparing the exercise price of stock grants received by various executives over several years to the average exercise price in a given one-month period.  See Complaint, ¶ 9.

Therefore, after months of analysis, investigation, and narrowing down research, no doubt existed that backdating was occurring at Lehman at the expense of both the Company and all its shareholders, including Garber who opted, by and through Scott and Scott, to pursue this action and recover the losses incurred. Garber thus filed the 54-page complaint that walks through the years of purchasing and exercising of options on an individual basis for each defendant.

The extensive research undertaken by Plaintiff Garber, by and through his counsel, specifically revealed that the Defendants were engineering, authorizing, or permitting the award of Lehman stock options with an exercise price far below the fair market value of Lehman stock in order to reap hundreds of millions of dollars in unlawful profit at the expense of both the Company and the remaining stockholders. This is in direct violation of the Lehman Management Ownership Plan and the Lehman Employee Incentive Plan which provide that an employee or director may purchase Lehman common stock at a specific price, which is to be at least 100% of the fair market value of the stock *on the true date the stock option is granted.* By backdating a stock, the executive can pay a price that is lower than the price on the actual day that the option is granted and thus the company gets less money for the stock when the option is ultimately exercised. See Complaint, ¶¶ 4-5.

The backdating practices of the Defendants that were uncovered by Scott + Scott were not only *ultra vires* and in violation of certain adopted Lehman policies, but they also served to unjustly enrich the Defendants and resulted in a breach of fiduciary duties and the issuance of false and/or misleading financial statements. The Directors of Lehman, also listed as Defendants, had a duty to Lehman to administer the policies and a duty to oversee the practices at Lehman. The various practices and breaches exhibited by all the Defendants resulted in exposing Lehman to liability for federal income taxes, government investigations, prosecutions, and shareholder actions as well as causing the Company great harm by damaging its reputation, increasing its professional costs, and denying the Company payment for common stock to which it was entitled. See Complaint, ¶ 5.

Plaintiffs Garber and Saginaw, as stockholders of Lehman, have thereby been injured by the actions of the Defendants.  Combined, Garber and Saginaw not only possess a large number of Company shares, but are in a unique position as the original pursuers of this cause of action.  Unlike the Locals, who have merely piggy-backed off of these efforts, Garber has invested in months of research and statistical analysis to ferret out the wrongdoings at Lehman.  As such, he, along with Saginaw, has already and will continue to most vigorously and intensely pursue this action.

## LEGAL ARGUMENT

As set forth more fully below, Saginaw and Garber are the logical choice for lead plaintiffs because Garber, by and through his counsel, invested considerable time, expense and energy in uncovering the backdating at Lehman and in subsequently filing the original complaint.  That complaint first exposed the causes of action that the Locals later adopted. Therefore, Garber and Saginaw respectfully request that they be appointed lead Plaintiffs and be permitted their choice of lead counsel.

I.    Saginaw And Garber Are The Most Fit To Be Lead Plaintiffs.

Saginaw and Garber ask that this Court enter an Order appointing them as lead plaintiffs in the case, and thereby oppose the August 1, 2007 Motion by the Plaintiffs in the Locals Case to be appointed lead plaintiffs.  Under the law and for the reasons outlined below, it is clear that Saginaw and Garber are, in fact, the *most fit* to be lead plaintiffs.

A.    Plaintiffs In The Locals Case Misapply The Law.

The Plaintiffs in the Locals Case have misstated and confused the law surrounding selection of lead plaintiffs in derivative cases.  They rely on both the United States Supreme Court's decision in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949) as well as the Private Securities Litigation Reform Act of 1995 (the "PSLRA") to suggest that because they have the largest holdings (among the plaintiffs) in Lehman, they should be appointed lead plaintiffs in this *derivative* case.  However, this is simply not the law.  One District Court best recently explained that:

> [a]ppointment of lead plaintiff in such cases [securities cases] is governed by the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67 (1995).  *There is no similar act addressing shareholder derivative actions.*  Lee cites the United States Supreme Court's decision in Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949).  However, that decision does *not* address a contested position of lead plaintiff in a consolidated shareholder derivative action.  Rather, *Cohen* discusses the general responsibilities of a plaintiff in a derivative action as a representative of a group of similarly situated shareholders.

Lee v. Ambroseo, 2007 WL 1558565, at *2 (N.D. Cal. May 29, 2007) (emphasis added).

See also, In re Conesco, Inc. Securities Litigation, 120 F. Supp. 2d 729, 734 (S.D.Ind. 2000) ("The PSLRA does not directly apply to derivative actions"); In re Doral Financial Corp. Securities Litigation, 2006 WL 1120491, at *1 (S.D.N.Y., April 27, 2006) ("No statutory authority exists for the appointment of lead plaintiff in shareholder derivative actions").

Therefore, the Plaintiffs in the Locals Case have misstated the law surrounding appointment of lead plaintiff in a derivative case.  It is clear that they did this in an attempt to flex their number of shares and cause this Court to place undue weight on the

amount of Locals' stake in Lehman.  However, in a derivative case, "there is no presumption in favor of selecting the plaintiff with the largest financial stake as there is in cases under the Private Securities Litigation Reform Act."  In re Foundry Networks, Inc. Derivative Litigation, 2007 WL 485974, at *2 (N.D. Cal. Feb. 12, 2007).  Therefore, the number of shares possessed by the Plaintiffs in the Locals Case is not a determining factor in selecting the lead plaintiff.  Garber, through his investigation and initiative in bringing this case and Saginaw, with its almost 5,000 shares worth close to $300,000.00, have shown more than sufficient interest in Lehman to assure that this case is vigorously pursued.  See Scott Declaration, ¶ 3.

### B.    Saginaw And Garber Will Pursue The Action More Vigorously.

Instead, there can be absolutely no question that Garber (joined by Saginaw), as the original Plaintiff who not only filed the case, but caused the entire pattern of events and cause of action it concerns to be discovered, should be lead plaintiffs.  The question of the fitness of an individual or an entity to serve as lead plaintiff in a derivative action centers around various factors including whether the plaintiff holds shares of the company; whether the plaintiff is represented by capable counsel; and whether the plaintiff will prosecute the suit with energy, enthusiasm, and vigor.  See Wright v. Krispy Kreme Doughnuts, Inc., 232 F.R.D. 528 (M.D.N.C. 2005).

Saginaw and Garber absolutely meet and excel at these factors.  Saginaw possesses almost 5,000 shares in the Company with a present value of almost $300,000.00.  See Scott Declaration, ¶ 3.  As stated below, both parties have retained the

same capable counsel -- counsel that first assisted in uncovering and exposing the wrongdoings at the Company.[1]

Finally, the fact that Garber filed the original complaint cannot be overlooked as the *critical* factor in revealing that he will, in fact, pursue this case more vigorously than other plaintiffs. In Millman ex. Rel. Friedman's, Inc. v. Brinkley, 2004 WL 2284505, at*3 (N.D.Ga. Oct. 1, 2004), the District Court chose to appoint as lead plaintiffs those who filed the original complaint. That decision states that:

> Plaintiffs Millman and Walter filed their Complaint first and their Complaint appears to be replicated by Plaintiff Tam in his action. Plaintiff Tam's use of Plaintiffs Millman's and Walter's Complaint as a template for the Complaint filed by Plaintiff Tam underscores the quality of Plaintiffs Millman's and Walter's initial pleadings and leads the Court to give them strong marks for the quality of their work. *See, e.g.* Lloyd v. Indus. Bio-Test Labs., Inc.,  454 F. Supp. 807, 813 (S.D.N.Y. 1978)(citing which counsel drafted complaint as  factor in appointing lead counsel); *Dollens* at *5-6 (analyzing quality of pleadings; declining to appoint lead plaintiff "where he has simply adopted the complaint of [competing plaintiff] and has not otherwise demonstrated his ability to prosecute the case any more vigorously than other plaintiffs").

In this case, Plaintiff Garber, by and through counsel and with the assistance of their statistical expert, expended countless hours of research into the history and grant dates spanning years and scores of companies. From this, the practices at Lehman were discovered and the backdating was brought to light. Garber then, by and through counsel, filed the initial and comprehensive complaint which expressed the results of months of research in the form of tables, charts, dates, and lists, as well as laying out the

---

[1] The Locals Case plaintiffs state that "The Retirement Trust did not race to the courthouse to file a case against Lehman's officers and directors upon the mere announcement of a potential backdating scandal." (August 1, 2007 Memo at  p. 9). However, the "mere announcement" that they refer to must be the filing of this lawsuit as it was Garber, by and through counsel, that first discovered Lehman's backdating and brought it to Lehman's and the public's attention, in the form of this lawsuit. No other announcement is or could be cited. Prior to the institution of this lawsuit, there were no publicized reports of backdating by Lehman. The Locals have, therefore, merely filed a "**me too**" complaint capitalizing on the work and investigation of Garber and his counsel.

legal theories that Locals then, in large part, also adopted. It was entirely due to the

effort, work, expenses, investigation, and energy of plaintiff and counsel that this lawsuit

was even brought. Had Garber, by and through counsel, not caused this work to be done

and subsequently filed suit, Lehman would most likely never have been exposed, seeing

as Lehman never appeared on any of the SEC public lists of companies engaging in

backdating. See Scott Declaration, ¶ 10. Therefore, Garber has already demonstrated the

utmost degree of vigor and energy in bringing this case and, with Saginaw, will continue

to do so.

The Plaintiffs in the Locals Case have merely reformatted the information discovered

by Garber's counsel to draft their complaint and thereby seek to displace and step in the

shoes of Garber and his counsel without doing any of the original months of work or

research. Such a result would not only be unfair and unwarranted in this case, but would

have a chilling effect on others who might be contemplating the costs and effort needed

to prepare a case of this magnitude. Moreover, the work already performed demonstrates

that Garber (with Saginaw), as the original pleader and plaintiff, will prosecute this case

more vigorously than the other plaintiffs. As such, Plaintiffs Saginaw and Garber

respectfully request that this Court appoint them as lead Plaintiffs to robustly represent

Lehman's interests in this case.

II.     Scott + Scott And RUF Should Be Approved As Co-Lead Derivative Counsel.

Plaintiffs Saginaw and Garber further request that the Court approve their selection of

Scott + Scott and RUF as co-lead derivative counsel in the case. Under the law, once the

most adequate plaintiffs are selected, they shall choose appropriate counsel. 15 U.S.C.

Sec. 78u-4(a)(3)(B)(v). Saginaw and Garber have selected and retained Scott + Scott and

RUF to represent them derivatively on behalf of the Company.  Both firms are unquestionably qualified to serve as lead counsel in this derivative action.

Scott + Scott is a national law firm, recognized for its premier derivative class action and corporate governance litigation practice.[2]  See Scott Declaration, ¶ 11.  Scott + Scott has served as lead counsel specifically in a number of high-profile derivative federal class actions in which it participated in the recovery of recovery of millions of dollars and achieved precedent-setting reforms in corporate governance on behalf of its clients.  For example, in *In Re: Qwest Communications Int'l, Inc.*, 01-1451 (CBS) (D. Colo.), *In Re: Lattice Semiconductor Derivative Litig.*, No. 04-3327, *Knowles v. Gemstar-TV Guide*, No. 02-8440 (MRP) (C.D. Cal.), Scott + Scott initiated and litigated shareholder derivative cases and obtained far-reaching corporate governance and internal control reforms on behalf of shareholders. In the derivative case of *In re: Healthsouth Corp. Derivative Litig.*, 02-2565 (N.D. Ala.), in addition to other relief obtained, derivative plaintiffs recovered $17.5 million and $52 million from former Healthsouth CEO Richard Scrushy for the Company, and an additional $100 million on the Company's behalf from the Board Members accused of breaching their fiduciary obligations to Healthsouth's shareholders.  Scott + Scott has also served in leadership roles in other notable derivative suits, including *In re: OM Group, Inc. Derivative Litig.*, 03-0020 (N.D. Ohio); *Bonds, et. al. v. William Davidow, et. al. and Rambus Inc.*, No. 902086 (Super. Ct. Cal.); *Dasser v. Paul A.Frame, et. al. and Seitel, Inc.*, No. 02-1874 (S.D. Tex.). The settlements and corporate reforms achieved in these and other high-profile derivative cases are indicative of the results Scott + Scott typically achieves as lead counsel.

---

[2] According to a 2005 study of the top fifty plaintiffs' law firms by Securities Class Action Services (SCAS), a subsidiary of Institutional Shareholder Services (ISS), Scott + Scott is one of the top 20 plaintiff law firms in the United States.

In addition to the above derivative actions, Scott + Scott has been named sole or co- lead counsel in countless securities, antitrust and ERISA class actions in jurisdictions across the country, that have achieved billions of dollars in settlements and significant corporate governance reforms. For example, Scott + Scott, as lead counsel, recently successfully negotiated an $80 million settlement on behalf of class members in *In re: Priceline.com Sec. Litig.* (No. 00-1884) (D. Conn) where, like this case, no government investigation previously exposed the defendants' wrongdoings.  In his ruling approving the final $80 million settlement against Priceline.com, Judge Covello, United States District Judge for the District of Connecticut, made the following comments regarding Scott + Scott's performance and professionalism for the hard-fought litigation:

> The quality of representation here is demonstrated, in part, by the result achieved for the class.  Further, it has been this court's experience, throughout the ongoing litigation of this matter, that counsel have conducted themselves with the utmost professionalism and respect for the court and the judicial process.

Order, Dkt. # 479 at 10, *In re: Priceline.com Sec. Litig.* (No. 00-1884) (D. Conn July 20, 2007).

In particular, the attorneys at Scott + Scott that will work on this case cumulatively exhibit excellent credentials and experience that are difficult to match. Beth Kaswan, who will manage the day-to-day aspects of this litigation, has successfully represented plaintiffs in numerous actions involving complex securities and consumer fraud since 1998, including as a partner with the Milberg Weiss law firm in addition to her successes since joining Scott+Scott.  Additionally, Attorney Kaswan worked at the Department of Justice for almost 15 years, including as an Assistant U.S. Attorney at the U.S. Attorney's Office for this District, rising to the position of Deputy Chief of the Civil

Division, and has been repeatedly recognized by the Justice Department with awards for the many high profile cases she handled.

Ms. Kaswan will be assisted by two highly accomplished and experienced associates.[3] Geoffrey Johnson, who worked extensively and directly with the professional expert in this case to unearth the individual backdating practices at Lehman, is a graduate of the University of Chicago Law School, clerked for the Honorable Karen Nelson Moore, Sixth Circuit United States Court of Appeals, and has worked at Scott + Scott on securities, derivative and ERISA class action litigation, corporate governance and other complex commercial litigation, including among others: *In re: Priceline.com Securities Litigation*; *In re: GM ERISA Litigation*; *Shirk v. Fifth Third Bancorp.*; and *In re: Merck ERISA Litigation*.  Working along side Attorney Johnson on this case would be Attorney Amanda Lawrence, a graduate of Dartmouth College and Yale Law School who has worked for large firms in Washington, D.C., New York, Cleveland and Denver, and has worked on several high profile national securities fraud cases since 1997.  This team thus brings to this case decades of experience, expertise, knowledge and energy.

Further adding to this, Scott + Scott has agreed to serve as co-counsel with RUF, a firm that Scott + Scott has worked with extensively in the past and that is likewise competent, experienced, and highly capable to serve as lead counsel.  RUF, as outlined in their firm resume, has extensive experience and success in litigating derivative and class actions in federal and state courts across the nation.  In fact, RUF has secured numerous beneficial recoveries for shareholders in complex actions in the past, including securing $51.5 million for the company to be paid by the individual defendants and substantial

---

[3] Although the primary litigation team for this case is described herein, it will also at times include both David R. Scott and Arthur L. Shingler, III, who together achieved the far-reaching reforms and results in the *Qwest, Lattice, and Knowles* derivative suits described above.

corporate governance changes in the case of *In re Tenet Healthcare Corporation Derivative Litigation*, No. 01098905 (Santa Barbara Superior Court).  RUF, as sole lead counsel, also recently settled *In re OM Group Derivative Litig.*, Case No. 1:03CV0020 (N.D. Ohio), helping to secure $29 million for the company as well as affecting numerous highly beneficial corporate governance measures.

RUF has a long-standing relationship with Scott + Scott and the two firms will capably and energetically represent the Plaintiffs' interests in this derivative suit.

<u>CONCLUSION</u>

For the reasons set forth herein, proposed lead plaintiffs Saginaw Police & Fire Pension Board and Robert L. Garber respectfully request that this Court appoint Saginaw and Garber as lead plaintiffs, and approve their choice of lead counsel.

DATED:  August 14, 2007                    Respectfully submitted,

                                              SCOTT + SCOTT, LLP


                                              <u>/s/ Beth A. Kaswan</u>
                                              Beth Kaswan (BK-0264)
                                              75 Rockefeller Plaza
                                              19th Floor, Suite 1915
                                              New York, NY  10019
                                              Telephone:  212/710-1040
                                              Facsimile:  212/710-1041
                                              bkaswan@scott-scott.com

                                              David R. Scott (DS 8053)
                                              108 Norwich Ave.
                                              P.O. Box 192
                                              Colchester, CT 06415
                                              Telephone:  860/537-5537
                                              Facsimile:  860/537-4432
                                              drscott@scott-scott.com

                                      _____

                                              SCOTT + SCOTT, LLP
                                              Geoffrey Johnson
                                              33 River Street
                                              Chagrin Falls, OH  44022
                                              Telephone:  440/247-8200
                                              Facsimile:  440/247-8275
                                              gjohnson@scott-scott.com

                                              **Counsel for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on August 14, 2007, a copy of the foregoing Memorandum In Support Of Motion for Selection of Lead Plaintiffs and Approval of Lead Counsel and In Opposition to Motion of Locals 302 and 612 of the International Union of Operating Engineers-Employers Construction Industry Retirement Trust was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/Beth A. Kaswan_____
Beth A. Kaswan (BK-0264)