UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| IN RE LEHMAN BROTHERS HOLDINGS, INC. DERIVATIVE LITIGATION | : : : : : : : : : : : : | 07 Civ. 2990 (DAB)<br><br><br>DEMAND FOR JURY TRIAL |
| | x | |

**VERIFIED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**

RECEIVED
U.S.D.C. S.D.N.Y.
CASHIERS
JAN 04 2008

Plaintiffs Robert L. Garber, the Saginaw Police & Fire Pension Board, and the International Brotherhood of Electrical Workers Local No. 38 Pension Fund ("IBEW") (collectively, "Plaintiffs"), by and through Co-Lead Counsel Scott + Scott, LLP and Robbins Umeda & Fink, LLP (collectively, "Co-Lead Counsel"), derivatively on behalf of Lehman Brothers Holdings, Inc. ("Lehman" or the "Company"), allege as follows, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia,* the investigation conducted by and through Co-Lead Counsel, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, news reports, press releases, and other publicly available documents regarding Lehman, and the performance of statistical studies of the dates and amounts of stock option payments made to Lehman executives:

## I.   NATURE OF THE ACTION

1.      This is a shareholders' derivative suit brought by Plaintiffs, stockholders of Lehman, on behalf of Nominal Defendant Lehman and all Lehman shareholders against: Richard S. Fuld, Jr. ("Fuld"), Michael L. Ainslie ("Ainslie"), John F. Akers ("Akers"), Roger S. Berlind ("Berlind"), Thomas H. Cruikshank ("Cruikshank"), Marsha Johnson Evans ("Evans"), Sir Christopher Gent ("Gent"), Roland A. Hernandez ("Hernandez"), John D. Macomber ("Macomber"), Jeremy Isaacs ("Isaacs"), Bradley H. Jack ("Jack"), Henry Kaufman ("Kaufman"), Michael F. McKeever ("McKeever"), Dina Merrill ("Merrill"), Jeffrey Vanderbeek ("Vanderbeek"), Jonathan Beyman ("Beyman"), John L. Cecil ("Cecil"), David Goldfarb ("Goldfarb"), Joseph M. Gregory ("Gregory"), Christopher O'Meara ("O'Meara"), Thomas A. Russo ("Russo") (collectively, "Defendants").

2.      Plaintiffs bring claims to declare that stock options and restricted stock units ("RSU's") issued in violation of Lehman's stock plan are void and to set them aside, to recover wrongfully issued stock and stock proceeds, and to obtain damages for breach of fiduciary duty, misappropriation of corporate assets, unjust enrichment, gross mismanagement, corporate waste, misrepresentation and fraudulent concealment. These claims arise from the actions of Individual Defendants (described below) in engaging in, or in a sustained and systemic failure of oversight,

1

permitting others to engage in the wrongful and deceptive practice of intentionally manipulating and falsely reporting Lehman's stock option and RSU grant dates between 1997 and August 2002 (the "Grant Period"), in order to secure a huge financial windfall for themselves and others at the expense of Lehman. For the Grant Period, and through February 13, 2007 (the "Relevant Period"), as options vested, and as the expense for RSU's was amortized, and as the stock-based compensation was reported on Lehman's Form 10-K's filed with the SEC, Defendants also misstated Lehman's financial results by failing to properly report its true compensation expense and tax liabilities attributable to the grants of back-dated stock options and RSU's.

3.     Specifically, Company executives including Defendant Fuld, the Company's Chairman and Chief Executive Officer ("CEO"), Defendant Cecil, the Company's Chief Financial and Administrative Officer, Defendant Goldfarb, the Company's Chief Administrative Officer ("CAO") and Executive Vice President, Defendant Gregory, the Company's President and Chief Operating Officer ("COO") and former CAO, Defendant Isaacs, the Company's CEO for Asia and Europe, and Defendant Russo, Executive Vice-President and Chief Legal Officer ("CLO"), have engineered, authorized or permitted the award of Lehman stock options with exercise prices below the fair market value of Lehman's stock in violation of Lehman's stock option plans and have engaged in certain transactions, including the exercise of back-dated options, to reap hundreds of millions of dollars in unlawful windfall profits at the expense of the Company. These Defendants have also received misdated RSU's which were fraudulently concealed and falsely reported on Lehman's financial statements and federal tax returns.

4.     The stock option grants were back-dated in order to have the stock options issued at an exercise or "strike" price below the closing price of the shares at the true time of the grant, thus permitting these key executives to pocket more compensation than they otherwise were entitled to receive under Lehman's stock plans. As described by Professor James Cox of Duke University School of Law, back-dating grants is "a very sorry practice" – "[i]t's like letting the CEOs bet on a race when they know who the winner will be." This practice also exposed Lehman to additional liability for federal income taxes, government investigations and

2

prosecutions, as well as shareholder actions and liability based upon Lehman's issuance and publication of false financial statements and false tax returns.

5.    A stock option granted to an employee or director of Lehman allows the employee or director to purchase Company common stock at a specified price – referred to as the "exercise price" – for a specified period of time.  Under Lehman's stock plans, stock options were granted as part of an executive's compensation package to create incentives for him or her to boost profitability and, hence, stock value. When an executive or other employee exercised an option, he or she purchased the stock from the Company at the exercise price, regardless of the stock's price at the time the option was ultimately exercised.  Under Lehman's stock plans, the Compensation and Benefits Committee of Lehman's Board of Directors (the "Compensation Committee") was required to establish option (or "exercise") prices which were at least 100% of the Fair Market Value (*i.e.*, the stock's closing price on the NYSE and other exchanges) of the stock on the true date of the stock option grant.

6.    When an option is back-dated to a day on which a market price is lower than the price on the day the option is granted, the executive or other employee pays less and the Company gets less money for the stock when the option is ultimately exercised.  There are also serious federal tax consequences and different financial reporting requirements when a company issues stock options to employees at prices below fair market value.   Because of these consequences, Lehman's stock plans expressly prohibited the issuance of stock options below their fair market value, so that Defendants' authorization of the grant of the stock options was *ultra vires,* illegal and should be declared void and of no effect.  The wrongful pricing of the stock options resulted in excessive compensation to Lehman's executives and directors, including the Individual Defendants, resulted in Lehman's issuance of false and misstated financial statements, increased Lehman's federal tax liabilities by causing the options to be treated as non-deductible compensation under §162(m) of the Internal Revenue Code ("IRC"), increased Lehman's employee federal tax withholding requirements, and exposed Lehman to federal prosecution, government investigations, penalties and suits for violation of the securities laws for filing misstated financial statements. Lehman's financial statements were also false and

misstated for their failure to report as compensation costs and amortize as expense the true higher values of its RSU's based upon the higher values of Lehman common stock at the RSU's actual grant dates.

7.    Here, the unlawful stock option and RSU grants occurred between 1997 and August 2002 (before the Sarbanes-Oxley Act was enacted which required companies to disclose the grants within two days), while certain Director Defendants (described in Part II.D. ¶¶ 29-40) were directing the Company. Because many of the stock options vested over a 4 ½ year period, under Generally Accepted Accounting Principles ("GAAP"), and particularly Accounting Principles Board ("APB") Opinion No. 25, the wrongful grants affected Lehman's financial reporting and public reports (which the Directors signed) through at least 2007. Similarly, Lehman measured the amount of the compensation cost of the RSU's based on the market value of Lehman's common stock on the grant date of the RSU's, and then amortized and recognized the compensation expense over the vesting period, generally five years from the grant date, so that the false pricing of the RSU's also affected Lehman's financial reporting and public reports through 2007. The false financial and other public reports also served to fraudulently conceal Plaintiffs' causes of action. Thus, all the current Director Defendants, either by their actions or failures to act, as members of the Board of Directors, and its Committees, charged with oversight responsibilities over the issuance of the grants or their public reporting, shared in the responsibility for Lehman's false financial reporting such that a demand to the Board to act on the allegations herein would be futile. Even as public reports of widespread abuse of stock option dating practices became common, and the SEC issued new rules requiring enhanced disclosures of option grant dates and practices, Lehman's Director Defendants failed to act to question, verify, and investigate Lehman's own practices, and instead signed off on Lehman's 2006 Form 10-K which continued to falsely misrepresent Lehman's compensation costs for the back-dated stock-based compensation.

8.    This action seeks redress for Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith, candor, due care, and their knowing, reckless and/or gross negligence in, *inter alia*: (i) failing to monitor and oversee the process for issuing executive

4

stock options and RSU's and/or prevent the improper manipulation of employee stock options and RSU's and the grant of the stock options and RSU's at prices below that authorized by Lehman's stock plans; (ii) failing to monitor and oversee the process for reporting compensation expense for executive stock options and RSU's and/or prevent the public misreporting of compensation expense and earnings caused by the manipulation of the pricing of employee stock options and RSU's, including its effect on stock-based compensation expenses and tax liabilities; (iii) failing to properly implement, oversee and maintain appropriate and adequate accounting and internal controls, practices and procedures, namely concerning the administration of the Company's stock-based compensation plan; (iv) failing to ensure that Lehman's financial statements were prepared in accordance with GAAP; (v) failing to ensure that Lehman operated in compliance with all applicable federal and state laws, rules, and regulations requiring the dissemination of accurate financial statements and restricting the misuse of material non-public information; (vi) failing to ensure that Lehman did not engage in any unsafe, unsound, or illegal business practices; (vii) failing to investigate and remedy the violations of law and duty described above; and (viii)  misrepresenting and/or fraudulently concealing the back-dating practices. This suit also seeks to remedy the *ultra vires* acts by which the stock options were issued in violation of the stock plans and to recover misappropriated assets on behalf of the Company.

9.    The practice of back-dating stock options, though widespread, remained virtually undetected until mid 2006 when academic research was published in the media which revealed patterns of stock option grants that could not be explained by chance. Professor Eric Lie of the Tippie College of Business at the University of Iowa hypothesized that at least some grant dates must have been determined retroactively, prompting the SEC to begin investigating the anomaly. In March 2006, *The Wall Street Journal* published a study it performed with the help of Professor Lie and Professor John Emerson, a statistician at Yale University that tested Professor Lie's theory. (Charles Forelle and James Bandler, "The Perfect Payday," *The Wall Street Journal*, March 18, 2006). That article identified a number of companies at which executives had achieved stock paydays the likelihood of which far exceeded that of winning the lottery.

Since that date, more than 100 corporations have been the target of investigations by the SEC, and one or more United States Attorneys or others at the Department of Justice. Certain published studies have found that upwards of 1400 companies may have illegally back-dated stock options, and a survey of lawyers at top corporations reflects that more than a third considered probing their company's own option granting practices in the wake of the scandal. As a result of the investigations, prosecutions and studies on the illegal back-dating of corporate stock options that have been widely published in the media since 2006 through the present, and new SEC rules issued in response, public companies and their directors have known of their responsibilities to probe and verify the dates and practices by which their executive options were issued and reported.

10.     Statistical analyses of Lehman's stock option grants using academic and peer reviewed methods indicate that the same type of highly improbable statistical anomaly has occurred at Lehman. Here, Lehman's top executives received stock option grants on a total of nine different dates between January 1997 and July 2002. Of these nine grants, all but one of the grants was dated on the date when Lehman's stock price was trading at its lowest or second lowest point during the entire month. And the only stock option grant that was not dated on the lowest or second lowest trading date was dated on the fourth lowest trading date during the entire month. The statistical odds of Lehman's stock option granting pattern (*i.e.,* eight of the nine grants dated on the date when Lehman's stock was trading at its lowest or second lowest point during the entire month, and the ninth grant dated on the date when Lehman's stock was trading at its fourth lowest point for the month) occurring as a result of chance is astronomically high, in this case more than 18 billion to one. RSU's issued to Lehman executives were also reported as "granted" on suspiciously favorable dates.

11.     Defendants' malfeasance has caused, and will continue to cause Lehman great harm, by (i) indelibly damaging its reputation and loss of goodwill in general, (ii) causing it to expend considerable financial cost in having to review and restate previously issued financial statements; (iii) exposing the Company to potential criminal and civil liability, including potential suits for violations of the securities laws; (iv) denying the Company payment for

common stock to which it was entitled; and (v) exposing the Company to potential additional federal tax liability, interest and penalties imposed by the Internal Revenue Service for the mis-reporting of employee compensation deductions, and for the failure to pay withholding taxes as a consequence of the back-dating of options and RSU's provided to Lehman employees, including its executive officers.

## II.    THE PARTIES

### A.    Plaintiffs

12.    During the Relevant Period, Plaintiff Robert L. Garber engaged in the following transactions in Lehman stock:

| Date | Shares | Transact | # Shares |
|---|---|---|---|
| 11/8/2001 | 25 | Buy | 25 |
| 11/20/2001 | 50 | Buy | 75 |
| 11/20/2001 | 50 | Buy | 125 |
| 11/20/2001 | 25 | Buy | 150 |
| 10/31/2002 | -50 | Sale | 100 |
| 11/7/2003 | 50 | Buy | 150 |
| 2/4/2004 | 50 | Buy | 200 |
| 2/4/2004 | 5 | Buy | 205 |
| 2/4/2004 | 10 | Buy | 215 |
| 3/8/2004 | -25 | Sale | 190 |
| 7/6/2004 | -10 | Sale | 180 |
| 7/6/2004 | -50 | Sale | 130 |
| 7/6/2004 | -5 | Sale | 125 |
| 2/7/2005 | -25 | Sale | 100 |
| 3/7/2005 | -25 | Sale | 75 |
| 7/1/2005 | -10 | Sale | 65 |
| 9/1/2005 | -25 | Sale | 40 |

| 9/1/2005 | -15 | Sale | 25 |
| 9/1/2005 | -25 | Sale | 0 |
| 1/23/2007 | 14 | Buy | 14 |
| 1/28/2007 | 8 | Buy | 22 |

As such, Garber has standing to assert certain of the claims in this action. Plaintiff Garber resides in Pittsburgh, Pennsylvania.

13.    Plaintiff Saginaw Police & Fire Pension Board  purchased and continues to hold Lehman stock as follows:

| Date | Quantity | Transact | # Shares |
|------|----------|----------|----------|
| 1/12/2007 | 100 | Buy | 100 |
| 1/12/2007 | 400 | Buy | 500 |
| 1/16/2007 | 200 | Buy | 700 |
| 1/16/2007 | 100 | Buy | 800 |
| 1/16/2007 | 100 | Buy | 900 |
| 1/17/2007 | 300 | Buy | 1,200 |
| 1/18/2007 | 100 | Buy | 1,300 |
| 1/18/2007 | 300 | Buy | 1,600 |
| 1/19/2007 | 1,580 | Buy | 3,180 |
| 3/6/2007 | 100 | Buy | 3,280 |
| 3/7/2007 | 100 | Buy | 3,380 |
| 3/8/2007 | 200 | Buy | 3,580 |
| 3/9/2007 | 100 | Buy | 3,680 |
| 3/12/2007 | 100 | Buy | 3,780 |
| 3/13/2007 | 500 | Buy | 4,280 |

As such, Saginaw has standing to assert certain of the claims in this action. Saginaw is located in Michigan.

14.    IBEW engaged in the following transactions in Lehman stock:

| Date | Shares | Transact | # Shares |
|------|--------|----------|----------|
| 10/19/1999 | 5,000 | Buy | 5,000 |
| 10/6/2000 | 2,000 | Sell | 3,000 |
| 10/23/2000 | 3,000 | Split | 6,000 |
| 5/1/2006 | 6,000 | Split | 12,000 |
| 2/13/2007 | 1,500 | Sell | 10,500 |

As such, the IBEW has standing to assert certain of the claims in this action. IBEW is located in Ohio.

**B.    Nominal Defendant**

15.    Nominal Defendant Lehman is a Delaware Corporation and during the Relevant Period has maintained its executive offices at 745 Seventh Avenue, New York, NY 10019. Lehman provides financial services to corporations, governments and municipalities, and institutional customers worldwide. It offers an array of equities and fixed income sales, trading, and research, investment banking services, and investment management and advisory services. The Company operates through three segments: Investment Banking, Capital Markets, and Investment Management. The Investment Banking segment provides advice on mergers, acquisitions, and other financial matters. It also raises capital for clients by underwriting public and private offerings of debt and equity securities.

16.    Lehman was founded in 1850 and is headquartered in New York City. Lehman common stock trades on the New York Stock Exchange ("NYSE") and Pacific Stock Exchange under the symbol "LEH."

17.    Throughout the grant period, Lehman had stock-based incentive compensation plans, including the 1996 Management Ownership Plan, which, with certain limitations, authorized the grant of stock-based awards, including stock options and RSU's, to Lehman executives as incentive compensation. A copy of the 1996 Management Ownership Plan (the "Plan"), and the Plan as amended through March 31, 2001, are attached hereto and incorporated

herein as Exhibit A. Directors who served on the Lehman Compensation Committee had the authority and responsibility to determine the awards to Lehman's senior management in compliance with the terms of the Plan. Throughout the grant period, members of the Compensation Committee authorized and/or permitted grants of incentive stock options and RSU's to Lehman executives in violation of the terms of the Plan. Throughout the Relevant Period, members of the Lehman Board of Directors had oversight responsibilities to direct the affairs of Lehman and to oversee and assure the integrity of the process and internal controls for granting incentive stock options and RSU's and for the public reporting of Lehman's stock-based compensation and financial performance. The Lehman Board of Directors often relied upon and delegated to committees of its members performance of these responsibilities, including Lehman's executive committee (the "Executive Committee"), the nominating and corporate governance committee (the "Governance Committee") and the audit committee (the "Audit Committee"). More than half of the current members of the Board of Directors served on these committees and engaged in a sustained and systemic failure to exercise oversight over the process by which stock options were granted and accounted for in Lehman's financial statements.

## C.    **Officer Defendants**

18.    During the Relevant Period, the following parties, sometimes referred to herein as the "Officer Defendants," served as senior officers.

19.    Defendant Fuld has been employed at Lehman, and its subsidiaries, since 1969. He has been Chairman of the Board of Directors of Lehman since April 1994 and has been Lehman's Chief Executive Officer ("CEO") since November 1993. Fuld has been a member of the Executive Committee since 1993. Fuld has improperly received millions of dollars of excessive compensation through the receipt and vesting of back-dated stock options and RSU's granted in violation of the Plan. Throughout the Relevant Period, with knowledge or the reckless disregard of the back-dated options and RSU's, Fuld has signed proxies and other reports filed with the Securities and Exchange Commission ("SEC") that contained false statements about the issuance of stock-based compensation to himself and other Lehman executives, and which

materially misstated Lehman's compensation expense for the back-dated stock options and RSU's. During the Relevant Period, with knowledge or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, Fuld sold nearly 4.7 million shares of Lehman stock for proceeds of $209.7 million. At the time this action was filed, Defendant Fuld was a resident of Greenwich, Connecticut.

20.    Defendant Gregory served as the Company's CAO from 1998 to 2000, has been President and COO of Lehman since 2004 and is a member of the Company's Executive Committee. From 2002 until 2004, Gregory was the Company's Co-COO. From 2000 until 2002, he was the Company's CAO, and from 1996 to 2000, he was head of the Company's Global Equities Division, in charge of the overall equities business. He joined Lehman in 1974. During the Grant Period, Gregory received both back-dated stock options and RSU's. During the Relevant Period, Defendant Gregory, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold 6.8 million shares of Lehman stock for $255.4 million. At the time this action was filed, Defendant Gregory was a resident of Huntington, New York.

21.    Defendant Isaacs is CEO for Lehman Brothers Europe & Asia and a member of the Company's Executive Committee. Isaacs joined the Company in 1996, as Co-COO of European Equities and later that year became head of Global Equity Derivatives. In 1997, he was appointed head of European Equities and retained responsibility for the global equity derivatives business. In March 1999, he became COO, Europe, and, in December 1999, was appointed CEO, Europe. In April 2000, he was additionally named head of the Lehman's Asian operations, and has held the role of CEO, Europe & Asia since then. During the Grant Period, Isaacs received both back-dated stock options and RSU's. During the Relevant Period, Defendant Isaacs, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold 605,000 shares of Lehman stock for $19.7 million. At the time this action was filed, Defendant Isaacs was a resident of the United Kingdom.

22.    Defendant Russo is an Executive Vice President and the Chief Legal Officer of Lehman. Russo is a Vice Chairman of Lehman and is a member of and serves as Counsel to Lehman's Executive Committee. He is responsible for the Company's Corporate Advisory Division, which includes Legal, Compliance, Corporate Audit, Government Relations and Transaction Management. In that capacity, Russo had the obligations to probe and verify Lehman's stock option granting process as the back-dating scandal became widely reported in the media. During the Grant Period, Russo received both back-dated stock options and RSU's. During the Relevant Period, Defendant Russo, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold 1.38 million shares of Lehman stock for $61.9 million. At the time this action was filed, Defendant Russo was a resident of New York, New York.

23.    Defendant Vanderbeek served in Lehman's Office of the Chairman from 2002 until he resigned from the Company in June 2004. Defendant Vanderbeek joined the Company in 1984, and served in various senior capacities until he was promoted to COO of Fixed Income Government Department and COO of Fixed Income Derivative Department of Lehman in 1993, serving in this capacity until his promotion in 1996 as head of Global Fixed Income Division, serving in the position until his promotion in 2002 to head of Lehman's Capital Markets Division. During the Grant Period, Vanderbeek received both back-dated stock options and RSU's. During the Relevant Period, Defendant Vanderbeek, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold 2.3 million shares of Lehman stock for $65.4 million. At the time this action was filed, Defendant Vanderbeek was a resident of Warren, New York.

24.    Defendant O'Meara served as Executive Vice President and Chief Financial Officer ("CFO") of Lehman from 2004 until December 1, 2007, and in that capacity signed certifications of Lehman's false financial statements and deficient internal controls for Lehman's 2004 through 2006 Form 10-K's. Additionally, O'Meara served as Lehman's Global Controller since 2002. During the Relevant Period, Defendant O'Meara, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold

12

15,932 shares of Lehman stock for $1.2 million. At the time this action was filed, Defendant O'Meara was a resident of New York, New York.

     25.    Defendant Jack joined the Company in 1984 and has held a number of senior management positions, including as the Company's Co-COO. During the Grant Period, Jack received both back-dated stock options and RSU's. During the Relevant Period, Defendant Jack, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold 3.4 million shares of Lehman stock for $99.1 million. At the time this action was filed, Defendant Jack was a resident of Fairfield, Connecticut.

     26.    Defendant Cecil is a former Chief Financial and Administrative Officer of the Company, having left those positions on or about February 29, 2000. During the Grant Period, Cecil received both back-dated stock options and RSU's. At the time this action was filed, Defendant Cecil was a resident of Larchmont, New York.

     27.    Defendant Goldfarb has been global head of Strategic Partnerships, Principal Investing and Risk for Lehman since October 2006. Goldfarb is also chairman of the Company's Pension Trustee Committee. Goldfarb served as CAO of Lehman from 1995 to 2000, and as CFO from 2000 to December 2004. As CFO, Goldfarb was involved in and responsible for the false financial accounting of the back-dated options and RSU's, and Goldfarb signed false certifications approving Lehman's accounting and internal controls filed with Lehman's Form 10-K's. During the Grant Period, Goldfarb received both back-dated stock options and RSU's. During the Relevant Period, Defendant Goldfarb, with knowledge of or in reckless disregard of the wrongful issuance and false reporting of the back-dated options and RSU's, sold 998,760 shares of Lehman stock for $47.2 million. At the time this action was filed, Defendant Goldfarb was a resident of Woodbury, New York.

     28.    Each of these Executives received stock options and/or RSU's that, in light of the statistical unlikelihood that their terms could have occurred by chance, may fairly be inferred as having been back-dated to include exercise prices that were below the trading price of the true date of the grants. As such, each of the Defendants received windfall compensation and were unjustly enriched by the receipt of stock options and RSU's that were illegally issued in violation

of Lehman's stock plans. As the Company's Executives, the Officer Defendants assumed important managerial responsibilities at Lehman, which required them to implement appropriate internal controls to assure that stock-based compensation was paid and truthfully reported in accordance with law and with Lehman's stock plans. Rather than fulfill these important fiduciary duties which the Officer Defendants owed to Lehman, they actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached their fiduciary duties to Lehman by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. Because of their positions, and their own receipt of back-dated options and/or RSU's, they knew Lehman's executive compensation and accounting and public reporting practices, including via access to internal corporate documents, conversations and contacts with other corporate officers, directors, employees and outside auditors, tax professionals and attorneys, attendance at management and Board meetings, and via reports and other information provided to them in connection therewith. During the Relevant Period, they participated in (or had responsibility for) the  process by which stock options were improperly granted and back-dated as well as the issuance of false and/or misleading statements, including the approval of the false and/or misleading press releases, proxy statements, periodic financial statements, tax returns and SEC filings.

**D.    The Director Defendants**

29.    The following parties, sometimes referred to herein as the "Director Defendants," during the Relevant Period, serve as members of the Board as follows:

30.    Defendant Ainslie has served as a Director of the Company since 1996, and is a member of the Audit Committee. Ainslie is also a Director of the Lehman Brothers Bank, FSB. At the time this action was filed, Defendant Ainslie was a resident of Palm Beach, Florida.

31.    Defendant Akers has served as a Director of the Company since 1996. Defendant Akers serves as Chairman of the Compensation Committee that administers Lehman's stock plans. At the time this action was filed, Defendant Akers was a resident of Westport, Connecticut.

14

32.    Defendant Berlind has served as Director of the Company since 1985. He serves as Chairman of the Audit Committee. At the time this action was filed, Defendant Berlind was a resident of New York, New York.

33.    Defendant Cruikshank has served as Director of the Company since 1996. He has served as Chairman of the Audit Committee since 2004 and has been a member of the Governance Committee since 2003. Cruikshank previously served as a member of the Audit Committee. At the time this action was filed, Defendant Cruikshank was a resident of Dallas, Texas.

34.    Defendant Kaufman has served as Director of the Company since 1995. He serves as a member of the Governance Committee from 1996 to 2002. At the time this action was filed, Defendant Kaufman was a resident of New York, New York.

35.    Defendant Macomber has served as Director of the Company since 1994. He served as Chairman of the Compensation Committee from 1995 to 2004 and has served as a member of the Compensation Committee since that time. Macomber has served as a member of the Executive Committee and Governance Committee. At the time this action was filed, Defendant Macomber was a resident of Washington, DC and North Haven, Maine.

36.    Defendant Evans has been a Director of Lehman since 2004. She serves as the Chairman of the Governance Committee and as a member of the Compensation Committee. At the time this action was filed, Defendant Evans was a resident of Alexandria, Virginia.

37.    Defendant Gent has been a Director of Lehman since 2003. He serves as a member of the Audit Committee and the Compensation Committee. At the time this action was filed, Defendant Gent was a resident of the United Kingdom.

38.    Defendant Hernandez has been a Director of Lehman since 2005. At the time this action was filed, Defendant Hernandez was a resident of California.

39.    Defendant Merrill served as a Director and a member of the Compensation Committee from 1998 to April 2006. At the time this action was filed, Defendant Merrill was a resident of New York, New York and Los Angeles, California.

40.    The above-named Directors are collectively referred to in this Complaint as the "Director Defendants." As members of the Board and pursuant to Lehman's Code of Ethics, the Director Defendants owed a duty to Lehman to be reasonably informed about and to monitor and exercise oversight over the business, operations and financial reporting of the Company and to act in the best interest of the Company.    Those directors who were members of the Compensation Committee, the Governance Committee and the Audit Committee had obligations to administer the Stock Plans in accordance with their terms, and/or to assure that appropriate internal controls were in place and to monitor the awards. In violation of those obligations, and without legal authority, these members knowingly or recklessly approved or permitted the approval of stock options and RSU's for prices that were less than fair market value.    Those directors who were members of the Audit Committee also had obligations to assure that appropriate internal controls were implemented and observed with respect to the accurate recording of stock-based compensation in corporate records, and for their reporting in Lehman's financial statements and tax returns.    Rather than acting in good faith to fulfill these important fiduciary duties that the Director Defendants owed to Lehman, each actively participated in or knowingly or recklessly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached their fiduciary duties and obligations of good faith and loyalty by failing in a sustained and systemic manner to exercise oversight and thereby disregarding these wrongful acts or omissions. Because of their positions, these Directors knew (or recklessly disregarded) Lehman's executive incentive stock-based compensation, accounting and reporting practices, via access to internal corporate documents, conversations and connections with other corporate directors, officers, and employees, attendance at management, Board and Committee meetings, and via reports and other information provided to them in connection therewith. During the Relevant Period, more than half of the Director Defendants received back-dated stock options and/or RSU's, or through their membership on sub-committees of the Board of Directors, participated in the process by which stock options were illegally granted, back-dated and approved and/or the process for the issuance of false and/or

16

misleading statements, including the approval of the false and/or misleading press releases, proxy statements, periodic financial statements and SEC filings.

41.    The Officer Defendants and Director Defendants identified in Parts II.C and II.D, above, are referred to collectively as the "Individual Defendants."

### III.    JURISDICTION AND VENUE

42.    This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332, because Plaintiffs' claims, brought derivatively, exceed $75,000 and the suit is between citizens of different states.

43.    Venue is proper in this Court pursuant to Section 28 U.S.C. § 1391, because Nominal Defendant Lehman is a resident of this District and substantially all of the other Defendants either reside or conduct business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

### IV.    SUBSTANTIVE ALLEGATIONS

#### A.    Lehman's Stock Option Plans

44.    For all periods relevant to this lawsuit, Lehman had stock option plans, including a "1996 Management Ownership Plan" (the "Plan"), which was amended through March 31, 2001 (Exhibit A), pursuant to which purported authority for the grant of stock-based incentive compensation, including stock options and RSU's were awarded, on a sporadic basis, to Lehman's executive management, including the Officer Defendants.    Non-Management Directors, as part of their compensation, received RSU's on the days of the shareholder annual meetings or could elect to receive stock options pursuant to the 1994 Management Ownership Plan.

45.    Pursuant to the Plan, the Compensation Committee had the responsibility and authority to administer the Plan, select the executives to receive stock option awards and determine the terms of the awards subject to the provisions of and limitations in the Plan. The Plan also authorized the Committee to award RSU's that were "valued in whole or in part by reference to, or otherwise based on, the Fair Market Value of [Lehman] Common Stock."

46.    Among other things, the Compensation Committee was required to "administer the Plan in such a manner as to comply with the requirements for deductibility under §162(m) of the [Internal Revenue] Code," and in the case of incentive stock options, § 422(b) of the Internal Revenue Code. Under the Plan, the Compensation Committee was also directed to "establish the option price at the time each stock option is granted, which shall not be less than 100% of the Fair Market Value of the Common Stock on the date of grant." The Plan defined "Fair Market Value" on any date to mean, "the closing price of the shares on such date on the principal national securities exchange on which such shares are listed or admitted to trading," *i.e.* the New York Stock Exchange.

47.    By back-dating the stock options and RSU's and issuing the options at prices below the closing price on the NYSE on the true date of the grant, Defendants engaged in *ultra vires* acts. As such, the back-dated RSU's and stock options improperly issued to Officer Defendants that remain unexercised should be declared legally invalid and set aside, and to the extent that the options have been exercised, the resulting stock and/or other proceeds should be recovered from each of the Officer Defendants.

## B.    Duties of the Company's Directors and Officers

48.    By reason of their positions as directors, officers and/or fiduciaries of Lehman and because of their ability and responsibility to control and/or monitor and oversee the business, corporate and financial affairs of Lehman, and pursuant to Lehman's Code of Ethics and Charters, each of the Defendants owed Lehman the duty of good faith and loyalty in their exercise of care and diligence in the management, administration and monitoring of the affairs of the Company and in the use and preservation of its property and assets. Each also had a duty and responsibility to monitor and exercise oversight to assure that only truthful disclosures about Lehman's executive stock-based compensation were included in Lehman's public reports. Further, Defendants owed a duty to Lehman to monitor and ensure that the Company operated in compliance with all applicable federal and state laws, rules, and regulations and within the bounds of their authority under the Lehman's stock plans, and ensure that Lehman not engage in any unsafe, unsound, or illegal business practices. The conduct of Defendants complained of

18

herein involves knowing and/or reckless violations of their duties as directors of Lehman, a lack of due diligence and the absence of good faith on their part of which Director Defendants were aware or should have been aware posed a risk of serious injury to Lehman. By signing Lehman proxies and Form 10-K's that misstated Lehman's compensation expense and earnings, and which falsely stated that the options and RSU's were valued as of their grant dates, the Directors also knowingly or recklessly made false representations to Lehman shareholders, and concealed from shareholders claims to set aside the wrongfully issued options and RSU's.

49.     Director Defendants, by their fiduciary duties and obligations of good faith and loyalty, and pursuant to Lehman's Code of Ethics, owed to Lehman a duty to monitor and exercise oversight to ensure that the Company's financial reporting fairly presented, in all material aspects, the earnings and financial condition of Lehman. Because Lehman executives were personally interested in the process by which incentive stock-based compensation was granted to them, Directors had a particularly important role in assuring the integrity of the granting process and in connection with the financial reports on the grants which they signed. In order to adequately carry out their duties, it was necessary for Director Defendants to know and understand the material, non-public information to be disclosed or omitted from the Company's public statements. This material, non-public information included the fact that Lehman's internal controls were woefully defective and that the Company's executives were improperly causing their stock options to be back-dated, and that the Compensation Committee was administering the stock plans in violation of the stock plan terms and their authority.

50.     To discharge these duties, Defendants were required to exercise, oversee and monitor the management, policies, practices, controls, and financial and corporate affairs of Lehman. By virtue of these obligations, Defendants were required, among other things, to:

(a)     question, manage, conduct, supervise, and direct the employees, businesses and affairs of Lehman, in accordance with laws, rules and regulations, and the charter, by-laws, and stock plans of Lehman;

(b)     neither violate nor permit any officer, director or employee of Lehman to violate applicable laws, rules, regulations and Lehman's stock plans, and to exercise control and supervision over such officers and employees; and

ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Lehman;

(c)     remain informed as to how Lehman was, in fact, operating, particularly with respect to its grant and accounting for executive stock-based compensation, and upon receiving notice or information of unsafe, imprudent or unsound practices, to investigate in connection therewith and to take steps to correct that condition or practice, including, but not limited to, maintaining and implementing an adequate system of internal controls to gather and report information internally, to allow Defendants to perform their oversight function properly to prevent the use of non-public corporate information for personal profit;

(d)     supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Lehman and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers of Lehman and to make full and accurate disclosure of all material facts, concerning *inter alia*, each of the subjects and duties set forth above; and

(e)     preserve and enhance Lehman's reputation as befits a public corporation and to maintain public trust and confidence in Lehman as a properly managed institution fully capable of meeting its duties and obligations.

51.     Lehman's Code of Ethics also recognizes the critical importance that Lehman's financial disclosures are full, fair and accurate and imposes duties on Lehman's officers and directors:

**Full, Fair, Accurate, Timely and Understandable Disclosure**

It is crucial that all books of account, financial statements and records of the Firm reflect the underlying transactions and any disposition of assets in a full, fair, accurate and timely manner. All employees and directors who are involved in the Firm's disclosure process are required to know and understand the disclosure requirements applicable to the Firm that are within the scope of their responsibilities, and must endeavor to ensure that information in documents that Lehman Brothers files with or submits to the SEC, or otherwise disclosed to the public, is presented in a full, fair, accurate, timely and understandable manner. Additionally, each individual involved in the preparation of the Firm's financial statements must prepare those statements in accordance with Generally Accepted Accounting Principles, consistently applied, and any other applicable accounting standards and rules so that the financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of the Firm.

Furthermore, it is critically important that financial statements and related disclosures be free of material errors. Employees and directors are prohibited

from knowingly making or causing others to make a materially misleading, incomplete or false statement to an accountant or an attorney in connection with an audit or any filing with any governmental or regulatory entity. In that connection, no individual, or any person acting under his or her direction, shall directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence any of the Firm's internal auditors or independent auditors if he or she knows (or should know) that his or her actions, if successful, could result in rendering the Firm's financial statements materially misleading.

52.     As Lehman reported in its most recent Form 10-K, as a leader in the financial services industry, its responsibility for full compliance with legal and regulatory requirements is particularly important and non-compliance is particularly costly:

**Legal, Regulatory and Reputational Risk**

The securities and financial service industries are subject to extensive regulation under both federal and state laws in the U.S. as well as under the laws of the many other jurisdictions in which we do business. We are subject to regulation in the U.S. by governmental agencies including the SEC and Commodity Futures Trading Commission, and outside the U.S. by various international agencies including the Financial Services Authority in the United Kingdom and the Financial Services Agency in Japan. We also are regulated by a number of self-regulatory organizations such as the National Association of Securities Dealers, the Municipal Securities Rulemaking Board and the National Futures Association, and by national securities and commodities exchanges, including the New York Stock Exchange. As of December 1, 2005, Holdings became regulated by the SEC as a consolidated supervised entity ("CSE"), and as such, we are subject to group-wide supervision and examination by the SEC, and accordingly, we are subject to minimum capital requirements on a consolidated basis. Violation of applicable regulations could result in legal and/or administrative proceedings, which may impose censures, fines, cease-and-desist orders or suspension of a firm, its officers or employees.

The scrutiny of the financial services industry has increased over the past several years, which has led to increased regulatory investigations and litigation against financial services firms. Legislation and rules adopted both in the U.S. and around the world have imposed substantial new or more stringent regulations, internal practices, capital requirements, procedures and controls and disclosure requirements in such areas as financial reporting, corporate governance, auditor independence, equity compensation plans, restrictions on the interaction between equity research analysts and investment banking employees and money laundering. The trend and scope of increased regulatory compliance requirements have increased costs.

Our reputation is critical in maintaining our relationships with clients, investors, regulators and the general public, and is a key focus in our risk management efforts.

53.     Each Defendant breached his fiduciary duties, including his/her duties of loyalty and good faith by failing to oversee and monitor the process by which executive stock-based compensation was granted and accounted for in reports filed with the SEC, by failing to implement appropriate internal controls, by allowing other Defendants to cause, or by themselves causing the Company to violate the terms of the Plan, to file false tax returns and to misrepresent Lehman's financial results, as detailed herein, and/or by failing to prevent other Defendants from taking such illegal actions. Even when put on notice of widespread corporate abuse of stock-dating practices, Defendants failed to probe, verify and investigate, and then correct Lehman's practices, to restate past materially misstated financial reports or to seek to recover Lehman's property or damages suffered by Lehman. As a result, Lehman has and will unnecessarily expend significant sums of money. Such expenditures include, but are not limited to:

(a)     Costs of excessive compensation;

(b)     Costs incurred to carry out internal investigations, including legal fees paid to outside auditors and counsel;

(c)     Additional tax liabilities, penalties and interest; and

(d)     Costs incurred in investigating and defending Lehman and certain directors and officers in potential class action lawsuits, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

54.     Moreover, these actions will irreparably damage Lehman's corporate image and goodwill. For at least the foreseeable future, Lehman will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Lehman's ability to raise equity capital or debt on favorable terms in the future may be impaired.

## C.     Duties and Responsibilities of Committees of the Board

55.     Throughout the Relevant Period, the standing committees of the Board included: (i) the Benefits Committee; (ii) the Audit Committee; (iii) the Governance Committee; and (iv)

the Executive Committee. The Director Defendants serving on these committees breached their duties and responsibilities delegated to them by the full Board of Directors.

### Compensation and Benefits Committee

56.     The following Director Defendants served on the Compensation Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| COMPENSATION AND BENEFITS COMMITTEE | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Defendant | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
| Akers | M | M | M | M | M | M | M | C | C | C | C |
| Evans | | | | | | | | | | M | M |
| Gent | | | | | | | | M | M | M | M |
| Macomber | C | C | C | C | C | C | C | M | M | M | M |
| Merrill | M | M | M | M | M | M | M | M | M | | |
| | | | | | | | | | | | |
| M = Member     C = Chairman | | | | | | | | | | | |

57.     According to the Company's proxy statements, the Compensation Committee "oversees the compensation and benefits programs of the Company and the evaluation of the Company's management, with particular attention given to the Company's Chief Executive Officer and other senior executives."

58.     Under the Plan, the Compensation Committee had and has the responsibility to administer the Plan, including selecting the plan participants who will receive awards and determining the terms of the stock-based awards, including for RSU's and stock options, subject to the limitations in the Plan. The proxies also provide that the "Compensation Committee has an established compensation philosophy that is reviewed annually and provides the foundation for making its decisions with respect to the Company's compensation and benefit programs in general and the compensation of its executive officers."

59.     Under the Plan, the Compensation Committee's authority to grant stock-based compensation was limited in the following respects:

- The Compensation Committee was required to administer the Plan "in such a manner as to comply with the requirements for deductibility under Section 162(m) of the [Internal Revenue] Code";

- With respect to the grant of incentive stock options, the Compensation Committee was required to provide terms and conditions that complied with Section 422(b) of the Internal Revenue Code. The requirements included that the Committee "shall establish the option price at the time each stock option is granted, which price shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant";

- For other stock-based awards, including RSU's, the Committee was authorized to issue awards valued in whole or in part by reference to the Fair Market Value of Lehman's stock at the time of the grant.

60.    Each of the above-referenced requirements was violated by Defendants Akers, Macomber and Merrill as members of the Compensation Committee during the Grant Period, and, as such, each faces a substantial likelihood of liability by this action. Defendants Akers and Macomber continue to serve on the Board of Directors, and are disabled from performing a disinterested review of the claims in this case, and from acting to bring suit and remedy the wrongs described herein.

### *Audit Committee*

61.    The following Director Defendants served on the Audit Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| Defendant | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|-----------|------|------|------|------|------|------|------|------|------|------|------|
| Ainslie | M | M | M | M | M | M | M | M | M | M | M |
| Berlind | C | C | C | C | C | C | M | M | M | M | M |
| Cruikshank | M | M | M | M | M | M | C | C | C | C | C |
| Gent | | | | | | | | M | M | M | M |
| | | | | | | | | | | | |
| **M = Member    C = Chairman** | | | | | | | | | | | |

62.    As described in Lehman's Charter for the Audit Committee of the Board of Directors, the "purpose of the Audit Committee" is, *inter alia*, "to assist the Board of Directors in fulfilling its oversight of: 1. the quality and integrity of the Corporation's financial statements; and 2. the corporation's compliance with legal and regulatory requirements.

63.    With respect to the Audit Committee's oversight of the financial reporting process, Lehman's Audit Committee charter required the Committee to "review the Corporation's disclosure controls and procedures and accounting and financial reporting processes and controls," and specifically provided that:

> The Audit Committee shall obtain and discuss with management and the independent auditors, prior to the filing of each audit report with the SEC, a report regarding:
>
> (i)    all critical accounting policies and practices of the Firm;
>
> (ii)   all alternative treatments within GAAP, for policies and practices related to material items, that have been discussed with management, including the ramifications of the use of the alternative disclosures and treatments, and the treatment preferred by the independent auditors;
>
> (iii)  major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles;
>
> (iv)   major issues as to the adequacy of the Corporation's internal controls and any specific audit steps adopted in light of material control deficiencies; and
>
> (v)    any other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

64.    Beginning with the proxy statements filed for the fiscal year 2001 annual shareholders meeting, and thereafter, through the proxy filed for the FY 2006 meeting, the Audit Committee members included their representations that they had the responsibility to monitor and oversee the Company's processes for internal controls, the financial reporting process and preparation of the consolidated financial statements by management, and, in that context, that

they had met and held discussions with management about the Company's compliance with GAAP.

65.    On February 8, 1999, the National Association of Securities Dealers ("NASD") and the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees released its report announcing ten far-reaching recommendations to improve the quality of corporate financial reporting. Based, in large part, upon this report, the SEC adopted new rules and amendments to then existing rules to improve disclosure relating to the functioning of corporate audit committees and to enhance the reliability and credibility of financial statements of public companies. As the SEC explained, "Audit Committees play a critical role in the financial reporting system by overseeing and monitoring management's and the independent auditor's participation in the financial reporting process."

66.    As is more fully explained below, throughout the Relevant Period, *i.e.* 1997 through 2007, Lehman represented in its public reports that, for the Grant Period, it was fixing or had fixed the price of its executive stock options based on the fair market value **at the time of the grant**, so that, under GAAP, and particularly APB 25, no compensation expense was recognized for these options, and that the reported amortized expense for the RSU's was based upon a determination of the compensation cost of the RSU's that reflected the fair market value of Lehman's common stock **at the date of the grant**. Each of these explicit representations regarding Lehman's practices for issuing stock-based compensation to its executives, was false as a result of Lehman's back-dating practices, and the amounts reported as compensation expense for the RSU's was materially understated. For the stock options, no compensation expense was reported as the options vested, when it should have been, both for the value attributable to the below-market exercise price, and for the options' intrinsic value since the safe harbor in APB 25 did not apply to options issued for less than fair market value. The members of the full Board of Directors signed the Form 10-Ks that included these false representations.

67.    Even after the back-dating scandal broke, and the SEC issued new disclosure rules to address the back-dating abuses, and when the Audit Committee clearly should have realized Lehman's exposure had they been doing their job, Lehman's public filings do not reflect

that any investigation or action was taken by the Audit Committee to question and verify the integrity of the process by which Lehman's executives reaped millions of dollars of executive compensation, and to assure that Lehman's accounting for the options was accurate. Thus, *e.g.*, the following items, among others, have appeared in the press about the scandal that required Lehman and the Director Defendants to act:

- In March 2006, *The Wall Street Journal* published a study that it had performed with the help of Professor Lie and Professor John Emerson, a statistician at Yale University that tested Professor Lie's theory, the "The Perfect Payday." The article identified a number of companies at which executives had achieved stock paydays the likelihood of which exceeded that of winning the lottery by misdating stock options.

- In an article dated May 31, 2006, *USA Today* observed that the stock option manipulations served "as yet another troubling example of how shareholders are being fleeced." *USA Today* also reported how a benefit designed to attract, reward and retain talented employees was being perverted.

- On July 23, 2006 the *New York Times* published an article which noted, "Investors are getting a clearer view of what these executives were doing with their beloved options. It's not pretty."

- On July 26, 2006, the SEC issued a release announcing, "SEC Votes to Adopt Changes to Disclosure Requirements Concerning Executive Compensation and Related Matters." This release explained that the SEC would require additional "disclosure of company programs, plans and practices relating to the granting of options, including in particular the timing of option grants in coordination with the release of material non-public information and the selection of exercise prices that differ from the underlying stock's price on the grant date."

- On August 11, 2006, the SEC published the final rules that require more disclosure about options grants, particularly back-dated options, and about

27

spring loading. The rules became effective for Form 10-K's for fiscal years ending on or after December 15, 2006 and for proxy statements filed on or after December 15, 2006.

- On January 15, 2007 *Crain's* noted that, in 2006, of the 110 securities cases filed, 20 related to stock option back-dating.

- On January 21, 2007, the *New York Times* published an academic study which determined that 43 per cent of the companies in its study--1400 publicly traded companies--engaged in option back-dating between 1996 and 2002.

- On May 1, 2007 *USA Today* reported that "pressured by shareholders, prosecutors and regulators, and facing stiffer anti-fraud rules, 250 U.S. companies in the past year launched internal investigations into back-dating.

68.    Lehman's Form 10-K for its FY ended November 30, 2006, filed on February 13, 2007, continued to contain false statements regarding Lehman's past stock option practices. Nor were truthful disclosures included in Lehman's proxy statement filed February 26, 2007 for the April 12, 2007 annual meeting of shareholders--where shareholders were being asked to vote on a proposal to expand Directors' authority to issue more stock options. Even the quarterly report filed **after** this lawsuit was brought does not reflect that Lehman launched an internal investigation or appointed a disinterested special committee to review Lehman's incentive stock-based compensation practices. Thus, three members of the current Board of Directors (Ainslee, Berlind and Cruikshank) served on the Audit Committee, and breached their oversight responsibilities throughout both the Grant Period and through February 2007, and a fourth, Gent, who joined the Audit Committee in 2004, failed to investigate potential corporate wrongdoing, when on notice that he should do so. As such, these four current Board members (out of the 10 current members) are disabled from performing a disinterested review of the claims in this case, and from acting to bring suit and remedy the wrongs described herein.

### *The Governance Committee*

69.    The following Director Defendants served on the Governance Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| NOMINATING AND CORPORATE GOVERNANCE COMMITTEE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1997** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** |
| Cruikshank | | | | | | M | M | M | M | M | M |
| Macomber | M | M | M | M | M | M | M | M | M | M | M |
| Evans | | | | | | | | M | C | C | C |
| Merrill | M | M | M | M | M | C | C | C | M | | |
| Kaufman | M | M | M | M | M | | | | | | |
| Fuld* | C | C | C | C | C | | | | | | |
| | | | | | | | | | | | |
| **M = Member    C = Chairman    \*Chairman and Non-Voting Member** | | | | | | | | | | | |

70.    According to the Company's Proxy Statements, the Governance Committee is responsible for developing and recommending to the Board of Directors a set of corporate governance principles applicable to the Company, including with respect to executive compensation. Among other things, pursuant to its charter, the Governance Committee has the authority to select, retain and terminate outside counsel or other experts--which is what should have been done to confirm and investigate Lehman's stock option practices, particularly after widespread industry abuse was reported.

### Executive Committee

71.    The following Director Defendants served on the Executive Committee of the Lehman Board of Directors at certain times during the Relevant Period:

| EXECUTIVE COMMITTEE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Defendant** | **1997** | **1998** | **1999** | **2000** | **2001** | **2002** | **2003** | **2004** | **2005** | **2006** | **2007** |
| Fuld | C | C | C | C | C | C | C | C | C | C | C |
| Macomber | M | M | M | M | M | M | M | M | M | M | M |
| Goldfarb | | | | | | | | | | | |
| Gregory | | | | | | | | | | | |
| Russo | | | | | | | | | | | |
| | | | | | | | | | | | |
| **M = Member    C = Chairman** | | | | | | | | | | | |

72.    The Executive Committee has the authority, in the intervals between meetings of the Board of Directors, to exercise all of the authority of the Board of Directors, except for those

matters that the Delaware General Corporation Law or the Restated Certificate of Incorporation reserves to the full Board of Directors. The two members on this Committee, Fuld and Macomber, were personally involved in the wrongdoing alleged in this case--Fuld as CEO and the recipient of large numbers of back-dated options and RSU's and the person who certified the financial accounting for the stock-based compensation, and Macomber, who served as the Chairman of the Compensation Committee during the Grant Period, for wrongfully authorizing the grants in violation of the Plan's terms.

**D.    Defendants' Stock Option and RSU Manipulations.**

73.    Despite the duties and obligations of the Director Defendants described above, these Defendants approved the illegal stock-based compensation and signed off on the false financial statements, and/or participated in a sustained and systemic failure of the Board to exercise oversight, thereby allowing and/or failing to prevent the top-level executives at the Company from illegally back-dating their stock option and RSU grants. According to data from *Thompson Insider Financial Monitor*, and as confirmed by Form 4's and Form 5's filed by the Company, between January 1997 and July 2002, Lehman's executives received stock option grants on the following **nine** dates:

- January 8, 1997
- December 11, 1997
- December 14, 1998
- December 1, 1999
- February 18, 2000
- December 1, 2000
- September 20, 2001
- December 3, 2001
- July 23, 2002

74.    Of these nine grants, all but one of the grants was dated on the date when Lehman's stock price was trading at its lowest or second lowest point during the entire month. And the only stock option grant that was not dated on the lowest or second lowest trading date

was dated on the fourth lowest trading date during the entire month. The statistical odds of Lehman's stock option granting pattern (i.e., eight of the nine grants dated on the date when Lehman's stock was trading at its lowest or second lowest point during the entire month, and the ninth grant dated on the date when Lehman's stock was trading at its fourth lowest point for the month) occurring as a result of chance is astronomically high, in this case, more than 18 billion to one.

### 1. The January 8, 1997 Stock Option Grants.

75.    Lehman's executives dated their first set of stock option grants as of January 8, 1997. This is the date when Lehman's stock price was trading at its second lowest point during the entire month of January.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 1/8/1997 | Fuld | 325,000 | $30.125 | $9,790,625 | $31.164 | $10,128,550 |
| 1/8/1997 | Vanderbeek | 75,000 | $30.125 | $2,259,375 | $31.164 | $2,337,300 |
| 1/8/1997 | Callaghan | 75,000 | $30.125 | $2,259,375 | $31.164 | $2,337,300 |
| 1/8/1997 | Hintz | 75,000 | $30.125 | $2,259,375 | $31.164 | $2,337,300 |
| 1/8/1997 | Russo | 75,000 | $30.125 | $2,259,375 | $31.164 | $2,337,300 |
| 1/8/1997 | McKeever | 75,000 | $30.125 | $2,259,375 | $31.164 | $2,337,300 |

## 2.    The December 11, 1997 Stock Option Grants.

76.    Lehman's executives dated their second set of stock option grants as of December 11, 1997. This is the date when Lehman's stock price was trading at its fourth lowest point during the entire month of December.



12/14/1997
$12.14
4th Lowest Price

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 12/11/97 | Callaghan | 400,000 | $12.14 | $4,856,000 | $12.57 | $5,029,840 |
| 12/11/97 | Cecil | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Fuld | 1,400,000 | $12.14 | $16,996,000 | $12.57 | $17,604,440 |
| 12/11/97 | Gregory | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Hintz | 400,000 | $12.14 | $4,856,000 | $12.57 | $5,029,840 |
| 12/11/97 | Jack | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Lessing | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | McKeever | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |
| 12/11/97 | Russo | 400,000 | $12.14 | $4,856,000 | $12.57 | $5,029,840 |
| 12/11/97 | Vanderbeek | 1,200,000 | $12.14 | $14,568,000 | $12.57 | $15,089,520 |

## 3.    The December 14, 1998 Stock Option Grants

77.     Lehman's executives dated their third set of stock option grants as of December 14, 1998. This is the date when Lehman's stock price was trading at its lowest point during the entire month of December.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|------|-----------|------------------------|----------------|------------------------------------|-----------------------------|------------------------------------|
| 12/14/98 | Cecil | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Fuld | 1,400,000 | $10.22 | $14,308.000 | $11.18 | $15,649,620 |
| 12/14/98 | Gregory | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Jack | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Lessing | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | McKeever | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |
| 12/14/98 | Vanderbeek | 1,200,000 | $10.22 | $12,264,000 | $11.18 | $13,413,960 |

### 4.     The December 1, 1999 Stock Option Grants.

78.     Lehman's executives dated their fourth set of stock option grants as of December 1, 1999. This is the date when Lehman's stock price was trading at its lowest point during the entire month of December.