

| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|------|-----------|------------------------|----------------|-----------------------------------|----------------------------|----------------------------------|
| 12/1/99 | Cecil | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Fuld | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Gregory | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Jack | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Lessing | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | McKeever | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |
| 12/1/99 | Vanderbeek | 200,000 | $19.22 | $3,843,750 | $20.37 | $4,073,020 |

**5.     The February 18, 2000 Stock Option Grants.**

79.     Lehman's executives dated their fifth set of stock option grants as of February 18, 2000.  This is the date when Lehman's stock price was trading at its second lowest point during the entire month of February.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|------|-----------|------------------------|----------------|-----------------------------------|-----------------------------|-----------------------------------|
| 2/18/2000 | Fuld | 1,600,000 | $15.80 | $25,280,000 | $25.81 | $41,296,000 |
| 2/18/2000 | Gregory | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | Jack | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | Lessing | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | McKeever | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |
| 2/18/2000 | Vanderbeek | 1,200,000 | $15.80 | $18,960,000 | $25.81 | $30,972,000 |

6.    **The December 1, 2000 Stock Option Grants.**

80.    Lehman's executives dated their sixth set of stock option grants as of December 1, 2000. This is the date when Lehman's stock price was trading at its lowest point during the entire month of December.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|------|-----------|------------------------|----------------|-------------------------------------|------------------------------|-------------------------------------|
| 12/1/00 | Fuld | 900,000 | $25.56 | $23,004,000 | $31.33 | $28,199,520 |
| 12/1/00 | Goldfarb | 300,000 | $25.56 | $7,668,000 | $31.33 | $9,399,840 |
| 12/1/00 | Gregory | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |
| 12/1/00 | Isaacs | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |
| 12/1/00 | Jack | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |
| 12/1/00 | Lessing | 400,000 | $25.56 | $10,224,000 | $31.33 | $12,533,120 |
| 12/1/00 | Vanderbeek | 700,000 | $25.56 | $17,892,000 | $31.33 | $21,932,960 |

7.    **The September 20, 2001 Stock Option Grants.**

81.    Lehman's executives dated their seventh set of stock option grants as of September 20, 2001. This is the date when Lehman's stock price was trading at its lowest point during the entire month of September.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|------|-----------|------------------------|----------------|------------------------------------|------------------------------|------------------------------------|
| 9/20/2001 | Goldfarb | 150,000 | $23.43 | $3,513,000 | $28.01 | $4,201,500 |

**8.    The December 3, 2001 Stock Option Grants.**

82.    Lehman's executives dated their eighth set of stock option grants as of December 3, 2001. This is the date when Lehman's stock price was trading at its lowest point during the entire month of December.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 12/3/01 | Fuld | 800,000 | $31.70 | $25,360,000 | $33.06 | $26,446,960 |
| 12/3/01 | Goldfarb | 150,000 | $31.70 | $4,755,000 | $33.06 | $4,958,805 |
| 12/3/01 | Gregory | 600,000 | $31.70 | $19,020,000 | $33.06 | $19,835,220 |
| 12/3/01 | Isaacs | 1,600,000 | $31.70 | $50,720,000 | $33.06 | $52.893,920 |
| 12/3/01 | Jack | 600,000 | $31.70 | $19,020,000 | $33.06 | $19,835,220 |
| 12/3/01 | Vanderbeek | 600,000 | $31.70 | $19,020,000 | $33.06 | $19,835,220 |

**9.      The July 23, 2002 Stock Option Grants.**

83.     Lehman's executives dated their ninth set of stock option grants as of July 23, 2002. This is the date when Lehman's stock price was trading at its lowest point during the entire month of January.



| Date | Executive | No. of Options Granted | Exercise Price | Total Grant Value at Date Of Grant | Monthly Average Stock Price | Total Grant Value Based on Average |
|---|---|---|---|---|---|---|
| 9/23/2002 | Goldfarb | 1,000,000 | $25.31 | $25,310,000 | $30.5 | $30,500,000 |

84.   Published data on Lehman's RSU's issued during the Grant Period also reflected that they were issued at suspiciously low points in the trading patterns for Lehman's stock.

85.   The Lehman executive stock-based compensation granted on sporadic dates during the Grant Period creates a striking pattern that is so advantageous to the grantees that it could not have been the result of chance. Eight of the nine stock option grants were dated on dates when Lehman's stock was trading at its lowest or second lowest price during the entire month, and the ninth grant was dated on the fourth lowest price during the month. When calculated using recognized and peer-reviewed methods by academics involved in the revelation of the stock-option back-dating scandal, the statistical odds of Lehman's stock option granting pattern occurring as a result of chance is astronomically high, in this case more than 18 billion to one. *See* Exhibit B incorporated herein by reference.

86.    Moreover, each of the Officers identified on the tables above, received a substantial number of option shares that increased in value immediately after they were granted, by significant amounts, another red flag inferring that the dates were being manipulated. Indeed, a great number of the foregoing stock option grants were dated just after a sharp drop (the "low point") and just before a substantial rise in Lehman's stock price, and many others were granted on dates when the option values increased immediately after they were granted (low point and upward trend), as the Company's historical stock price charts demonstrate.

87.    Thus, back-dating of the options and RSU's may properly be inferred. This practice resulted in option grants with lower exercise prices, which, in violation of Lehman's Plan, increased the value of the options to the Officer Defendants and improperly reduced the amount they had to pay the Company upon exercise of the options.

**E.    Lehman's False Financial Reports Filed With the SEC**

88.    For 1997 through 2006, each of Lehman's financial statements included in Lehman's quarterly Form 10-Q's and annual Form 10-K's filed with the SEC contained false statements describing Lehman's stock-based management incentive compensation and/or misstated the amounts of Lehman's compensation and benefits expense, federal income tax, and earnings for the stock options and RSU's that were back-dated during the Grant Period.

89.    Pursuant to accounting guidance FAS 123, Lehman had elected to report its incentive stock options in accordance with APB 25. Under those accounting rules, even though employee stock options issued with exercise prices equal to the Company's stock price at the date of the grant were valuable compensation (and had to be disclosed on a pro forma basis), a Company was not required to recognize compensation expense for the grants when they issued or as they vested, provided that the options were granted with exercise prices at least equal to the Company's stock price at the actual time of the stock option grant.

90.    Under these accounting rules, where stock options contained an exercise price below the Company's stock's fair market value (as occurred during the Grant Period for Lehman), the "safe harbor" in APB 25 did not apply, and compensation expense was required to be recognized on the Company's income statement for the fair market value of the stock options.

40

* * *

**The exercise price for all stock options awarded has been equal to 100% of the market price of Common Stock on the day of the grant.** (Emphasis added).

* * *

The Company will continue to follow Accounting Principles Board No. 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation cost has been recognized in the Consolidated Statement of Income for its stock option awards and employee stock purchase plan.

* * *

The Company's 1997 and 1996 pro forma net income would have been $629 million and $413 million, respectively, compared to actual net income of $647 million and $416 million, respectively. Pro forma earnings per common share for 1997 and 1996 would have been $4.57 and $3.22, respectively compared to actual earnings per common share of $4.72 and $3.24, respectively.

The FY November 30, 1998 Form 10-K filed February 26, 1999

FN#7:

The Company records compensation expense for RSUs based on the market value of its Common Stock and the applicable vesting provisions.

* * *

Total compensation cost recognized during 1998, 1997 and 1996 for the Company's stock-based awards was approximately $221 million, $162 million and $136 million, respectively.

* * *

The Company will continue to follow Accounting Principles Board No. 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation cost has been recognized in the Consolidated Statement of Income for its stock option awards and employee stock purchase plan.

* * *

The Company's 1998, 1997 and 1996 pro forma net income would have been $723 million, $629 million and $413 million, respectively, compared to actual net

income of $736 million, $647 million and $416 million, respectively. Pro forma earnings per common share for 1998, 1997 and 1996 would have been $5.09, $4.57 and $3.22, respectively compared to actual earnings per common share of $5.19, $4.72 and $3.24, respectively.

The FY November 30, 1999 Form 10-K filed February 28, 2000

FN #1:

The Company continues to follow APB 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation expense has been recognized for stock option awards *because the exercise price was at or above the fair market value of the Company's common stock on the grant date*. (Emphasis added).

FN#7:

**The Company measures compensation cost for RSUs based on the market value of its Common Stock at the grant date and amortizes this amount to expense over the applicable vesting periods.** RSU awards made to employees have various vesting provisions and generally convert to unrestricted freely transferable Common Stock five years from the grant date. (Emphasis added).

* * *

Total compensation cost recognized during 1999, 1998 and 1997 for the Company's stock-based awards was approximately $363 million, $221 million and $162 million, respectively.

* * *

**The exercise price for all stock options awarded has been equal to 100% of the market price of Common Stock on the day of the grant.** (Emphasis added).

* * *

The Company's 1999, 1998 and 1997 pro forma net income would have been $1,091 million, $723 million and $629 million, respectively, compared to actual net income of $1,132 million, $736 million and $647 million, respectively. Pro forma earnings per common share for 1999, 1998 and 1997 would have been $7.98, $5.09 and $4.57, respectively, compared to actual earnings per common share of $8.15, $5.19 and $4.72, respectively.

The FY November 30, 2000 Form 10-K filed February 28, 2001

FN #1:

The Company continues to follow APB 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation expense has been recognized for stock option awards *because the exercise price was at or above the fair market value of the Company's common stock on the grant date*. (Emphasis added).

FN#7:

**The Company measures compensation cost for RSUs based on the market value of its Common Stock at the grant date and amortizes this amount to expense over the applicable vesting periods.** RSU awards made to employees have various vesting provisions and generally convert to unrestricted freely transferable Common Stock five years from the grant date. (Emphasis added).

\* \* \*

Total compensation cost recognized during 2000, 1999 and 1998 for the Company's stock-based awards was approximately $520 million, $363 million and $221 million, respectively.

\* \* \*

The Company's 2000, 1999 and 1998 pro forma net income would have been $1,725 million, $1,091 million and $723 million, respectively, compared to actual net income of $1,775 million, $1,132 million and $736 million, respectively. Pro forma earnings per common share for 2000, 1999 and 1998 would have been $6.32, $3.99 and $2.55 respectively, compared to actual earnings per common share of $6.38, $4.08 and $2.60, respectively.

\* \* \*

**The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of the grant.** (Emphasis added).

The FY November 30, 2001 Form 10-K filed February 28, 2002

FN #1:

The Company continues to follow APB 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation expense has been recognized for stock option awards *because the exercise price was at or above the fair market value of the Company's common stock on the grant date*. (Emphasis added).

44

FN#8:

**The Company measures compensation cost for RSUs based on the market value of its Common Stock at the grant date and amortizes this amount to expense over the applicable vesting periods.** RSU awards made to employees have various vesting provisions and generally convert to unrestricted freely transferable Common Stock five years from the grant date. (Emphasis added).

* * *

Total compensation cost recognized during 2001, 2000, and 1999 for the Company's stock-based awards was approximately $544 million, $520 million, and $363 million, respectively.

* * *

**The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of grant.** (Emphasis added).

* * *

The Company's 2001, 2000 and 1999 pro forma net income would have been $1,183 million, $1,725 million and $1,091 million, respectively, compared to actual net income of $1,255 million, $1,775 million and $1,132 million, respectively. Pro forma earnings per common share for 2001, 2000 and 1999 would have been $4.20, $6.32 and $3.99 respectively, compared to actual earnings per common share of $4.38, $6.38 and $4.08, respectively.

The FY November 30, 2002 Form 10-K filed February 28, 2003

FN #1:

The Company continues to follow APB 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation expense has been recognized for stock option awards *because the exercise price was at or above the fair market value of the Company's common stock on the grant date*. (Emphasis added).

FN#10:

**The Company measures compensation cost for RSUs based on the market value of its Common Stock at the grant date and amortizes this amount to expense over the applicable vesting periods.** RSU awards made to employees have various vesting provisions and generally convert to unrestricted freely transferable Common Stock five years from the grant date. (Emphasis added).

45

\* \* \*

Total compensation cost recognized during 2002, 2001 and 2000 for the Company's stock-based awards was approximately $570 million, $544 million and $520 million, respectively.

\* \* \*

**The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of grant.** (Emphasis added).

\* \* \*

The Company's 2002, 2001 and 2000 pro forma net income would have been $830 million, $1,183 million and $1,725 million, respectively, compared to actual net income of $975 million, $1,255 million and $1,775 million, respectively. Pro forma earnings per common share for 2002, 2001 and 2000 would have been $2.95, $4.20 and $6.32, respectively, compared to actual earnings per common share of $3.47, $4.38 and $6.38, respectively.

The FY November 30, 2003 Form 10-K filed February 26, 2004

FN #1:

Through November 30, 2003 the Company followed APB 25 and its related interpretations to account for equity-based employee compensation. Accordingly, no compensation expense was recognized for stock option awards *because the exercise price equaled or exceeded the market value of the Company's common stock on the grant date. Compensation expense was recognized for restricted stock units with future service requirements over the relevant service periods.* (Emphasis added).

FN #15:

**The Company measures compensation cost for RSUs based on the market value of its Common Stock at the grant date and amortizes this amount to expense over the applicable vesting periods.** (Emphasis added).

\* \* \*

Total compensation cost recognized during 2003, 2002, and 2001 for the Company's stock-based awards was approximately $625 million, $570 million, and $544 million, respectively.

\* \* \*

**The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of grant.** (Emphasis added).

The FY November 30, 2004 Form 10-K filed February 14, 2005

FN #1:

Through November 30, 2003 we followed APB 25 and its related interpretations to account for equity-based employee compensation. Accordingly, no compensation expense was recognized for stock option awards *because the exercise price equaled or exceeded the market value of our common stock on the grant date. Compensation expense for restricted stock units with future service requirements was recognized over the relevant service periods.* (Emphasis added).

FN #15:

**We measure compensation cost for RSUs based on the market value of our Common Stock at the grant date for awards granted prior to 2004** and based on the market value of our Common Stock at the grant date less a discount for sale restriction subsequent to the vesting date for awards granted in 2004. We amortize this amount to expense over the applicable service periods. (Emphasis added).

\* \* \*

**The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of grant.** (Emphasis added).

The FY November 30, 2005 Form 10-K filed February 13, 2006

FN #1:

Through November 30, 2003 we followed APB 25 and its related interpretations to account for equity-based employee compensation. Accordingly, no compensation expense was recognized for stock option awards *because the exercise price equaled or exceeded the market value of our common stock on the grant date.* (Emphasis added).

FN #14:

For awards granted prior to 2004, we measure compensation cost for RSUs based on the market value of our Common Stock at the grant date in accordance with APB 25.

\* \* \*

**The exercise price for all stock options awarded has been equal to the market price of Common Stock on the day of grant.** (Emphasis added).

The FY November 30, 2006 Form 10-K filed February 13, 2007

FN #1:

On December 1, 2005, we adopted SFAS No. 123 (revised 2004), *Share-Based Payment* ("SFAS 123(R)") using the modified-prospective transition method. Under this transition method, compensation cost recognized during fiscal 2006 includes: (a) compensation cost for all share-based awards granted prior to, but not yet vested as of, December 1, 2005, based on the grant-date fair value and related service period estimates in accordance with the original provisions of SFAS 123; and (b) compensation cost for all share-based awards granted subsequent to December 1, 2005, based on the grant-date fair value and related service period estimated in accordance with the provisions of SFAS 123(R). Under the provisions of the modified-prospective transition method, results for fiscal 2005 and fiscal 2004 were not restated.

SFAS No. 123 permits companies to either continue accounting for stock-based compensation using the intrinsic value method prescribed by Accounting Principles Board Opinion No. 25 ("APB 25") or using the fair value method prescribed by SFAS No. 123. The Company continues to follow APB 25 and its related interpretations in accounting for its stock-based compensation plans. Accordingly, no compensation expense has been recognized for stock option awards *because the exercise price was at or above the fair market value of the Company's common stock on the grant date.*" (Emphasis added).

- FN #15:

For RSU's granted prior to 2004, or measured compensation cost based on the market value of our common stock at the grant date in accordance with APB 25 and, accordingly, a discount from the market price of an unrestricted share of common stock on the RSU grant date was not recognized for selling restrictions subsequent to the vesting date. . . .

We use the Black-Scholes option-pricing model to measure the grant date fair value of stock options granted to employees. **Stock options granted have exercise prices equal to the market price of our common stock on the grant date.** (Emphasis added).

## F.    Lehman's False Proxy Statements, Form 4's and Form 5's

93.    For the Grant Period, each Proxy Statement filed with the SEC presented the purported stock-based compensation for Lehman's CEO and the four other most highly compensated executive officers. The proxies represented that the stock options were issued, and that the included values were based upon, Lehman's stock prices for certain reported dates. Both the dates and the values were false because the options were, in fact, back-dated. Similarly, the Proxies represented that RSU's were issued, and values reported, based upon Lehman stock prices for certain reported dates that were false because the RSU's were also back-dated. The

proxies explicitly (and falsely) represented that the options were awarded "with exercise prices equal to fair market value on the date of the grant."

94.    Form 4's and/or Form 5's were filed with the SEC for stock options issued to the Officer Defendants during the Grant Period. These forms identified the dates when the officers purportedly "acquired" the options. The Forms were false because, in fact, the options had been back-dated.

## IV.    DEMAND FUTILITY--WRONGDOING BY THE CURRENT MEMBERS OF THE BOARD OF DIRECTORS

95.    The members of the Board of Directors as of the time that the original complaint was filed in this action were:

1. Fuld
2. Ainslie
3. Akers
4. Berlind
5. Cruikshank
6. Evans
7. Gent
8. Hernandez
9. Merrill
10. Macomber

At least half of these members either profited from the back-dating scheme or otherwise face a substantial likelihood of liability from the facts alleged herein, so that a demand on the Board under Fed. R. Civ. P. 23.1 and Delaware law is excused as futile. Because the back-dating of the stock options and RSU's was *ultra vires* and illegal, and the statements and accounting for the back-dated options and RSU's in Lehman's SEC filings, were false and served to cover up the back-dating scheme, the "business judgment rule" has no applicability to this case.

96.    All the current board members signed the false Form 10-Ks that were filed as of the day that they had become members of the Board. Given the SEC's new rules addressing disclosures of back-dated options, and wide-spread reports relating to the back-dating scandal

from at least mid-2006 through February 13, 2007 (when the 2006 Form 10-K was filed), each of the current Board members knowingly or recklessly failed to perform their jobs by failing to question and investigate whether the explicit assertions included in the 2006 Form 10-K about the grant dates of the stock options and RSU's, and their accounting were truthful.

97.    Fuld, as the person receiving the largest number of back-dated options and RSU's and also, as CEO, who certified the false accounting and deficient internal controls, is particularly complicit in the wrong-doing and is disabled from making a disinterested decision on pursuing the claims alleged herein.

98.    Current Board members who served on the Compensation Committee during the Grant Period, and who were responsible for administering the Plan in accordance with its terms (Akers and Macomber) are particularly complicit in the wrong-doing, and are disabled from making a disinterested decision on pursuing the claims alleged herein.

99.    Board members who served on the Audit Committee during the Grant Period (Ainslie, Berlind and Cruikshank), or later when the Grant Period back-dated stock options and RSU's continued to be falsely described and accounted for in Lehman's Form 10-Ks (Gent and Ainslie, Berlind and Cruikshank) are particularly and substantially exposed to liability for the wrong-doing, and are disabled from making a disinterested decision on pursuing the claims alleged herein.  As described herein, each of these Audit Committee members had a duty, in good faith, to monitor and exercise oversight over the integrity of the financial reporting of the Company, and to assure that adequate internal controls were in place over the process of awarding incentive stock-based compensation to the Company's executives.  The Audit Committee's responsibilities in this area were particularly important, because unlike for other items in Lehman's financial statements, Fuld and the other members of management had a direct conflict with the Company, since the back-dating scheme served to increase their compensation, and reduce their own federal tax liabilities.

## V.    ADDITIONAL DEMAND FUTILITY ALLEGATIONS

100.    Plaintiffs bring this action derivatively in the right and for the benefit of Lehman to redress injuries suffered, and to be suffered, by Lehman as a direct result of Defendants' *ultra*

*vires* acts, breaches of fiduciary duties and/or self-dealing acts, misappropriation of and/or waste of corporate assets, gross mismanagement, unjust enrichment and for misrepresentations about Lehman's option and RSU grants and misstatements of earnings in Lehman's SEC filings and other false and misleading statements and omissions. Lehman is named as a Nominal Defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

101.    Plaintiffs will adequately and fairly represent the interests of Lehman in enforcing and prosecuting its rights.

102.    Plaintiffs are and were owners of Lehman stock during times relevant to Defendants' wrongful course of conduct alleged herein, and remain stockholders of the Company.

103.    Plaintiffs have not made any demand upon the Current Board to bring an action asserting the claims herein, for the damages suffered by Lehman, since such demand would be a futile, wasteful and useless act.

104.    As described above, all of the Director Defendants signed one or more of the Company's annual reports on Form 10-K between 1998 and 2006 containing the Company's financial statements, which failed to account for the back-dated stock option grants as compensation and as an expense of the Company incurred as the options vested as provided in FAS 123 and APB 25. As a result, the income on those financial statements of the Company was inflated and may need to be restated. The financial statements may also need to be restated to properly account for disallowed compensation expense under §162(m) of the IRC. The Company may also have failed to properly withhold taxes from its executives and to pay them over to the Internal Revenue Service. Any suit by the Director Defendants to remedy the wrongs complained of herein could also expose them to securities and tax liabilities. Thus, they are hopelessly conflicted and are unable to make an independent determination on a demand that they cause the Company to bring this action.

105.    As a result of their access to and review of internal corporate documents, conversations and contacts with other corporate officers, employees and directors, and

attendance at management and Board meetings, each of the Director Defendants knew the adverse, non-public information regarding Lehman's performance, and knew they were failing to perform their obligations to monitor and exercise oversight.

106.    These Director Defendants face a substantial threat of liability should the options be set aside, or for damages for the misappropriation or waste of assets, unjust enrichment and breach of fiduciary duty and loyalty and/or for Lehman's false financial reporting. Since these Director Defendants are undeniably interested, any demand upon them is futile.

107.    Demand is also excused because Director Defendants participated in, approved and/or permitted the wrongs alleged herein, concealed or disguised those wrongs or recklessly disregarded them so that they face a substantial likelihood of liability, and are therefore not disinterested parties.

108.    The Sarbanes-Oxley Act of 2002 ("SOX") placed significant additional responsibilities on the boards of directors of public companies subject to SOX, like Lehman, to improve corporate financial accounting and internal controls and to improve corporate financial responsibility and disclosure. This new law was a disaster for the Lehman Board, since, despite its public posture of concern over good corporate governance, controls, disclosure and integrity, it was sitting atop a scheme to falsify its executive and directors compensation and thereby, artificially inflate its Company's reported financial results. Though the illegal stock options were granted before SOX was enacted, because the options vested thereafter, pursuant to FAS 123 and APB 25 Lehman's financial statements continued to understate Lehman's compensation expenses long after SOX was passed. Any real compliance with SOX would have exposed the long-existing scheme, brought it to an end and resulted in embarrassing discharges. Thus, the Board did not enforce or comply with SOX, despite its legal obligation under federal law to do so. Clearly, the Lehman Board will not sue themselves for this failure.

109.    Demand is also excused because insurance policies covering the liability of a company's directors and officers purport to exclude legal claims asserted directly by the Company against such persons. Thus, there was, and is, a substantial disincentive for Lehman to bring any action directly against Defendants. Generally, under the terms of such directors' and

officers' insurance policies, a company would be required by the carriers to cooperate in the defense of any claims, such as the present action, which seek to impose liability upon certain officers and directors of Lehman, including Defendants in this action, for misconduct and mismanagement. Thus, if the policy or policies which Lehman maintains contain the foregoing provision, the insurance carriers would argue that Lehman and its Board are thereby contractually disabled from complying with any demand that would cause Lehman to institute, and/or prosecute any action against Defendants for such misconduct and mismanagement; because to do so could result in the loss to Lehman of its insurance coverage. Similarly, Lehman would be disabled from pursuing Defendants, as it would not benefit from any insurance they may have.

110.    Moreover, Lehman has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein. Despite Director Defendants having knowledge of the claims and causes of action raised by Plaintiffs, the current Board has failed and refused to seek to recover for Lehman for any of the wrongdoing alleged by Plaintiffs herein.

111.    Demand is futile because half or more of the current members of the Lehman Board cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of many of the claims raised in this Complaint. In addition, the failures of the Board to design and implement an effective corporate information and reporting system to assure the existence of reasonable internal financial controls and the accuracy of the Company's publicly reported financial information demonstrates a lack of a good faith exercise of business judgment. The Board would thus be required potentially to investigate and bring claims against themselves for their own misconduct.

## VI.    NO STATUTE OF LIMITATIONS BAR

90.    Although certain of Defendants' misconduct as alleged herein occurred more than three years prior to the filing of this derivative action, the statute of limitations as set forth under Delaware statute 10 *Del. C.* § 8106, the claims asserted herein either failed to accrue because of the continuing nature of the wrongs or because of discrete acts of misconduct that occurred during the three years before this action was filed. In addition the "discovery" rule, equitable

tolling and/or defendants' fraudulent acts to conceal their misconduct tolled the statute of limitations or delayed its accrual. Defendants engaged in wrongful acts (including by secretly back-dating the options in the Company's records and by publicly reporting false dates for the grants) actively concealed Plaintiffs' claims and denied Plaintiffs the opportunity to timely discover that stock options were issued in violation of the Plan and were improperly accounted for. Thus, Defendants misled Plaintiffs about the facts needed to provide them with actual knowledge that the Defendants had repudiated their fiduciary duties and engaged in the other affirmative misconduct alleged herein.

112.    These stock option grants were and continue to be illegal, *ultra vires* and void because they were issued in violation of the limitations on the Compensation Committee's authority in the Plan.

113.    When they participated in, or allowed the granting of the back-dated stock options, Defendants, including the members of the Company's Audit Committee who are charged with overseeing the Company's financial reporting, failed to ensure an accurate accounting of the Company's compensation expenses and committed affirmative acts of concealment or misrepresentation when they issued false disclosures about the circumstances of the stock option awards, including statements made in the Company's Form 10-K's that falsely assert that options had been granted at fair market value on the date of the grant. The wrongful award of the stock options was further concealed by the false financial accounting for the awards. Pursuant to FAS 123 and APB No. 25, the below market stock options that vested over a 4 ½ year period should have been reported and disclosed as additional compensation over the vesting period. Instead, the grants were back-dated to conceal the excessive compensation and the accounting and tax implications of the awards, and false financial statements were publicly reported over this period.

114.    Defendants' actions impeded discovery of the truth until at least mid 2006, when academic statistical studies were published in the media showing the widespread industry practices described in this Complaint. Armed with these disclosures, Plaintiffs diligently retained an expert in statistics, used the same methods as used in the academic studies, and

reviewed Lehman's stock option grant patterns. When, as a result, the misconduct became apparent, Plaintiffs promptly filed suit.

115.    Thus, even for those claims for which the 3-year statute would otherwise have run, the applicable limitations period is tolled or its accrual delayed under (1) equitable tolling for fraudulent concealment because Defendants fraudulently concealed facts essential to Plaintiffs' case; and (2) the "discovery rule" because the injuries alleged herein were inherently unknowable, there were no observable or objective factors to put Plaintiffs on notice of injury and Plaintiffs were blamelessly ignorant of the acts and injuries alleged in the Complaint.

116.    As the party seeking to toll the limitations period or delay its accrual, Plaintiffs were not on inquiry notice until at least March 2006 because they were not in possession of facts sufficient to have made them suspicious. Accordingly, to the extent required, Plaintiffs have alleged the specific facts to demonstrate that the facts regarding the illegal stock option grants were so hidden as a result of their having been back-dated in corporate records and falsely reported, that a reasonable plaintiff could not have made timely discovery of an injury necessary to file a complaint within the applicable statute of limitations.

## VIII.  CAUSES OF ACTION

### COUNT I
### Invalidating Stock Options and RSU's for *Ultra Vires* Acts

117.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

118.    Stock options were issued to the Officer Defendants in violation of the Plan. Lehman's Compensation Committee's approval of the stock options issued below Fair Market Value constituted *ultra vires* acts.

119.    RSU's were issued to the Officer Defendants in violation of the Plan. Lehman's Compensation Committee's approval of the RSU's issued below Fair Market Value constituted *ultra vires* acts.

120.   The unexercised stock options should be declared to be void, and set aside and other equitable relief awarded to permit Lehman to recover the stock or other proceeds of those illegal stock options that have already been exercised. The RSU's should also be declared to be void, and set aside and other equitable relief awarded to permit Lehman to recover the proceeds of any RSU's that have been sold.

**COUNT II**
**Derivative Claim for Breach of Fiduciary Duty (Against All Defendants)**

121.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

122.   Defendants all owed and owe a fiduciary duty to Lehman and its stockholders. By reason of their fiduciary relationships, Defendants all owed and owe Lehman the highest obligation of good faith, fair dealing, loyalty and due care and diligence in the management and administration of the affairs of the Company, as well as in the financial accounting, auditing and reporting of the Company. Moreover, Defendants owed and owe the duty of full and candid disclosure of all material facts.

123.   Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision by, *inter alia*, (i) approving or permitting the issuance of stock options in violation of the Plan, and the back-dating of the awards to conceal the violations, (ii) the knowing or reckless disregard with which they published the financial statements of Lehman that contained misrepresentations and violated GAAP; (iii) the knowing or reckless disregard with which they supervised the audits and reviews of Lehman's financial statements and internal controls and procedures; and (iv) the violation of their duties of loyalty in failing to investigate, detect, prevent and/or disclose Lehman accounting misstatements, and the weaknesses in the internal controls and procedures of the Company, as previously described herein.

124.   Defendants also each owed a duty to Lehman to test, oversee and monitor their systems of internal disclosure, financial and accounting controls, governance procedures and

56

disclosure procedures and to ensure that they were functioning in an effective manner and in compliance with, *inter alia,* SOX.

125.    Each of the Defendants had actual or constructive knowledge that they had caused the Company to misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

126.    Each of the Defendants authorized, or by abdication of duty, permitted the stock options and RSU's granted to Lehman's executives to be issued in violation of Lehman's stock plans and then back-dated.  Company records were falsified to conceal the true amounts of excessive compensation awarded to the Officer Defendants.  These actions were not a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests. By this misconduct, Defendants exposed Lehman to potential government investigations, civil and criminal prosecutions, additional liabilities for federal taxes, penalties and interest, and lawsuits for violation of the federal securities laws.

127.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Lehman has suffered substantial monetary losses and damages, as well as further and even greater damage in the future, including damage to Lehman's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

**COUNT III**
**Derivative Claim for Gross Mismanagement (Against All Defendants)**

128.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

129.    By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and businesses of Lehman in a manner consistent with the operations of a publicly held corporation.

130.    Defendants also engaged in further gross mismanagement by improperly subjecting the Company to claims under the Federal and State securities laws and federal tax

laws by including false and misleading statements of Lehman's compensation expenses in Lehman's financial statements and by failing to properly report Lehman's executive compensation on its federal tax returns.

131.    As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, Lehman has suffered substantial monetary damages, as well as further and even greater damage in the future, including damage to Lehman's reputation and good will. Defendants are liable to the Company as a result of the misconduct alleged herein.

**COUNT IV**
**Derivative Claim for Misappropriation and/or Waste Of Corporate Assets**
**(Against All Defendants)**

132.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

133.    As a result of the improper grant of stock options and RSU's to Lehman executives in violation of the Plan, and by failing to properly consider the interests of the Company and its public shareholders by failing to monitor and conduct proper supervision, Defendants have either misappropriated Lehman corporate assets or caused Lehman to waste its assets.    Besides the millions of dollars of excessive compensation paid to Defendants and Lehman's other executives and potential additional tax liabilities for violation of the deductibility requirements of §162(m) of the IRC, and employee tax withholding requirements, Lehman is exposed to enormous professional costs to restate Lehman's past financial statements, to correct for the improperly back-dated stock option grants, and to respond to likely government investigations and to defend  Defendants' unlawful actions.

134.    Defendants also wasted corporate assets by recklessly subjecting the Company to claims under the Federal and State securities laws by issuing false and misleading statements in Lehman's financial statements.

135.    As a direct and proximate result of Defendants' misappropriation and/or waste of corporate assets, the Defendants are liable to the Company.

## COUNT V
### Derivative Claim for Unjust Enrichment

136.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

137.    By their wrongful acts and omissions, those Defendants which received stock options at exercise prices below the stock's fair market value, and back-dated RSU's, received illegal and excessive compensation and were unjustly enriched at the expense of and to the detriment of Lehman.

138.    As a result of the wrongful pricing and back-dating of the options and RSU's granted to them, the Defendants have been and will continue to be unjustly enriched at the expense of and to the detriment of the Company.

139.    Plaintiffs, as shareholders and representatives of Lehman, seek to declare the illegal stock options and RSU's to be void, to set them aside, to recover their proceeds, if any, restitution, damages, and an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants from their wrongful conduct and fiduciary breaches, and other relief for the Company, in an amount to be proven at trial.

## COUNT VI
### Derivative Claim for Misrepresentation and Fraudulent Concealment

140.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

141.    By their actions alleged herein, Defendants either signed or caused to be signed Form 10-K's, proxy statements, Form 4's and Form 5's that made knowing misrepresentations about the dates and amounts of stock-based compensation granted to Lehman executives, and omitted facts about Lehman's back-dating practices.

142.    For years, as a result of these various false statements and omissions, Lehman and its shareholders failed to act to remedy the excessive and illegal compensation practices (including by filing timely derivative actions) and authorized increases in Directors' authority to grant stock-based compensation to Lehman's executives.

143.    As a direct and proximate result of Defendants' misrepresentations and fraudulent concealment, Lehman has suffered substantial monetary damages, as well as further and even greater damage in the future to Lehman's reputation and good will. Defendants are liable to the company as a result of the misconduct alleged herein.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf, and derivatively on behalf of Lehman, pray for judgment as follows:

A.    Declaring the illegal unexercised stock options and RSU's void and ordering the recovery of the proceeds of the exercised stock options and sales of stock;

B.    Awarding Plaintiffs, on behalf of Lehman, all equitable and injunctive relief permitted by law and equity, including the imposition of a constructive trust and attachment of assets, as may be necessary to grant to Lehman all relief to redress all of the harm suffered by Lehman as a result of Defendants' wrongdoing;

C.    Ordering Defendants to account to Lehman for all damages sustained or to be sustained by the Company, and all profits obtained by Director, by reason of the wrongs alleged herein;

D.    Ordering the Individual Officer Defendants to return to Lehman all incentive-based or equity-based compensation paid to them by the Company during the time they were in breach of their fiduciary duties that they owed to Lehman;

E.    Ordering the Individual Officer Defendants to return to Lehman all unexercised stock options and RSU's granted to them by the Company during the Grant Period;

F.    Against all of the Individual Defendants, for the damages suffered by Lehman as a result of their breaches of fiduciary duty, mismanagement and misappropriation and waste of corporate assets, misrepresentation and fraudulent concealment, together with prejudgment and post-judgment interest thereon, in an amount to be proved at trial;

G.    Against all of the Individual Officer Defendants in an amount equal to the amount by which they have been unjustly enriched;

H.    Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys and experts; and

I.    Granting Plaintiffs such further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: December 26, 2007

SCOTT + SCOTT, LLP

Beth Kaswan (BK 0264)
29 West 57th Street
New York, NY 10019
Telephone: 212/223-6444
Facsimile: 212/223-6334
bkaswan@scott-scott.com

SCOTT + SCOTT, LLP
David R. Scott (DS 8053)
108 Norwich Ave.
P.O. Box 192
Colchester, CT 06415
Telephone: 860/537-5537
Facsimile: 860/537-4432
drscott@scott-scott.com

SCOTT + SCOTT, LLP
Geoffrey Johnson
33 River Street
Chagrin Falls, OH 44022
Telephone: 440/247-8200
Facsimile: 440/247-8275
gjohnson@scott-scott.com

ROBBINS UMEDA & FINK, LLP
Brian J. Robbins
Jeffrey P. Fink
Felipe Arroyo
Arshan Amiri
610 West Ash Street, Suite 1800
San Diego, CA 92101
Telephone: 619/525-3990
Facsimile: 619/525-3991

**Co-Lead Counsel for Plaintiffs**

## VERIFICATION

I, Robert L. Garber, hereby declare and verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, Rescission, Gross Mismanagement, and the Misappropriation and Waste of Corporate Assets, and I believe that the matters alleged therein are true and correct to the best of my knowledge, information and belief.

Dated: December 13, 2007

Robert L. Garber

## VERIFICATION

I, THOMAS H. FANCHER, am an officer of the Saginaw Police & Fire Pension Board. I hereby declare and verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, Rescission, Gross Mismanagement, and the Misappropriation and Waste of Corporate Assets, and I believe that the matters alleged therein are true and correct to the best of my knowledge, information and belief.

THOMAS H. FANCHER
City Attorney
Legal Advisor
City of Saginaw Police & Fire
Pension Board of Trustees

:jal/THF/P&FP/Verification

## VERIFICATION

I, _Walter O'Malley_____, am a Trustee of the International Brotherhood of Electrical Workers Local No. 38 Pension Fund. I hereby declare and verify that I have reviewed the foregoing Verified Consolidated Shareholder Derivative Complaint for Breach of Fiduciary Duty, Unjust Enrichment, Rescission, Gross Mismanagement, and the Misappropriation and Waste of Corporate Assets, and I believe that the matters alleged therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _26_ day of December, 2007.

_Walter O'Malley_
Signature