UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
|  | x | 07 Civ. 2990 (DAB) |
| IN RE LEHMAN BROTHERS | : |  |
| HOLDINGS, INC. DERIVATIVE | : | **Electronically Filed** |
| LITIGATION | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
|  | : |  |
| _____ | x |  |

## <u>PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS</u>

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION ...............................................................................................1
ARGUMENT .....................................................................................................6
I.   Plaintiffs Have Sufficiently Alleged That Demand Is Futile.............................6
    A.   The Legal Standard For Showing That Demand Is Futile ......................6
    B.   The Board's Approval of Lehman's False Financial Statements Was Not A Valid Exercise Of Business Judgment. ...............................................8
    C.   A Majority Of The Board Members Were Not Disinterested And Independent..............................................................................................12
        1.   Defendant Fuld Is Not Disinterested Because He Received Backdated Stock Option Grants...............................................12
        2.   Defendants Akers and Macomber Are Not Disinterested Because They Approved The Backdated Stock Option Grants. ............14
            i.   Directors Who Approve Backdated Stock Option Grants Are Not Disinterested For Purposes Of Considering A Demand. ......................................................................14
            ii.   The Chancery Court's Opinion in *Desimone* Is Not On Point. ....................................................................14
        3.   Defendants Ainslie, Berlind, Cruikshank And Gent Are Not Disinterested Because They Had Notice Of Accounting Irregularities Tied To The Stock Option Grants And Still Signed Off On False Financial Reports. ......................16
            i.   Directors Who Are Put On Clear Notice Of Serious Accounting Irregularities Are Not Disinterested. ..........................16
            ii.   The Fact That These Directors Have Settled Claims Relating To Certain False Proxy Statements Has No Bearing On The Demand Futility Analysis. .................................20
II.   Plaintiffs Have Adequately Plead Each Of The Delaware Common Law Claims. ...........21
    A.   For Most Of Their Claims, Plaintiffs Need Not Satisfy The Heightened Pleadings Standard of Rule 9(b). ...........................................................22
    B.   Each Count In The Consolidated Complaint Adequately Pleads A Claim Under Delaware State Law. ....................................................................23
        1.   Plaintiffs Adequately Allege A Breach Of Fiduciary Duty (Count II) ................................................................24
        2.   Plaintiffs Adequately Allege Claims For Gross Mismanagement (Count III). ...............................................................25
        3.   Plaintiffs Adequately Allege Misappropriation and Waste of Corporate Assets (Count IV). ..................................................25
        4.   Plaintiffs Adequately Allege Unjust Enrichment (Count V). ....................26
        5.   Plaintiffs Adequately Allege *Ultra Vires* Acts (Count I)...........................27
        6.   Plaintiffs Adequately Allege Misrepresentation and Fraudulent Concealment (Count VI)...............................................................28
            i.   Count Six is Properly Pled ............................................28
            ii.   The *Bader* Settlement Agreement and Release Does not Extinguish any of Plaintiffs' Claims.............................29

i

      C.      Plaintiffs Have Sufficiently Alleged Claims Based On The Backdated RSUs. ............................................................................................30

      D.      The Statute Of Limitations Does Not Bar Plaintiffs' Claims. ...............................31

III.    The Named Plaintiffs Have Standing To Allege The Bulk Of The Claims Alleged In The. ..................................................................................................................33

CONCLUSION................................................................................................................36

## TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) ...................................................6, 7, 8, 12

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ...................................................3, 7, 8, 26

*Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007) ...................................................24

*Conrad v. Blank,* 940 A.2d 28 (Del. Ch. 2007) ...................................................*Passim*

*Desimone v. Barrows,* 924 A.2d 908 (Del. Ch. 2007) ...................................................2, 15

*Emerald Partners v. Berlin*, 787 A.2d 85 (Del. 2001)...................................................26

*Guttman, et al. v. Huang*, 823 A.2d 492 (Del. Ch. 2003).................................................17

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996) ...................................11

*In re Dean Witter P'ship Litig.*, 1998 WL 442456 (Del. Ch. July 17, 1998) .........................11, 17

*In re Ditech Networks, Inc. Deriv. Litig.*, 2007 WL 2070300 (N.D. Cal. July 16, 2007) .............32

*In re Initial Public Offering ("IPO") Litigation,* 241 F.Supp.2d 281 (S.D.N.Y. 2003)...............22

*In re In-Store Advertising Sec. Litig.,* 878 F.Supp. 645 (S.D.N.Y. 1995) ...................................23

*In re MIPS Technologies, Inc. Derivative Litig.*, 2008 WL 131915
    (N.D. Cal. Jan. 11, 2008.................................................................................36

*In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309 (8th Cir. 1997)...........................................23

*In re Philadelphia Stock Exchange, Inc.*, 2008 WL 803922 (Del. Supr. March 27, 2008)...........30

*In re Tyson Foods, Inc. S'holder Litig.,* 919 A.2d 563 (Del. Ch. 2007)...........................2, 5, 6, 32

*In re the Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. Supr. 2006) ...........................9, 26

*Layton* v. *Allen*, 246 A.2d 794 (Del. Supr. 1968) .....................................................30

*Manzo v. Rite Aid Corp.*, 2002 WL 31926606, (Del. Ch. Sept. 6, 2002) .........................................

*Melzer* v. CNET *Networks, Inc.,* 934 A.2d 912 (Del. Ch. 2007)...........................................28, 36

*Metro Communications Corp. BVI* v. *Advanced Mobilecomm Tech. Inc.*,
    854 A.2d 121 (Del. Ch. 2004)............................................................................29

*Michelson v. Duncan*, 407 A.2d 211 (Del. Supr. 1979).....................................................26

*Mitzner v. Hastings*, 2005 WL 88966 (N.D. Cal. January 14, 2005) .........................................17

*Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242 (S.D.N.Y. 1994) .....................23

*Rales v. Blasband,* 634 A.2d 927 (Del. Supr. 1993)...................................................*Passim*

*RCM Securities Fund, Inc. v. Stanton,* 928 F.2d 1318 (2d Cir. 1991)...........................................6

*Ryan v. Gifford*, 918 A.2d 341 (Del. Ch. 2007)...................................................*Passim*

*Sample v. Morgan*, 914 A.2d 647 (Del. Ch. 2007)...................................................26

*Schock v. Nash,* 732 A.2d 217 (Del. Supr. 1999) ...................................................27

*Solomon v. Armstrong,* 747 A.2d 1098 (Del. Ch. 1999)........................................................

*Stiegele v. Bailey*, 2007 WL 4197496 (D. Mass, Aug. 23, 2007)  ...............................................

*Stone v. Osborne*, 06-CV-3120(RBK), 2007 WL 2085354 (D.N.J. 2007)...................................28

*Stone v. Ritter*, 911 A.2d 362 (Del. 2006) ...................................................9, 11

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)...................................................24


**Statutes**

Fed. R. Civ. P. 8(a) ...................................................................................23

Fed. R. Civ. P. 9(b) ...................................................................................24

Fed. R. Civ. P. 12(b)(6)...............................................................................24

Fed. R. Civ. P. 23.1(b)(1)...............................................................................6

Fed. R. Civ. P. 23.1(b)(3)...............................................................................6

## INTRODUCTION

This shareholder derivative action arises out of hundreds of millions of dollars of illegal "backdated" stock option grants that Nominal Defendant Lehman Brothers Holdings, Inc. ("Lehman")'s top executive officers and directors received and/or approved between 1997-2002, and the directors' subsequent attempts to cover up the backdating by filing false financials through 2007. The practice known as "backdating," which came to light following an article about the practice in *The Wall Street Journal* on March 18, 2006, occurs when "a company issu[es] stock options to an executive on one date while providing fraudulent documentation asserting that the options were actually issued earlier." *Ryan v. Gifford,* 918 A.2d 341, 345 (Del. Ch. 2007). Backdating provides "a windfall for executives because the falsely dated stock option grants often coincide with market lows. Such timing reduces the strike prices and inflates the value of stock options, thereby increasing management compensation." *Id.* Where, as here, backdating is prohibited by a company's stock option plan, the practice "runs afoul of many state and federal common and statutory laws that prohibit dissemination of false and misleading information." *Id.*

Between 1997 and 2002, Lehman's executives and directors unlawfully backdated all nine of the stock option grants awarded during this period so that they could collectively reap hundreds of millions of dollars in additional, windfall compensation ¶¶73-87[1]. In clear violation of Lehman's Stock Option Plan, the Company's executives and directors backdated eight of these nine awards to the date when Lehman's common stock was trading at its lowest or second lowest point during the entire month in which the option was granted. ¶74. The ninth stock

---

[1] Unless otherwise noted, paragraph references ("¶" or "¶¶") refer to the Verified Consolidated Shareholder Derivative Complaint (the "Consolidated Complaint") filed December 28, 2007.

1

option grant during this period was backdated to the date when Lehman's stock was trading at its fourth lowest point during the entire month.  *Id.*  The statistical odds that this highly favorable stock option granting pattern occurred as a result of chance are more than 18 billion to one.  ¶76. In addition, to conceal the stock option backdating scheme, and the huge windfall that they had received, Lehman's officers and directors prepared and signed Securities and Exchange Commission ("SEC") filings that contained explicit and false information about the dates of the stock option grants, and their effects on Lehman's financial reporting under Generally Accepted Accounting Principles ("GAAP").  ¶¶88-94.

Nonetheless, Nominal Defendant Lehman and the Individual Defendants (collectively, the "Defendants") have moved to dismiss each and every claim asserted by Plaintiffs in this case. Because Lehman is incorporated in the State of Delaware, the arguments that Defendants have raised in the motions are governed by Delaware law.  This is an important point to highlight at the outset because the Delaware Chancery Court has already addressed the arguments that Defendants make in four seminal cases involving backdated stock option grants -- *Ryan v. Gifford,* 918 A.2d 341, *In re Tyson Foods, Inc. S'holder Litig.,* 919 A.2d 563 (Del. Ch. 2007), *Desimone v. Barrows,* 924 A.2d 908 (Del. Ch. 2007) and *Conrad v. Blank,* 940 A.2d 28 (Del. Ch. 2007).  Interestingly, Defendants do not cite to *Conrad* and *Tyson Foods* at all, and they cite to *Ryan* only once, even though these Delaware Chancery Court cases are directly on point.[2] Instead, Defendants rely extensively on *Desimone,* the only one of the four Delaware cases that is readily distinguishable on its facts.  Delaware law is also clear that a derivative claim may

---

[2] Defendants rely almost exclusively on several backdating cases from the Northern District of California -- even though the Delaware Chancery Court has cast doubt on whether the cases from that District are appropriately applying Delaware law.  *See Conrad*, 940 A.2d at fn.22 ("To the extent *CNET* and several other recent decisions of that court [the Northern District of California], can be read as applying a substantially harsher standard than in *Ryan* or in this decision, the court declines to follow them.").

proceed when the current directors breach their fiduciary duties to be reasonably informed and/or to act in good faith. *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

Nominal Defendant Lehman opens its brief with the claim that this lawsuit was improperly filed in the first instance because Plaintiffs purportedly were required to make a pre-suit demand upon Lehman's Board of Directors (the "Board") before bringing the suit. The reason Plaintiffs did not make a pre-suit demand on the Board to institute this action is that demand was futile and therefore not required as a matter of law. Indeed, under applicable Delaware law, Plaintiffs are not required to demand action from the Board when the Board has made an affirmative decision that is not the product of a valid exercise of business judgment. For years, Lehman's Board signed off on Lehman's Form 10-K's filed with the SEC that included financial statements falsely stating: "stock options granted have exercise prices equal to the market price of our common stock on the grant day." (Consolidated Complaint ¶92). This statement was false because the backdated stock options in truth had lower exercise prices than the market price of common stock on the grant date, creating a windfall to the stock option recipient and an injury to the corporation. The consequence of the backdating under GAAP, is that Lehman was required to recognize compensation expense and reduce its reported earnings in each of its Form 10-K's. Each year, the Board members sitting on the Company's Audit Committee further publicly reported that they were monitoring and overseeing the preparation of the financial statements for compliance with GAAP, when they consciously failed to do so.

In early 2007, when the 2006 Form 10-K was filed, the current Board signed off on the fiscal year ended ("FY") November 30, 2006 financial statements containing the inflated earnings and these same false statements about how the options had been priced. By this time, however, the industry-wide option backdating scandal dominated the headlines, and the SEC had

voted to impose greater obligations on public companies to assure that option grant practices were not being misrepresented. Another lawsuit against Lehman and its officers and directors raising questions about its executive compensation reporting practices and internal controls provided additional impetus to directors to fully investigate the integrity of the Company's accounting, which here the Defendants utterly failed to do. Thus, when the current Board, and particularly the Audit Committee members, signed off on the false FY 2006 financial statements, and failed to investigate and review the facts available to them, they had clear notice of the serious irregularities involving the backdated stock option grants, which easily shows a violation by Defendants of their duty to be "reasonably informed", as well as a "conscious disregard for one's responsibilities" under the business judgment rule.

These same facts demonstrate that the current Board is hopelessly conflicted because at least seven of its ten members are interested in the outcome of the litigation or face a substantial likelihood of liability for their action in support of the backdating scheme. At the time this lawsuit was commenced, three of the Board members were not "disinterested" because they either received the backdated stock options themselves or approved the backdated stock option grants. Four more current Board members were not disinterested because they were on the Audit Committee, and, as described above, were responsible for monitoring and overseeing the preparation of Lehman's financial statements, and knowingly or recklessly chose to sign the Company's SEC filings that falsely represented when the stock options were granted and priced, even after they had received clear notice of their obligations to investigate and verify the truthfulness of Lehman's reported stock option grant policies.

The Individual Defendants also claim in their separate brief that the Consolidated Complaint fails to adequately state a claim. Defendants' main argument is that Plaintiffs' breach

of fiduciary and other Delaware common law claims should be dismissed because Defendants supposedly acted in good faith and, thus, are protected by Delaware's business judgment rule when they backdated their stock option grants and then issued false financial statements to conceal the option backdating scheme. This is an argument that was rejected by the Chancery Court in both *Ryan* and *Tyson Foods*, and it is an argument that the defendants did not even bother to raise in the *Conrad* case. The reasons why the Delaware courts have rejected this argument are obvious. As the Chancery Court in *Ryan* explained: "[T]he intentional violation of a shareholder approved stock option plan, coupled with fraudulent disclosures regarding the directors' purported compliance with that plan, constitutes conduct that is disloyal to the corporation and is therefore an act in bad faith." 918 A.2d at 357-58; *see also Tyson Foods*, 919 A.2d at 592 ( "At their heart, all backdated options involve a fundamental, incontrovertible lie."). Simply put, those Lehman executive and directors who approved and/or received backdated stock option grants, as well as the directors who, while on notice of the misconduct, signed false financial statements to cover it up, cannot avail themselves of the protections of Delaware's business judgment rule.

Finally, Defendants argue that Plaintiffs lack standing to challenge three of the nine backdated stock option grants, and they claim that the backdating claims are barred on statute of limitations grounds. As with Defendants' other arguments, these are issues that Chancery Court addressed at length in the both *Ryan* and *Conrad*, and, accordingly, the Court's analysis in those cases should control in the present case. At the end of the day, for virtually all the issues raised in Defendants' two motions, this Court need look no further than the Chancery Court's opinions

in *Ryan*, *Conrad* and *Tyson Foods*.  All three cases are directly on point, and these three cases explain exactly why Defendants arguments fail as a matter of law.[3]

## ARGUMENT

**I.    Plaintiffs Have Sufficiently Alleged That Demand Is Futile.**

Nominal Defendant Lehman devotes the majority of its brief to the argument that the Consolidated Complaint should be dismissed because Plaintiffs supposedly have failed to allege with particularity why a pre-suit demand on Lehman's Board should be excused.  Federal Rule of Civil Procedure 23.1 requires plaintiffs who are suing derivatively on behalf of a corporation to make a pre-suit demand on the corporation's board or show that a pre-suit demand would be futile.  Fed. R. Civ. P. 23.1(b)(3).[4]  There are essentially two different types of transactions at issue in the Consolidated Complaint:  (1) unlawful backdating of the stock options; and (2) signing and publicly disseminating false financial statements.  In this case, Plaintiffs have shown that demand is futile for both sets of transactions.

**A.    The Legal Standard For Showing That Demand Is Futile.**

The two Delaware cases that set forth the standard for showing demand futility are *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) and *Rales v. Blasband*, 634 A.2d 927 (Del. Supr. 1993).  In *Aronson*, the Delaware Supreme Court permitted plaintiffs to demonstrate that a demand on the Board to bring suit on behalf of the company would be futile in either of two alternative ways:  a demand was futile and excused where plaintiffs had alleged particularized

---

[3] Plaintiffs respectfully direct the Court to the "Nature of the Action" portion of the Consolidated Complaint (¶¶1-11) for a summary of the allegations set forth in the Consolidated Complaint.

[4] Lehman is incorporated in the State of Delaware.  Thus, Delaware substantive law controls the inquiry into whether or not a pre-suit demand would have been futile at the time this lawsuit was filed.  *See, e.g., RCM Securities Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir. 1991) (substantive law of state of incorporation governs demand inquiry in a derivative suit).

facts that created a "reason to doubt" whether (1) the directors were disinterested and independent, or that (2) the challenged transaction was the product of a valid exercise of business judgment. *Aronson,* 473 A.2d at 814-15; *see also Brehm*, 746 A.2d at 256 ("These prongs [in *Aronson*] are in the disjunctive. Therefore, if either prong is satisfied, demand is excused.") To exercise business judgment, directors "must consider all material information reasonably available." 746 A.2d at 259.

The *Aronson* test applies to the misconduct of filing false financial statements, because, as is the case here, Plaintiffs challenge an affirmative decision that was made by at least half of the directors on the current Board. Plaintiffs are challenging the Board's decision to approve and sign Form 10-K's which include financial statements that falsely described how the executive stock options were priced and the accounting for the stock options. The FY 2006 false financial statements were approved and signed by the Board after receiving notice of stock option irregularities. Nonetheless neither the Board's Audit Committee nor the Board as a whole acted to review the readily available information on Lehman's backdating practices, to satisfy the informational component of the business judgment rule as required by *Aronson* and *Brehm*.

In response, Defendants claim that the *Aronson* standard does not apply. Their reason for making this claim is obvious – Defendants cannot legitimately argue that the current Board's decision to sign false financial statements, with no investigation and after having been put on notice of serious accounting irregularities, was a valid exercise of business judgment. As a result, Defendants ask the Court to apply the demand futility standard that the Delaware Supreme Court set forth in *Rales*, which applies when a plaintiff is challenging a decision that was ***not*** made by a majority of the members of the current Board. *Rales,* 634 A.2d 927; *see also Conrad v. Blank,* 940 A.2d 28, 36-37 (Del. Ch. 2007). Under *Rales*, demand futility is established by

7

demonstrating a "reasonable doubt" that a majority of the directors are "disinterested" or "independent," *Rales,* 634 A.2d at 933-34 -- *i.e.*, *Rales* excuses Plaintiffs' demand only where the first alternative in *Aronson* is satisfied. "The requisite doubt necessary to find a director interested under *Rales* may be raised by well pleaded facts demonstrating that the director will be exposed to liability as a result of the derivative claim." *Conrad v. Blank,* 940 A.2d 28, 37 (Del. Ch. 2007).

The Consolidated Complaint alleges facts that are sufficient to establish demand futility under *Aronson* for the affirmative act by the current Board who wrongfully approved and signed the false financial statements; demand futility is also demonstrated under *Rales* for all the misconduct alleged in the complaint.

### B.    The Board's Approval of Lehman's False Financial Statements Was Not A Valid Exercise Of Business Judgment.

Plaintiffs have alleged particularized facts to satisfy the second prong of *Aronson*, which is satisfied "by raising a reason to doubt whether the challenged transaction was the product of a valid exercise of business judgment." *Ryan,* 918 A.2d at 354. The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Id.* at 357 (quoting *Aronson,* 473 A.2d at 812). Directors who make a decision without obtaining all material information that is reasonably available do not satisfy the "informed basis" element of the business judgment rule. *Brehm*, 746 A.2d at 259. This alone is enough to demonstrate demand futility. *Id.* Defendants also fail the "good faith" element of the business judgment rule. A lack of "good faith" is demonstrated where a director, "intentionally acts with a purpose other than that of advancing the best interests of the corporation, where the fiduciary acts with the intent to violate applicable positive law, or where the fiduciary

intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties." *In re the Walt Disney Co. Derivative Litig.*, 906 A.2d 27, 67 (Del. Supr. 2006). Finally, Directors may be held liable for their lack of oversight where, having implemented an information system or set of controls, they "consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

In this case, the Consolidated Complaint alleges numerous facts that raise a reasonable doubt as to whether the Lehman Board acted on an informed basis and/or in good faith when it signed off on Lehman's Form 10-K's and proxy statements. For years, Lehman's SEC filings contained explicit and false representations that Lehman had satisfied APB 25, a tax safe harbor, so that it could avoid reporting hundreds of millions of dollars of compensation expense for the executive stock options. Lehman's accounting for its incentive stock options was based on the supposed fact that the exercise price of the stock options was equal to the price of Lehman's common stock on the date of the options' grant. *See* ¶92. These patently false statements continued to be made in Lehman's Form 10-K for FY November 30, 2006, which was filed on February 13, 2007, and its proxy statement filed February 26, 2007 for the April 12, 2007 annual meeting of shareholders -- long after the stock option scandal broke and Lehman's Board members were on clear notice that their representations about the Company's option grant dates could well be false. Significantly, at the time the Board signed these false statements about the Company's option grant practices:

- Numerous press reports about wide-spread option backdating appeared in the *Wall Street Journal*, *USA Today* and the *New York Times*.

- The SEC acted to address the scandal by an SEC release issued on July 26, 2006 announcing, "SEC Votes to Adopt Changes to Disclosure Requirements Concerning Executive Compensation and Related Matters."

This release explained that the SEC would require additional "disclosure of company programs, plans and practices relating to the granting of options, including in particular the timing of option granting coordination with the release of material non-public information and the selection of exercise prices that differ form the underlying stock's price on the grant date."[5]

- The SEC issued final rules on August 11, 2006 that required more disclosure by public companies about options grants, particularly backdated options, and about spring loaded stock option grants. The rules became effective for Form 10-Ks for fiscal years ending on or after December 15, 2006 and for proxy statements filed on or after December 15, 2006. 17 C.F.R. § 229.402.

- The Board had already been sued for making false disclosures in Lehman's proxies filed with the SEC in 2002-2006 about the valuations of Lehman's stock options – a lawsuit that Defendants themselves describe as having "alleged that Lehman's 2002-2006 proxy statements contained misstatements related to executive compensation, including its reporting of option grants during those years."

Nevertheless, the Board members, including those who had been involved in the approval of the manipulated grants and those sitting on the Audit Committee, still chose, in early 2007, to sign off on the false FY 2006 Form 10-K which included the Company's misstated financial statements. The Board members, and particularly those sitting on the Audit Committee, failed to perform any type of investigation whatsoever despite the serious internal control deficiencies identified in the *Bader* case with respect to the Company's options, and without examining Lehman's stock option grant practices for possible backdating in accordance with the newly released SEC rules.[6] At the very least, the *Bader* litigation should have been a red flag to the

---

[5] The Release is attached as Exhibit 1 to the Declaration of Beth A. Kaswan ("Kaswan Declaration").

[6] The four Audit Committee members made their own report in the proxy statement filed with the SEC in February 2007, representing that they had the responsibility to monitor and oversee the financial reporting process and the preparation of the Company's financial statements. A copy of this audit committee report is attached as Exhibit 2 to Kaswan Declaration. As described therein, the Audit Committee members purported to satisfy their responsibilities by having discussions with the managers who had received the backdated

Board members that there were inadequate internal controls over stock option grants and that the allegations of misstatements pertaining to valuation methodology for stock options may have been the tip of an iceberg.  Because Lehman's option grant manipulations were so egregious -- all but one were at the lowest or second lowest price in the month -- even a minimal effort to review the Company's grant date practices would have revealed the fraud -- so that the information needed to demonstrate that the 2006 financial statements were false was "readily available" to the Directors before they approved and signed off on the public reports.

These facts, at a minimum, raise a "reasonable doubt" for purposes of demand futility and the business judgment rule as described in the Delaware Supreme Court's 2000 decision in *Brehm*, as to whether the Board made any effort to inform itself as to the material information regarding the stock option grant practices, before signing and/or approving the statements in the Form 10-K and Proxy Statement filed with the SEC in 2007.  They also raise a "reasonable doubt" under the business judgment rule as to whether the Board members signed these statements in "good faith," as described in the 2006 Delaware Supreme Court decision in *Walt Disney*, rendered after the trial of the derivative claims, or exercised the required oversight for "good faith" in *Stone v. Ritter*, 911 A.2d at 370 and *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).  Note also the court's skepticism in *Ryan* that option backdating and its cover-up could ever satisfy the business judgment rule: "I am unable to fathom a situation where the deliberate violations of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly

---

options; as the Audit Committee members reported:  "Management represented to the Audit Committee that the Company's consolidated financial statements were prepared in accordance with generally accepted accounting principles."  Inasmuch as Management were wholly conflicted and shareholders necessarily looked to the Directors to assure that internal controls existed over management's compensation, this inquiry was hardly adequate to satisfy the Directors' oversight responsibilities.  See ¶¶49, 67.

with the shareholder-approved option plan, is anything but an act of bad faith." 918 A.2d at 358. Accordingly, the Board's decision to sign the false 2007 SEC reports is not a decision that is the product of a valid exercise of business judgment, and, thus, demand is futile under the second prong of the *Aronson* test.

### C.    A Majority Of The Board Members Were Not Disinterested And Independent.

Plaintiffs have also alleged particularized facts to satisfy demand futility under *Rales*, which is the operative standard for assessing demand futility when a plaintiff is challenging board "inaction" as opposed to an affirmative decision made by at least half of the members of the current board.[7]  *Rales* provides that "demand is excused when the complaint contains particularized facts creating a reason to doubt that a majority of the directors would have been independent and disinterested when considering the demand." *Ryan,* 918 A.2d at 355. Directors are not disinterested, where they face a "substantial likelihood" of liability. *See Rales,* 634 A.2d at 936. Here, seven of the ten current directors are not disinterested under the standard set forth in *Rales.* Specifically:

- Defendant Fuld, the Chairman of the Board, is not disinterested because he received seven of the nine backdated stock option grants at issue in this suit, and is being unjustly enriched by hundreds of millions of dollars in illegally granted stock options;

- Defendants Akers and Macomber are not disinterested because they served on the Board's Compensation Committee and approved all nine of the backdated stock option grants at issue in the suit; and

- Defendants Ainslie, Berlind, Cruikshank and Gent are not disinterested because they received clear notice of the accounting irregularities tied to the backdated stock option grants and, despite their heightened role and

---

[7] Because this is essentially the same test as the first alternative in *Aronson*, many derivative cases discussing directors' interest and independence refer to *Aronson* as well as *Rales*.

responsibilities as Audit Committee members, still signed off on Lehman's false financial reports.

1.    **Defendant Fuld Is Not Disinterested Because He Received Backdated Stock Option Grants.**

First of all, there is no question that Defendant Fuld faces a substantial likelihood of liability since the Consolidated Complaint alleges with particularity that he actually received the backdated stock option grants. ¶¶75-87. The *Ryan* and *Conrad* cases both held that allegations in a complaint that a director received backdated stock option grants are sufficient to raise a substantial likelihood of liability under *Rales. See, e.g., Conrad,* 940 A.2d at 38 ([T]he two directors who allegedly received backdated options . . . are clearly not disinterested under *Rales*."); *Ryan,* 918 A.2d at 355-56 (same).

The Delaware Chancery Court's opinion in *Conrad* is directly on point. There, the Chancery Court held:

> The plaintiff's pleadings [showing that two of the directors received backdated stock option grants] are adequate to raise a reasonable doubt as to whether these two directors are disinterested. Most obviously, both have a strong financial incentive to maintain the status quo by not authorizing any corrective action that would devalue their current holdings or cause them to disgorge improperly obtained profits. This creates an unacceptable conflict that restricts them from evaluating the litigation independently.

*Conrad,* 940 A.2d at 38. The Court's holding applies with equal force to Defendant Fuld. Here, Plaintiffs have alleged that Defendant Fuld received seven of the nine backdated stock option grants. ¶¶75-87. Four of Fuld's seven stock option grants (the December 14, 1998 grant, the December 1, 1999 grant, the December 1, 2000 grant and the December 3, 2001 grant) were priced on the date when Lehman's stock price was trading at its lowest point during the entire month. ¶¶77, 78, 80, 81. Two of Fuld's remaining three grants (the January 1, 1997 grant and the February 18, 2000 grant) were priced on the date when Lehman's stock price was trading at

its second lowest point during the entire month, and Fuld's final stock option grant (the December 14, 1997 grant) was priced on a date when Lehman's stock price was trading at its fourth lowest point.  ¶¶75, 76, 79.  Moreover, the statistical odds of Lehman's overall stock option granting patterns occurring as a result of chance (*i.e.,* eight of the nine dates priced on the date when Lehman's stock was trading at it slowest or second lowest point during th entire month, and the ninth grant date on the date when Lehman's stock was trading at its fourth lowest point for the month) is astronomically high, in this case more than 18 billion to one.  ¶10.  In light of these well-plead allegations in the Consolidated Complaint, there no question that Defendant Fuld is not disinterested for the purposes of considering a demand.

>    **2.    Defendants Akers and Macomber Are Not Disinterested Because They Approved The Backdated Stock Option Grants.**
>
>>    **i.    Directors Who Approve Backdated Stock Option Grants Are Not Disinterested For Purposes Of Considering A Demand.**

Defendants Akers and Macomber – the two directors who served on the Compensation Committee when the Lehman executives received the backdated stock option grants – also face a substantial likelihood of liability under *Rales* because they approved the backdated stock option grants.  ¶¶56-60.  Indeed, *Ryan* and *Conrad* both have held that compensation committee members who approved backdated stock option grants are not disinterested under *Rales* for the purposes of considering a demand.  *See, e.g., Ryan,* 918 A.2d at 355 ("A director who approves the backdating of options faces at the **very least** a substantial likelihood of liability, if only because it is difficult to conceive of a context in which a director may simultaneously lie to his shareholders (regarding his violations of a shareholder-approved plan, no less) and yet satisfy his duty of loyalty") (emphasis in original); *Conrad,* 940 A.2d at 40 ("Suffice it to say that, for

14

purposes of the *Rales* analysis, the court concludes that the allegations of the complaint are sufficient to excuse demand on the members of the compensation committee.").

### ii.    The Chancery Court's Opinion in *Desimone* Is Not On Point.

In response, Defendants' point to the Delaware Chancery Court's opinion in *Desimone v. Barrows,* 924 A.2d 908 (Del. Ch. 2007) for the proposition that directors on a compensation committee who approve backdated stock option grants are capable of considering a demand. *Desimone*, however, is readily distinguishable on its facts.  Indeed, the Chancery Court in *Conrad* explained that the key difference for demand futility purposes between the facts in *Ryan* and *Conrad*, on the one hand, and *Desimone*, on the other, was that: "Importantly, the relevant stockholder option plan in *Desimone* did not require all options to be priced at the fair market value of the common stock on the grant date."  940 A.2d at 39.  The compensation committee in *Desimone* had the discretion in dating the options.  *Id.*  They were not required to price the options at the fair market value on the date of the grant.  *Id.*

The Court went on: "The Staples stockholder-approved option plans, by contrast, gave no discretion to the compensation committee in setting exercise prices – the grant date controlled in all cases."  *Id.*  Thus, as the Court explained, it was reasonable to infer that the directors on the compensation committee knew that they were approving stock options that had been improperly backdated.  As the Court explained:

> [I]t is difficult to understand how a plaintiff can allege that directors backdated options without simultaneously alleging that such directors knew that the options were being backdated.  After all, any grant of options had to have been approved by the compensation committee, and that compensation committee can be reasonably expected to know the date of the options as well as the date on which they actually approve a grant.

*Id.* at 40 (quoting *Ryan*, 918 A.2d at 355).

The same facts that led the Chancery Court in *Ryan* and *Conrad* to conclude that the compensation committee was not disinterested are alleged with particularity here.  Most significantly, the Lehman Stock Option Plan specifically provided that the Compensation Committee "shall establish the option price at the time each stock options is granted, which price shall not be less than 100 percent of the Fair Market Value of the Common Stock on the date of grant."  ¶59.  Because the Lehman Stock Option Plan did not give the members of the compensation committee any discretion in setting the price or date for the grant -- but instead required them to set it as 100 percent of fair market value on the date of the grant -- it is reasonable to infer that the directors on the compensation committee knew that the stock options were being backdated.  The directors knew that backdating was going on because they approved stock option grants that were not dated and priced on the date when the compensation committee approved the grant, but on an earlier date when Lehman stock was trading at a lower price.  ¶¶56-60.  Because "the compensation committee can be reasonably expected to know the date of the options as well as the date on which they actually approved a grant," *Conrad*, 940 A.2d at 40, the two directors who served on the compensation committee and approve the backdated stock option grants (Defendants Akers and Macomber) are not disinterested under *Rales*.

> **3.    Defendants Ainslie, Berlind, Cruikshank And Gent Are Not Disinterested Because They Had Notice Of Accounting Irregularities Tied To The Stock Option Grants And Still Signed Off On False Financial Reports.**
>
> > **i.    Directors Who Are Put On Clear Notice Of Serious Accounting Irregularities Are Not Disinterested.**

The four current Audit Committee Board Members (Defendants Ainslie, Berlind, Cruikshank and Gent) also are not disinterested under Delaware law because they received clear notice of serious accounting irregularities and chose to ignore those accounting irregularities, when signing off in February 2007, on the Company's Form 10-K, and on their own report that

was included in the Company's proxy statement, Exhibit 2.  As such, they "consciously failed to monitor or oversee" the operations of Lehman's system of internal controls and "disabled themselves from being informed of risks or problems requiring their attention."  *Stone v. Ritter*, 911 A.2d at 370.  *See, also, Guttman, et al. v. Huang,* 823 A.2d 492 (Del. Ch. 2003), where the Court dismissed plaintiffs' "*Caremark*" claim, when the complaint failed to include an allegation that, "the audit committee had clear notice of serious accounting irregularities and simply chose to ignore them,"  *Id.* at 507 (citations omitted); *Stone v. Osborne*, 06-CV-3120(RBK), 2007 WL 2085354 at *4 (D.N.J. 2007)(Audit Committee members faced "a substantial likelihood of liability"); *Mitzner v. Hastings*, 2005 WL 88966 at *6 (N.D. Cal. January 14, 2005) (Audit Committee members signing false financial statements may be interested); *cf. Stiegele v. Bailey*, 2007 WL 4197496 at *6 (D. Mass, Aug. 23, 2007)(Merely asserting a director is an audit committee member is "alone insufficient" to disqualify a director as disinterested).  In fact, the Defendants themselves are forced to concede that Audit Committee members who ignore serious accounting irregularities are not disinterested for purposes of considering a demand.  *See* Lehman Mem. at 18 ("To establish that audit committee members cannot consider a demand, Plaintiffs must allege that they 'had clear notice of serious accounting irregularities and simply chose to ignore them or, even worse, to encourage their continuation.'") (quoting *Gutman,* 823 A.2d at 507).

Several facts placed these Directors on notice that the explicit statements included Lehman's financial reports about how its executive stock options were granted, priced and accounted for needed to be investigated and verified.  ¶¶66-68.  Most importantly, Defendants Ainslie, Berlind, Cruikshank and Gent were put on clear notice of the serious accounting irregularities regarding Lehman's stock option granting practices on August 3, 2006 when they

17

were served with the verified complaint in *Bader v. Ainslie, et al.,* an earlier derivative action

filed in the Southern District.  Remarkably, the Defendants themselves concede that the *Bader*

complaint "alleged that Lehman's 2002-2006 proxy statements contained misstatements related

to executive compensation, including its reporting of option grants during those years."  Lehman

Mem. at 14.  Moreover, around the same time that they were served with the *Bader* complaint,

Defendants Ainslie, Berlind, Cruikshank and Gent learned:

- That the SEC had issued a release on July 26, 2006 announcing, "SEC Votes to Adopt Changes to Disclosure Requirements Concerning Executive Compensation and Related Matters."  This release explained that the SEC would require additional "disclosure of company programs, plans and practices relating to the granting of options, including in particular the timing of option granting coordination with the release of material non-public information and the selection of exercise prices that differ form the underlying stock's price on the grant date."  (Exhibit 1)

- The SEC had published its final rules on August 11, 2006 that required more disclosure about options grants, particularly backdated options, and about spring loaded stock option grants.  The rules became effective for Form 10-Ks for fiscal years ending on or after December 15, 2006 and for proxy statements filed on or after December 15, 2006.  17 C.F.R. § 229.402.

¶69.  They also should have been aware of the backdated stock option grants given the level of

controversy that the practice was generating in the corporate world and the investment

community.   ¶69; *see also Ryan*, 918 A.2d at 345.  The Audit Committee members in their

February 26, 2007 report to shareholders, represented that they had the responsibility to monitor

and oversee the Company's processes for internal controls, financial reporting and preparation of

its financial statements, yet they consciously failed to act to satisfy those responsibilities.  The

fact that the directors on the Audit Committee had ***already*** been sued for making false statements

about the way they valued and disclosed the Company's stock option grants in the 2002-2006

proxy statements – when combined with the changes to the SEC rules – should have put the

directors on the Audit Committee on clear notice of their obligations to investigate whether their representations relating to the financial accounting for the stock option grants were true. Nevertheless, the four current directors on Lehman's Audit Committee simply accepted the conflicted management's representations that the financial statements complied with GAAP and took no action to verify the practices by which Lehman granted and accounted for its management's stock options. ¶¶67-78. Instead, the Company simply settled the claims in the *Bader* case quickly and cheaply in hopes that these serious irregularities would go away.

It is also important to point out that Lehman's managers (and the Compensation Committee Directors) were not making alterations to the stock option grants that required a high level of sophistication to identify -- this information was readily obtained had the Directors bothered to look. Eight of the Lehman's nine stock option grants were dated on the date when Lehman's stock price was trading at its lowest or second lowest point during the entire month. ¶74. And the only stock option grant that was not dated on the lowest or second lowest trading date was dated on the fourth lowest trading date during the entire month. ¶74. Importantly, these nine stock option grants represent all of the stock option grants that Lehman's top executives received during the Relevant Period. The odds of this stock option granting pattern occurring due to chance are astronomically high, in this case over 18 billion to one. ¶74. This pattern of stock option grants was so egregious that the four Defendants on the Audit Committee in 2007 would have easily noticed the highly suspect pattern of grants if they had made any effort at all to check the reliability or truthfulness of the representations about the grant and accounting practices -- something they should have done after having been put on clear notice of serious problems via the *Bader* lawsuit and the changes to the SEC disclosure rules addressing the industry's widespread option backdating abuses.

19

Defendants Ainslie, Berlind, Cruikshank and Gent not only failed to investigate the detailed statements regarding Lehman's stock option granting practices in the early financial statements, but they continued to sign off on financial statements going forward after the scandal broke and they were confronted with notice of Lehman's option reporting problems.  ¶68.  As stated in the Consolidated Complaint: "Lehman's Form 10-K for its FY ended November 30, 2006, filed on February 13, 2007, continued to contain false statements regarding Lehman's past stock option practices.  Nor were truthful disclosures included in Lehman's proxy statement filed February 26, 2007, for the April 12, 2007 annual meeting of shareholders – where shareholders were being asked to vote on a proposal to expand the Directors' authority to issue more stock options."  ¶68.

In fact, the four directors on the Audit Committee failed to launch a internal investigation or appoint a disinterested special committee to review Lehman's incentive stock-based compensation even after the present lawsuit was filed – a factor that that the Delaware Chancery Court has recently found to weigh heavily in favor of a finding of demand futility.  *Conrad,* 940 A.2d at 38.  As the Court in *Conrad* recently explained:

> Coming as this complaint does in the middle of a national scandal involving backdated options, there never was any doubt that various theories exist on which to recover from the corporation's officers and directors where evidence of improperly dated options exists.  Nonetheless . . . the audit committee ended their "review" without explanation and apparently without seeking redress of any kind.  In these circumstances, it would be odd if Delaware law required a stockholder to make demand on the board of directors before suing on those very same theories of recovery.

*Id.*  The Chancery Court's reasoning in *Conrad* applies with equal force to the four Audit Committee directors here.  As in *Conrad,* the four Audit Committee directors here failed to respond to the serious accounting allegations raised in the *Bader* complaint or seek any redress of any kind.  In sum, Defendants Ainslie, Berlind, Cruikshank and Gent were put on clear notice

of the serious accounting irregularities relating to the stock option grants as of August of 2006 at the latest.  Because this was over six months before Plaintiffs filed their initial complaint in the present case, Defendants Ainslie, Berlind, Cruikshank and Gent are disinterested under *Rales*.

> ### ii.    The Fact That These Directors Have Settled Claims Relating To Certain False Proxy Statements Has No Bearing On The Demand Futility Analysis.

Defendants go on to claim that Defendants Ainslie, Berlind, Cruikshank and Gent are capable of considering a demand because the claims in the *Bader* lawsuit were released in a settlement, which, according to Defendants, eliminated the risk that these Defendants would be held liable for signing off on financial  statements containing false statements about the stock option grants.  The problem with Defendants' argument is that it misstates the claims that were raised in the *Bader* complaint dated April 3, 2006, or settled as part of the *Bader* lawsuit.  *Bader* did not involve Lehman's accounting for the stock options or the false financial statements included in the Company's Form 10-K's.  Bader's complaint addressed only the pre-2007 valuation disclosures in the proxy statements which had no effect on Lehman's financial reports.  Thus, the bulk of Plaintiffs' claims raised in this case, both with respect to the backdating itself and also Lehman's false accounting in all its Form 10-K's and in the 2007 proxy statement, are not extinguished by the *Bader* release and continue with full force and effect.[8]

---

[8] In addition, the Stipulation and Agreement of Settlement in the *Bader* lawsuit was signed by Judge Paulet on May 1, 2007 (*Bader v. Ainslie, et al.*, (S.D.N.Y.) (Civil No. 06 CV 5884) (Docket Entry 46)) <u>after</u> the complaint in this case had already been filed and served on defendants (*Garber v. Fuld, et al.* (S.D.N.Y.) (Civil Action No. 07 Civ 2990) (Docket Entries 1 and 2).  As such, on the date that this case was filed and the interest and independence of the Directors is measured for purposes of demand futility, the Directors were in fact still exposed for the claims that had been pled in *Bader.*

**II.    Plaintiffs Have Adequately Plead Each Of The Delaware Common Law Claims.**

Whereas Nominal Defendant Lehman focuses the thrust of its brief on issues relating to demand futility, the Individual Defendants take a more scattershot approach and raise a wide-range of arguments as to why the Consolidated Complaint supposedly should be dismissed. First, the Individual Defendants claim that Plaintiffs' claims under Delaware common law (*e.g.,* claims for *ultra vires* acts, breach of fiduciary duty, breach of the duty of loyalty, gross mismanagement and misrepresentation) are all subject to the heightened pleading standard set forth in Rule 9(b) because these claims supposedly "sound in fraud." Second, the Individual Defendants go through each of the counts in Plaintiffs' Consolidated Complaint one-by-one and attempt to show why each particular count in the Complaint should be dismissed. Third, the Individual Defendants take issue with Plaintiffs allegations relating to the backdated Restricted Stock Units ("RSUs"). Finally, the Individual Defendants argue that Plaintiffs' claims are barred on statute of limitations grounds.

**A.    For Most Of Their Claims, Plaintiffs Need Not Satisfy The Heightened Pleadings Standard of Rule 9(b).**

The Individual Defendants open their brief with the claim that Plaintiffs' stock option backdating claims are subject to the heightened pleading requirements of Rule 9(b). To support this argument, the Individual Defendants rely on a single, unreported case from the Northern District of California in which a California court held that alleged stock option backdating claims must satisfy Rule 9(b) "because the options backdating sounds in fraud." Ind. Defs. Memo. at 8 (quoting *In re Ditech Networks, Inc. Deriv. Litig.,* 2007 WL 2070300, at *10 (N.D. Cal. July 16, 2007). Although they cite to this California case, what the Individual Defendants are really doing here is asking this Court to adopt the "sound in fraud doctrine."

22

This doctrine, which provides that courts are to apply Rule 9(b) to cases that purportedly "sound in fraud" even though fraud itself is not an element of the underlying claim, has been repeatedly rejected courts in the Southern District. *See, e.g., In re In-Store Advertising Sec. Litig.,* 878 F.Supp. 645, 650 (S.D.N.Y. 1995) ("this court finds that '[b]ecause proof of fraud is not necessary to prevail on a [non-fraud securities claim] . . . Rule 9(b) does not apply"); *Nelson v. Paramount Communications, Inc.,* 872 F.Supp. 1242, 1246 (S.D.N.Y. 1994) (same); *see also In re NationsMart Corp. Sec. Litig.,* 130 F.3d 309, 315 (8th Cir. 1997) (explaining that "a pleading standard which requires a party to plead particular facts to support a cause of action that does not include fraud or mistake as an element comports neither with Supreme Court precedent nor with the liberal system of 'notice pleading' embodied in the Federal Rules of Civil Procedure").

The Southern District case of *In re Initial Public Offering ("IPO") Litigation,* 241 F.Supp.2d 281, 338-42 (S.D.N.Y. 2003) is directly on point. There, Judge Scheindlin refused to apply Rule 9(b) in a case where fraud was not a necessary element of the claim even though the allegations supporting the claim themselves sounded in fraud. The Court explained:

> Whether Rule 8(a) or 9(b) is triggered turns on the type of claim alleged (*i.e.,* the cause of action) rather than the factual allegations on which the claim is based. That courts must look at the type of ***claim*** being alleged to determine which Rule applies is obvious from the plain language of Rule 8, which states that a "pleading which sets forth a ***claim*** for relief, whether an original ***claim***, counterclaim, cross-***claim***, or third-party ***claim***, shall contain . . . a short and plain statement of ***the claim*** showing that the pleader is entitled to relief."

241 F.Supp.2d at 341-42 (emphasis in original). The Court went on: "Likewise, Rule 9(b) only applies to claims that fall under the category of fraud or mistake. Because [the claim at issue] is not a fraud claim, Rule 8(a) applies. That the same factual allegations also give rise to [other fraud-based claims] is irrelevant to this analysis." *Id.* at 342. Judge Scheindlin's opinion in the

*In re IPO Litigation* – and the countless others cited above – are on far stronger footing that the lone unreported, California case that the Individual Defendants cite in their brief and, accordingly, this Court should reject the Individual Defendants' attempts to import the sound in fraud doctrine into the Southern District. Simply put, Rule 9(b) should only be applied to Count VI of the Consolidated Complaint where fraud is an essential element of the underlying claim. Even for this claim, however, the underlying facts have been pled with particularity. As Rule 9(b) permits knowledge and interest to be alleged "generally", Plaintiffs have fully satisfied their pleading burden as further described herein. For the remainder of the claims, Plaintiffs need only satisfy the liberal pleading standard in Rule 8(a).

### B.  Each Count In The Consolidated Complaint Adequately Pleads A Claim Under Delaware State Law.

As the Supreme Court recently explained in *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955 (2007), on a motion to dismiss, under Fed. R. Civ. P. 12(b)(6), a complaint must only provide defendants with firm notice of Plaintiff's claims and sufficient facts to provide notice of the grounds upon which the claims rest. *Id*. at 1959. While the allegations must establish "plausible grounds" for relief, that "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence [to support relief]. *Id.* at 1965. As described above, except for Plaintiffs' misrepresentation and fraudulent concealment claims, to survive a Rule 12(b)(6) motion, plaintiff need only satisfy Rule 8. The purpose of Rule 8 is to "give the defendant fair notice of what . . . plaintiff[s'] claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512 (2002). Here, the Consolidated Complaint more than meets that standard. Thus, the motion to dismiss must be denied.

1.    **Plaintiffs Adequately Allege a Breach of Fiduciary Duty (Count II).**

Next, Defendants argue that Plaintiffs' Count II breach of fiduciary duty claims should be dismissed because Plaintiffs have supposedly failed to allege facts to overcome Delaware's business judgment rule. Although Defendants do not mention it in their brief, much of the analysis with respect to Plaintiffs' Count II fiduciary duty claims begins and ends with the Chancery Court's recent backdating opinion in *Ryan*.

As the *Ryan* Court explained: "At the [motion to dismiss] stage, plaintiffs are afforded certain presumptions of trust. Because of these presumptions, plaintiff may survive a motion to dismiss where the complaint relies on empirical data to support claims of: 1) specific instances of backdating; 2) violations of shareholder-approved plans or some other legal obligations; and 3) fraudulent disclosures regarding compliance with that plan." 918 A.2d at 358, n.49. The Court then concluded:

> I am unable to fathom a situation where the deliberate violations of a shareholder approved stock option plan and false disclosures, obviously intended to mislead shareholders into thinking that the directors complied honestly with the shareholder-approved option plan, is anything but an act of bad faith. It certainly cannot be said to amount to faithful and devoted conduct of a loyal fiduciary. Well-pleaded allegations of such conduct are sufficient, in my opinion, to rebut the business judgment rule and to survive a motion to dismiss.

*Id.* at 358. *See also* Section I. B., *supra*, which explains why the current Board did not satisfy the business judgment rule in connection with the issuance of Lehman's recent Form 10-K and proxy statement. As these authorities are directly on point, the business judgment rule is not defense to Plaintiffs' claims.

2.    **Plaintiffs Adequately Allege Claims For Gross Mismanagement (Count III).**

Defendants go on to argue that Plaintiffs' gross mismanagement claims is wholly dependent upon the breach of fiduciary claims and cannot stand alone as a separate cause of

action. This, however, is simply a matter of semantics. Directors of Delaware corporations have three primary fiduciary duties: due care, loyalty, and good faith. *Emerald Partners v. Berlin*, 787 A.2d 85, 90 (Del. 2001). The Delaware Supreme Court has recently explained that a fiduciary breaches its duty of due care when its action involves "gross negligence." *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d at 64-66.

### 3. Plaintiffs Adequately Allege Misappropriation and Waste of Corporate Assets (Count IV).

Plaintiffs also allege an actionable claim for misappropriation and waste of corporate assets because Lehman's top executives exchanged no consideration whatsoever in return for the huge profits that they reaped by virtue of the backdating aspect of the stock option grants. Under Delaware law, plaintiffs sufficiently state a claim for misappropriation and waste of corporate assets where they allege that valuable corporate assets have been diverted for an improper or unnecessary purpose. *See, e.g., Brehm*, 746 A.2d at 263 ("Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to be beyond the range at which any reasonable person might be willing to trade. . . . Such a transfer is in effect a gift."); *Michelson v. Duncan,* 407 A.2d 211, 217 (Del. Supr. 1979) ("The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes."). Moreover, transferring assets for ***no consideration***, by its very definition, qualifies as misappropriation and a waste of corporate assets. *Id.* ("It is common sense that a transfer for no consideration amounts to a gift or waste of corporate assets."); *see also Sample v. Morgan,* 914 A.2d 647, 660-61 (Del. Ch. 2007) (explaining that misappropriation and a waste of corporate assets occurs where the challenged transaction served no corporate purpose or where the corporation received no consideration at all).

Here, Plaintiffs have sufficiently alleged that the Company received no consideration in exchange for the huge sums of money that Lehman's top executives reaped by virtue of backdating their stock option grants.  Indeed, under Lehman's shareholder-approved stock option Plan, option grants were designed to serve as incentives for Lehman's top executives to ***improve the Company's performance and increase the Company's stock price going forward***.  This was the consideration that the insiders provided for the stock option grants.  However, by manipulating options such that they carried a strike price lower than the trading price of the stock on the date of the grant, Lehman insiders profited immediately upon the award of the options, without having to do anything to improve the Company's future business or financial conditions.  As such, the Company was never compensated and did not receive any consideration in return for the immediate profits that insider reaped from the backdated grants.  Whereas the stock option grants were supposed to be priced at a fair market price to give the insiders an incentive to improve the Company's future stock price and performance, the backdated option grants in reality constituted unauthorized "gifts" to those who received them.  This is the very definition of a misappropriation and waste of corporate asset claim under Delaware law.

### 4.    Plaintiffs Adequately Allege Unjust Enrichment (Count V).

Defendants also argue that Plaintiffs unjust enrichment claim (Count V) is wholly derivative of the other Delaware statement common law claims alleged in the Complaint.  This argument does not square with the law in Delaware on unjust enrichment.  Rather, the Delaware Chancery Court opinion in *Ryan* is directly on point.  There, the Chancery Court explained: "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience.'"  918 A.2d at 361 (quoting *Schock v. Nash,* 732 A.2d 217, 232-33 (Del. Supr.

1999)).  Importantly, the Court went on to note: "A defendant may be liable 'even when the defendant retaining the benefit is not a wrongdoer' and 'even though he may have received [the backdated options] honestly in the first instance.'"  *Id.*  The *Ryan* Court concluded:

> At this stage, I cannot conclude that there is no reasonably conceivable set of circumstances under which [Maxim CEO] Gifford might be unjustly enriched. Gifford does retain something of value, the alleged backdated options, at the expense of the corporation and shareholders.  Further, defendants make no allegations that Gifford is precluded from exercising these options or that the options have expired.  Thus, one can imagine a situation where Gifford exercises the options and benefits from the low exercise price . . . .  Thus, I deny the motion to dismiss the unjust enrichment claims.

*Id.* at 361.  The Court's holding in *Ryan* reads right on the situation here.  Plaintiffs have alleged that the Defendants received backdated stock options grants and have been unjustly enriched as a result.  This is a separate cause of action under Delaware law, which is actionable "even when the defendant retaining the benefit is not the wrongdoer" and "even though [Defendants] may have received [the options] honestly in the first instance."  Accordingly, Defendants' motion to dismiss the unjust enrichment claim must be denied.

**5.    Plaintiffs Adequately Allege *Ultra Vires* Acts (Count I).**

Defendants also argue that Plaintiffs Count I claim for *ultra vires* acts "is not an independent cause of action but rather a form of a remedy equivalent to rescission and should be dismissed."  Ind. Defs. Mot. at 25.  This argument misstates Delaware law, which recognizes an independent cause of action for *ultra vires* acts.  *See, e.g., Solomon v. Armstrong,* 747 A.2d 1098, 1114 (Del. Ch. 1999) (recognizing that "*[u]ltra vires* acts include 'acts specifically prohibited by the corporation's charters, for which no implicit authority may be rationally surmised, *or* those acts contrary to basic principles of fiduciary law"); *Melzer v. CNET Networks,* 934 A.2d 912, 914 (Del. Ch. 2007) ("[T]o the extent a director knowingly backdated a stock option in violation of the company's charter, that director's action is *ultra vires*.").  Plaintiffs

28

have alleged that the Directors violated Lehman's corporate charter and stock option plans by approving backdated stock option grants. The Directors lacked any implicit or actual authority for approving the backdated option awards. These allegations are sufficient to state a claim against the Directors for making *ultra vires* acts.

> **6.    Plaintiffs Adequately Allege Misrepresentation and Fraudulent Concealment (Count VI).**

> **i.    Count Six is Properly Pled**

Count VI of the Complaint adequately pleads misrepresentation and false representation by the Lehman Board of Directors. The sixth cause of action arises from the act of the Board in knowingly and/or recklessly signing financial statements that misstated the Company's earnings and falsely described (and concealed the truth) with respect to the pricing for the backdated stock options.

Plaintiffs adequately allege all necessary elements of a claim for misrepresentation and fraudulent concealment under Delaware law. To establish a claim for misrepresentation or fraud plaintiff must allege that the defendant either represented false statements as true, actively concealed facts, or remained silent in the face of a duty to speak. The misrepresentation must be made either knowingly, intentionally, or with reckless disregard for the truth. *Metro Communications Corp. BVI* v. *Advanced Mobilecomm Tech. Inc.*, 854 A.2d 121, 154 (Del. Ch. 2004). *And see In re Cendant Corp.*, 189 F.R.D. 117 (D.N.J. 1999) (derivative complaint pleading that individual defendants knowingly or recklessly caused the company to issue false and misleading financial statements and reports sustained as against certain defendants). The Consolidated Complaint alleges that in signing the false financials in the Form 10-K's, proxy statements, Form 4's and Form 5's the Defendants knew the statements were false (¶141) or recklessly disregarded their obligation to be honest. (¶¶108, 113, 134, and 142). In this case, as

in *Manzo*, relied upon by defendant, "the magnitude and scope of the misrepresentations alleged support a reasonable inference that each and all of the defendants acted with at least reckless disregard for the truth or falsity of at least some of the various financial statements, . . ." *See Manzo v. Rite Aid Corp.*, No. Civ. A. 18451-NC, 2002 WL 31926606, at *3 (Del. Ch. Sept. 6, 2002).[9]

> ii.      **The *Bader* Settlement Agreement and Release Does not Extinguish Plaintiffs' Claims.**

Defendants contend that the April 5, 2007 Settlement Agreement and Release in the derivative action against Lehman and its directors, captioned *Bader v. Ainslie, et al.,* No. 06-cv-5884 extinguishes all claims in this case relating to Lehman's disclosures of its options and RSU grants between 2002 and 2006. The defendants are mistaken. As observed in Section I. 3. (ii), *supra*, the operative facts of the *Bader* complaint and settlement agreement pertained only to informational disclosures about the options' valuations in the 2002-2006 proxy statements as a result of misuse of a Black-Scholes option model. There is no mention of backdating of stock options, nor of false financial reporting in *Bader*. Particularly, there is no allegation that Lehman falsified its accounting or its compensation expense and earnings for the executive stock options in its financial statements included in the Form 10-K's, as there are in the complaint here.

"In Delaware, the limiting principle is that a settlement can release claims that were not specifically asserted in the settled action, but only if those claims are based on 'the same identical factual predicate' or the 'same set of operative facts' as the underlying action." *In re Philadelphia Stock Exchange, Inc.*, 2008 WL 803922 at *14 (Del. Supr. March 27, 2008)

---

[9] It is unclear why the defendants cite to the 1968 case of *Layton v. Allen*, 246 A.2d 794 (Del. Supr. 1968) but it is irrelevant to this case. *Layton* is a medical malpractice action that contains dicta that a fraudulent concealment claim cannot toll a negligence statute of limitations where a surgeon unknowingly left a small piece of metal inside a patient's body.

(citation omitted). A release is overbroad if it could be interpreted to "encompass any claim that has some relationship – however remote or tangential – to any "fact" "act" or conduct 'referred to" in the Action. In other words, a release is overly broad if it releases claims based on a common set of tangential facts, as opposed to operative or core facts." *Id*. *Bader* does not even challenge the accounting for the stock options or the financial statements included in Lehman's Form 10-K's. Therefore, the release may not be interpreted to extinguish Plaintiffs' claims in this case.

### C.    Plaintiffs Have Sufficiently Alleged Claims Based On The Backdated RSUs.

Defendants also argue that the claims based on Lehman's Restricted Stock Units (the "RSUs") should be dismissed because the Consolidated Complaint supposedly lacks any detail about the backdated RSUs. In the Consolidated Complaint, Plaintiffs allege, among other things:

- The time period when Defendants backdated their RSUs, *see* ¶7 (alleging that the "RSU grants occurred between 1997 and August 2002");

- The way that Defendants treated the RSUs for accounting purposes, ¶7 (alleging that "Lehman measure the amount of the compensation costs of the RSU's based on the market value of Lehman's common stock on the grant date of the RSU's, and then amortized and recognized the compensation expense over the vesing period, generally five years form the grant date"); and

- The reasons why the backdating of the RSUs rendered Lehman's financial statements false, *see* ¶6 (alleging that Lehman's financial statements were false because they "fail[ed] to report as compensation costs and amortize as expense the true higher values of [the Company's] RSU's based upon the higher values of Lehamn common stock at the RSU's actual grant dates.").

These allegations – when considered together with the empirical evidence that Plaintiffs have provided showing that Defendants backdated their other stock based awards – are sufficient to sustain the claims based on the backdated RSUs.

**D.    The Statute Of Limitations Does Not Bar Plaintiffs' Claims.**

A three year statute of limitation governs the claims set forth in the complaint. *In re Tyson Foods*, 919 A.2d at 584.    However, Delaware law is well settled that a statute of limitations can and must be tolled under various theories of equitable tolling in situations identical to this case. *Id.* at 584-85.  The doctrine of "fraudulent concealment" requires that the limitations period be disregarded when a defendant by use of an "actual artifice" "either prevents a plaintiff from gaining knowledge of the facts" or "put[s] a plaintiff off the trail of inquiry." *Ryan*, 918 A.2d at 360, quoting *In re Dean Witter P'ship Litig.*, 1998 WL 442456 at *4-6 (Del. Ch. July 17, 1998).  The holding in *Ryan* is dispositive: the statute of limitations must be tolled in this case.  The *Ryan* court stated:

> where plaintiff alleges that defendants intentionally falsified public disclosure, defendants may not rely on the statute of limitations as a defense until plaintiff is placed on inquiry notice that such filings were fraudulent." . . . Inaccurate public representations as to whether directors are in compliance with shareholder-approved stock option plans constitute fraudulent concealment of wrongdoing sufficient to toll the statue of limitations.

*Id*.  Thus an inaccurate public representation by the directors is sufficiently misleading that it excuses the plaintiff from filing within the three year statute of limitations.  The Consolidated Complaint in this case fully pleads all the elements necessary to satisfy the fraudulent concealment doctrine.[10]  By issuing false disclosures about the circumstances of the stock option awards in the Company's Form 10-K's filed year after year, the Defendants concealed that the

---

[10] The Complaint also properly pleads that the statute of limitations is tolled under two other theories. Under the doctrine of inherently unknowable injuries the statute will not run "where it would be practically impossible for a plaintiff to discover the existence of a clause of action."  Finally, "the doctrine of equitable tolling stops the statute from running while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary." *Tyson Foods,* 919 A.2d at 585.

32

grants were backdated and impeded Plaintiffs' discovery of the truth.  (Consolidated Complaint ¶¶90 -116).

Under any theory of tolling, the statute of limitations is tolled until the "plaintiff discovers, or in the exercise of reasonable diligence should have discovered, his injury." *Ryan* at 359.  The very earliest that the Plaintiffs in this case could have been on notice that defendants might have been backdating the stock options to unlawfully line the pockets of their already highly paid executives and themselves at the expense of the shareholders was in mid 2006 when academic statistical studies began appearing in the media illuminating the widespread industry practices described in the Complaint.  The Plaintiffs in this case acted with alacrity (far greater than did the Lehman Board of Directors who did not even make a pretense of reviewing the Company's option grant practices despite the greater information readily available to them) and immediately retained a statistical expert to review Lehman's stock option grant patterns and calculate the probabilities that the advantageous grant dates occurred by chance.  When, as a result, the misconduct became clear, Plaintiffs filed this suit.  Accordingly all the claims in this complaint were filed well within the three year limit of the earliest possible date of inquiry notice (March 2006) and none of the claims are subject to dismissal under statute of limitations grounds.

## III.    The Named Plaintiffs Have Standing To Allege The Bulk Of The Claims Alleged In The Complaint.

Defendants allege that none of the three Plaintiffs have standing to assert *any* claims based on the three stock options (dated January 9, 1997, December 11, 1997 and December 14, 1998) that were granted prior to October 19, 1999 on the grounds that none of the Plaintiffs owned stock prior to October 19, 1999.  In fact, the named Plaintiffs can properly sue for claims based on either stock options that were granted or false financial statements published after this

33

October 1999 date. Defendants do not contest that at least one of the Plaintiffs, IBEW, did continuously own shares since October 19, 1999 and therefore does have standing to assert all the claims against Defendants for the six post-October 1999 backdated stock options. There is also no dispute that under both Rule 23.1(b)(1) and settled Delaware authority, a plaintiff must have been a shareholder at the time of the "transaction complained of." *See Conrad*, 940 A.2d at 41. The question is, with respect to the stock options that were granted *before* October 1999 and which should have appeared as compensation expense on financial statements issued *after* October 1999, what "transaction" is being challenged in this lawsuit?

Essentially the Plaintiffs are challenging two separate and distinct groups of illegal transactions. The first transactions concern the *grant* of the illegal backdated stock options. As to these transactions, Plaintiffs agree that they lack standing to assert claims for the three stock option grants that occurred before they became owners of Lehman stock. Therefore Plaintiffs do not dispute that they lack standing to assert Counts One (*ultra vires* acts), Three (gross mismanagement), Four (misappropriation and/or waste), and Five (unjust enrichment) based on the three pre-ownership stock option grants.

The second group of challenged transactions concerns the approval and signing of false statements and financial accounting in the Form 10-K's. These are separate, actionable claims. *See, e.g., Saito v.* McCall, C.A. 17132-NC, 2004 WL 3029876 (Del. Ch. 2004) (plaintiff had standing to raise claims based on dissemination of allegedly false proxy statement that did not predate plaintiff's stock ownership); *see also In re Apple Computer, Inc.*, 2007 WL 4170566 (N.D. Cal. Nov. 19, 2007) (plaintiff could have standing to allege claims based on Section 10(b) and Rule 10(b)(5) for dissemination of fraudulent financial statements even though plaintiff lacked standing to challenge the backdated option grants).

As detailed in the Consolidated Complaint (¶¶88-94), where the safe harbor of APB 25 is not satisfied (as occurred here because of the backdating), and where the stock options vested over a four and a half year period, the accounting rules require that an allocable portion of the expense attributable to the backdated options had to be recognized and reported on the Company's income statements year after year over the entire period the options vested. Thus, *e.g.,* backdated options granted in December 2001, would impact every financial statement filed for the years ended November 30, 2002 through November 30, 2006 (which was actually filed with the SEC in February 2007). Each of the Form 10-K's containing the false financial statements, in the footnotes to the financial statements, also falsely represented that no expense was reportable for the stock options under APB 25 because the Company had priced the options as of the grant date. These unlawful "cover-up" transactions, the filing of false financial statements by the Board, are not simply "tag-along" claims: they support a set of claims under Count Two (for breach of fiduciary duty) and Six (misrepresentation and fraudulent concealment). The heart of the claim is the signing and disseminating to the public of false financial statements and it does not matter whether these false statements related to stock option *grants* that were made before or after Plaintiffs purchased Lehman stock. In short, Plaintiffs have standing to assert claims that occurred *after* they purchased Lehman stock and they do not lose standing merely because the original wrongful transaction– *granting* the option – occurred before the Plaintiffs owned their shares.

Apart from the standing, a separate issue is whether the three pre-ownership stock option grants are considered relevant for any purpose -- *e.g.*, to add weight to Plaintiffs' other substantive claims or to the showing of demand futility. The law in Delaware is well settled that "regardless of whether [a plaintiff] has standing to sue, events occurring before his ownership are

relevant to the demand futility analysis." *See In re MIPS Technologies*, *Inc. Derivative Litig*. 2008 WL 131915 at *6 (N.D. Cal. Jan. 11, 2008) quoting *Melzer,* 934 A.2d at 918-20.  Similarly, it is entirely appropriate to include the three pre-ownership grants in the statistical analysis to see whether there is a pattern and practice of backdating the stock options to correspond to the lowest or next lowest trading price for the month the option was granted.  *See In re Zoran*, No. C 06-05503WHA, 2007 WL 1650948 at *16 (N.D. Cal. June 5, 2007) ("Plaintiff cannot assert claims based on grants occurring before he acquired his stock . . . . he may still refer to grants before that date to establish Zoran's management had a predisposition to engage in backdating.") Thus, even if the Plaintiffs lack standing to challenge the three pre-ownership *grants* of stock options, those grants can still be examined both for determining whether a demand on the Board would have been futile and also to prove Plaintiffs' case in chief.  The backdating statistical analysis in this case which was properly based on all 9 grants showed the statistical odds of Lehman's stock option granting pattern occurring as a result of chance to be an astronomical more than 18 billion to one.

## <u>CONCLUSION</u>

For the reasons stated herein, Defendants' motions to dismiss the Consolidated Complaint should be denied.

Dated:  April 21, 2008                    Respectfully submitted,

                                          SCOTT + SCOTT LLP


                                          S/
                                          _____
                                          Beth A. Kaswan (BK 0264)
                                          Judith S. Scolnick (JS 0827)
                                          29 West 57th Street, 14th Floor
                                          New York, NY  10019
                                          Telephone:  212/223-6444
                                          Facsimile:  212/223-6334
                                          bkaswan@scott-scott.com
                                          jscolnick@scott-scott.com

                                          SCOTT + SCOTT LLP
                                          David R. Scott (DS 8053)
                                          108 Norwich Ave.
                                          P.O. Box 192
                                          Colchester, CT 06415
                                          Telephone:  860/537-5537
                                          Facsimile:  860/537-4432
                                          drscott@scott-scott.com

                                          SCOTT + SCOTT LLP
                                          Geoffrey M. Johnson
                                          12434 Cedar Road, Suite 12
                                          Cleveland Heights, OH  44106
                                          Telephone:  216/229-6088
                                          Facsimile:  216/229-6092
                                          gjohnson@scott-scott.com

                                          ROBBINS UMEDA & FINK, LLP
                                          Brian J. Robbins
                                          Jeffrey P. Fink
                                          Felipe Arroyo
                                          Arshan Amiri
                                          610 West Ash Street, Suite 1800
                                          San Diego, CA  92101
                                          Telephone:  619/525-3990
                                          Facsimile:  619/525-3991

                                          **Counsel for Plaintiffs**

37